## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ANDREW HANSON** | ) | |
| **TYLER YZAGUIRRE** | ) | |
| **NATHAN CHANEY** | ) | |
| **ERIC KLUN** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-2256 |
| | ) | |
| **DISTRICT OF COLUMBIA**, | ) | |
| Serve: Mayor Muriel Bowser | ) | |
| 1350 Pennsylvania Avenue, NW | ) | |
| Washington, DC 20004 | ) | |
| | ) | |
| c/o Office of Attorney General | ) | |
| 1 Judiciary Square | ) | |
| 441 4th Street, N.W., 6th Fl. South | ) | |
| Washington, D.C. 20001 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **ROBERT J. CONTEE III** | ) | |
| Metropolitan Police Department | ) | |
| 300 Indiana Avenue, N.W. | ) | |
| Washington, DC 20004 | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,
### AND DAMAGES

COME NOW the Plaintiffs, Andrew Hanson, Tyler Yzaguirre, Nathan Chaney, and Eric

Klun, by and through their undersigned counsel, and file this complaint for declaratory, injunctive

relief with respect to DC Code Section 7-2506.01(b) and damages for the enforcement of that code

section against Plaintiffs.

**THE PARTIES**

1.      Plaintiff Andrew Hanson is a natural person and a citizen of the United States and of the District of Columbia. He owns registered firearms within the District of Columbia. He also holds a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department ("MPD"). He regularly carries a concealed firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess and use such magazines within the District of Columbia for all lawful purposes including for self-defense within the home and outside the home.

2.      Plaintiff Tyler Yzaguirre is a natural person and a citizen of the United States and of the District of Columbia. He owns registered firearms within the District of Columbia. He also holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess and use such magazines within the District of Columbia for all lawful purposes including for self-defense within the home and outside the home.

3.      Plaintiff Nathan Chaney is a natural person and a citizen of the United States and of the Commonwealth of Virginia. He holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed registered firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would

possess such magazines within the District of Columbia for all lawful purposes including self-defense.

4.     Plaintiff Eric Klun is a natural person and a citizen of the United States and of the State of Maryland. He holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed registered firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess such magazines within the District of Columbia for all lawful purposes including self-defense.

5.     Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, Section 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States. Congress has chosen to delegate much of its power to make laws for the governing of the District of Columbia to the mayor and city council of the District.

6.     Defendant Robert J. Contee III is the Chief of the District of Columbia's MPD. Defendant Contee is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs, and practices against Plaintiffs, and is in fact presently enforcing the challenged laws, customs, and practices against Plaintiffs. Defendant Contee is sued in both his individual and official capacities.

**JURISDICTION AND VENUE.**

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988. Plaintiffs' claims for declaratory and

injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

8.      Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## STATEMENT OF FACTS.

### The Second Amendment.

9.      The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

10.      The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *New York State Rifle and Pistol Association v. Bruen,* 597 U.S. __, Case No. 20-843, slip op. (June 23, 2022) (hereinafter "*Bruen*"); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (per curiam) (hereinafter *"Caetono")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter *"Palmer"*).

11.      Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

12.      The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1.

4

**The statutory scheme.**

13.     This action challenges the constitutionality of DC Code Section 7-2506.01(b). This Section outlaws the possession of so-called large capacity ammunition feeding devices. Specifically, this section provides:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

14.     Pursuant to DC Code Section 7-2507.06(a)(4) possession of what the District defines as a large capacity feeding device is a felony carrying a penalty of up to three years in prison. In addition, conviction can result in the imposition of a fine of up to $12,500. DC Code Section 22-3571.01(b)(6).

15.     The term "large capacity feeding device" as used in the Code is not a technical term used in the firearms industry or community. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that come standard with magazines holding more than 10 rounds, and which are owned by millions of law-abiding American citizens for lawful purposes. Plaintiffs refuse to adopt the District's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Magazines" shall have the same meaning as the term "large capacity feeding device" in section DC Code Section 7-2506.01(b).

**DC Code Section 7-2506.01(b) infringes Plaintiffs' right to keep and bear arms.**

16.     Pursuant to the Supreme Court's decisions in *Bruen, supra,* and *District of Columbia v. Heller*, *supra*, and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to keep firearms in common use in the home and to carry a handgun in public for self-protection. A necessary component of the right to own or carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than perhaps as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) (the ability to train and practice with a firearm is protected by the Second Amendment). Likewise in order to employ ammunition in a firearm, it is necessary to possess and use ammunition feeding devices such as the Banned Magazines.

17.     Plaintiffs currently own and possess Banned Magazines outside the District. Plaintiffs desire to possess the Banned Magazines in the District for all lawful purposes including self-defense. Moreover, they wish to acquire more Banned Magazines and use their Banned Magazines for all lawful purposes, including self-defense.

18.     The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *Heller,* 554 U.S. at 627. The D.C. Circuit addressed this commonly owned issue with respect to the Banned Magazines in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"*).* There the majority opinion stated, "As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten." *Id.* at 1261.

19.     Inasmuch as the decision in *Heller II,* upholding the ban on magazines holding in excess of 10 rounds was based on an application of so-called intermediate scrutiny, that decision has been abrogated by *Bruen,* slip op. at 13-15, which specifically rejected the application of means/ends balancing tests like intermediate scrutiny to firearms regulations in favor of the text, history and tradition approach favored by the dissenting opinion of then judge, now Justice Kavanaugh. *See Heller II,* 670 F.3d at 1269-96.

20.     Similarly, the 4th Circuit in Kolbe v. Hogan addressed the commonly owned issue. 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen, supra.* In his dissent (which, after *Bruen,* likely represents the correct interpretation of the law), Judge Traxler stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds. Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds.

Id., 849 F.3d at 154 (Traxler, J. dissenting) (internal citations and quotation marks omitted).

21.     Law-abiding citizens own literally tens of millions of Banned Magazines such as those owned and possessed by Plaintiffs. The District's prohibition on the possession of the Banned Magazines owned by Plaintiffs violates the Second Amendment because it prohibits the possession of a commonly owned component of an arm protected by the Second Amendment..

22.     There is an actual and present controversy between the parties. The District infringes on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of magazines commonly possessed by millions of Americans for lawful purposes. Plaintiffs desire a judicial declaration that DC Code Section 7-2506,01(b), facially and/or as applied to them, violate their constitutional rights. Plaintiffs should not be forced to

choose between risking criminal prosecution and exercising their constitutional rights. The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

23.     Plaintiffs are injured by Defendants' enforcement of the DC Code Section 7-2506.01(b) as this provision violates Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide. If not enjoined by this Court, Defendants will continue to enforce this provision in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Though Plaintiffs seek damages for the violation of their Second Amendment rights, damages appear indeterminate or unascertainable beyond a nominal amount and, in any event, would not fully redress the harm Plaintiffs are suffering.

24.     Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate, consistent with the nation's historical tradition of firearms regulation, the manner of keeping and carrying arms, and may prohibit certain arms in narrowly defined sensitive places, prohibit the keeping and carrying of arms that are not within the scope of the Second Amendment's protection, such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Bruen, slip. op.* at 13; *Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. However, when such regulations impinge on the ability of law-abiding persons to protect themselves and others, such laws are invalid unless supported by the text of the Second Amendment or by historical analogues existing at the time of, or in close proximity to, the founding. *Bruen, slip op.* at 13.

25.     Given the decision in *Bruen and Heller*, the District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen, slip op.* at 13. *See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015); *Wrenn*, 864 F.3d 650; *Palmer*, 59 F.Supp.3d 173.

26.     The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection.

27.     The prohibiting on the Banned Magazines places Plaintiffs at risk in the event of a deadly force criminal attack by limiting the number of rounds Plaintiffs may rapidly bring to bear to protect their lives. There are two ways to stop a deadly force attack. The first is to persuade the attacker to stop. This could potentially be accomplished through verbal persuasion such as an appeal to morality and humanity; however, in the real world once someone has committed to the use of deadly force in the commission of a violent crime, he is not likely to be talked out of it. A more likely means of persuasion is the threat or application of deadly force in response. Indeed, most crimes which are stopped by armed citizens do not require the firing of a single shot. Similarly, an assailant who has been shot at or hit may decide he has made a grievous error in the victim selection process and break off the attack.

28.     Not all criminals, however, are persuadable. To stop those criminals, it is necessary to incapacitate them before they can inflict serious bodily harm or death. This can be done by

causing sufficient trauma and blood loss so that the attacker loses the ability to cause harm. Handgun bullets, however, are rather weak for this purpose as has been proven by numerous officer involved and civilian shootings.

29.     For example, Jacksonville Police Officer Jared Reston fired 14 shots in attempting to stop a shoplifter who carried a handgun chambered in .45 caliber, one of the larger caliber pistol bullets. The suspect shot Reston once in the face and proceeded to fire 11 more rounds, six of which struck Reston who survived the gun fight. Reston managed to hit the suspect seven times, ending the fight only with a final shot to the suspect's head. *See* Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html. *See also* Purkiss, Locked Back*, Lessons from Jered Reston's Gun Fight – Shot 7 Times & Still Won* (December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-times-still-won/. In a video where Reston goes into detail concerning the incident, he states that if he had had to reload, he would have been killed. Reston, Winning an Armed Encounter, Speech Delivered at McHenry County College (December 4, 2017), available at https://www.youtube.com/watch?v=jIx0Y25aTfU.[1]

30.     Noted police and civilian firearms instructor and use of force expert Massad Ayoob illustrates this point with two shooting incidents, one involving a civilian and the other involving a law enforcement officer:

> Famed Los Angeles watch shop owner Lance Thomas was involved in multiple gun battles with armed robbers, winning every one. In one of those incidents, he had to

---

[1] Reston explained, "I am a huge capacity person. A good workable caliber with capacity. If I were to have like a single stack 1911 or any single stack gun at that point, I would have had to reload in to there somewhere and that reload would have probably cost me my life." *Id.* at 17:47-18:07. "I'm a pretty good reloader and I can do it under two seconds, but that's almost 50 percent of damn gun fight itself I would have wasted reloading." *Id.* at 18:09-18:17.T

fire 19 rounds before the last of his multiple opponents was out of the fight. Some bad guys can soak up an unbelievable amount of lead, and the cunning ones run and use cover, making them harder to hit and requiring more shots to stop them.

A municipal police sergeant in northern Illinois, Tim Gramins, comes to mind. He pulled over a heavily armed suspect who came out shooting, and the fight was on. In just under a minute, the perpetrator was finally down and dead. During that time, Gramins had fired 33 rounds from his Glock 21 pistol, reloaded as necessary and hit his opponent 14 times with 230-grain Gold Dot .45 bullets. Six of those hits were in what most of us would call "vital zones," but the fight wasn't over until Gramins finally had the opportunity for brain shots. During that fight the suspect had gone through two semi-automatic pistols himself and had fired 21 shots.

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/.

31.   Wisconsin officer Brian Murphy was shot 15 times by a mass murdering white supremist. Only three of those rounds were stopped by his body armor. Other shots hit him in the face, throat, both hands, both arms, and both legs. Despite these grievous injuries, he survived. *See* Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/.

32.   In commenting on another incident in which a suspect was shot 17 times with both .40 caliber 180 Gr. Gold Dot hollow point pistol rounds and .223 Hornady TAP rifle rounds and was still struggling with police as he was being handcuffed, a report of the FBI's Defensive Systems Unit – Ballistic Research Facility, FBI Academy, stated, "Determined individuals can sustain many gunshot wounds in areas that produce great pain and continue to fight a long time, even without the aid of drugs or alcohol. Shot placement is everything in a gunfight and always the key to stopping a threat effectively." FBI, *Officer Involved Shooting*, available at https://info.publicintelligence.net/FBIAAROfficerShooting.pdf. In that gun fight, two officers

fired a total of 107 rounds. The suspect fired 26 rounds, reloading his magazine from a box of loose ammunition. *Id.*

33.     Perhaps one of the more influential gun fights, which has since profoundly affected doctrine on gun selection and ammunition caliber and quantity, is the 1986 FBI Miami shootout. *See generally,* Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017). In that incident two bank robbers shot it out with a team of FBI agents. "Early in the fight, a bullet from [FBI agent Jerry] Dove's 9mm pistol pierced the opposing rifleman's arm and into his chest, slicing an artery and inflicting a 'fatal, but not immediately neutralizing' hit when it stopped short of his heart. It was after that, that he [the bank robber] inflicted most of the deadly damage." Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/. The assailant would go on to take five more hits from the agents' guns until Agent Edmundo Mireles killed him with a shot to the head. Two FBI agents died and five were seriously wounded in that incident.

34.     These various incidents and many others present the reality of firearms and ammunition count in self-defense. One can never know how many rounds will be sufficient to stop a determined opponent. Even a shot in the face is no guarantee that it will incapacitate an opponent.[2] In his video presentation, Officer Reston explained that on the Jacksonville, Florida Department, he and two other officers had been shot in the face, but each went on to prevail against their assailants. *See* Reston, *Winning an Armed Encounter*, supra, at 23;50-24:24, available at

---

[2] Head shots are generally considered to be fight stoppers because a shot to the brain likely will shut down the attacker. By definition, a shot to the head is aimed at a small target, compared to a center mass shot, and requires considerably more skill in a life-or-death situation.

https://www.youtube.com/watch?v=jIx0Y25aTfU. Limits on ammunition such as the District has adopted here bear almost no relationship to reality.

35.     Reloading a firearm takes precious seconds that a victim may not have during a criminal attack. SWAT officer Jared Reston may be able to reload his pistol in two seconds, but the average citizen gun owner is much slower. Moreover, there may be circumstances where reloading is impossible. Reloading a semi-automatic handgun requires the use of two hands. That might not be possible under certain circumstances. For example, a person attempting to fend off an attacker in physical contact with him or her, likely will not have both hands free to reload an empty gun. Likewise, a homeowner awakened at night by the sound of a break in will likely have a firearm in one hand and flashlight in the other, and no room for a second magazine. The Chief's rule thereby imposes a severe and substantial infringement on the ability of Plaintiffs to use their self-defense firearms for the lawful protection of themselves and others. This is especially the case in which a licensed concealed carrier or armed District homeowner might be set upon by multiple assailants as is the case for residents of those neighborhoods in the District where gangs are prevalent. *See, e.g.,* Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%20the,can%20result%20in%20serious%20bodily%20injury%20or%av20death. *See also* Samson, *4 arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-Madison*, Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-including-15-old-174154164.html?fr=sycsrp_catchall; Ayoob, *Lead and diamonds: the Richmond jewelry store shootout.     (The     Ayoob     Files)*     (2003),     available     at

https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shoot

out.+(The+Ayoob...-a099130342.

36.     We note that District police officers are mandated to carry 52 rounds for their self-

defense when on duty with their Glock 17 pistols: one in the chamber, a full magazine of 17 rounds,

and two additional full 17 round magazines.[3] What is good for MPD officers, however, is forbidden

to the D.C. residents and out of state persons who D.C. concealed pistol license holders. Yet, those

license holders have undergone rigorous training and background checks which are among the

most demanding in America.

**SECTION 7-2506.01(b) LACKS ANY HISTORIC ANALOGUE**.

37.     Plaintiffs are unaware of any founding era limitations on the capacity of firearms a

person could own or carry to defend himself from an assailant. The District of Colorado recently

addressed a similar magazine ban in *Rocky Mountain Gun Owners v. Town of Superior,* Case No.

22-cv01685. There Judge Raymond P. Moore issued a Temporary Restraining Order against the

town's ordinance which, inter alia, banned magazines like the Banned Magazines at issue in this

case. Applying the test the Supreme Court articulated in *Bruen,* Judge Moore stated, "the Court is

unaware of historical precedent that would permit a government entity to entirely ban a type of

weapon that is commonly used by law-abiding citizens for lawful purposes whether in an

individual's home or in public." *Id.* Doc. 18 at 10.

---

[3] *See* MPD General Order RAR-901.01 (Handling of Service Weapons) at 4 (June 12, 2008).
Unlike MPD officers, District citizens are limited to 10 round low-capacity magazines, rather than
the standard capacity magazines that come stock with most semi-automatic pistols such as the
Glock 17 (17 round capacity standard magazine) or the Glock 19 (15 round capacity standard
magazine). *See Duncan v. Bonta,* Case No. 21-1194, Petition for Writ of Certiorari (February 28,
2022), cert. granted, vacated and remanded, 597 U.S. __ (June 30, 2022).

38. Prior cases involving bans on magazines, such as the Banned Magazines at issue in this case, failed to elicit any historical justification as required by *Bruen. See generally Heller II,* 650 F.3d 1244; *Kolbe v. Hogan,* 849 F.3d 114; *Duncan v. Bonta*, No. 19-55376 (9th Cir.) (en banc) (opinion issued Nov. 30, 2021; mandate stayed in part pending petition for certiorari Dec. 20, 2021), cert granted, vacated and remanded (June 30, 2022); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), cert. denied, 141 S. Ct. 109 (2020); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J. ("ANJRPC")*, 910 F.3d 106 (3d Cir. 2018).; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("NYSRPA"), 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).

39. Firearms with ammunition capacity in excess of 10 rounds date back to the 1500s. Professor David Kopel has done the heavy lifting researching the history of firearm ammunition capacity and restrictions. *See* Kopel, *The History Of Firearm Magazines And Magazine Prohibitions,* 78 Albany L. Rev. 849 (2015) (hereinafter "Kopel"). He reports the first known firearm able to fire more than ten rounds without reloading was a 16-shot gun created around 1580. *Id.* at 852. Another early design was the 11-round "Defence Gun," patented in 1718 by inventor James Puckle. *Id.*

40. Professor Kopel further explains that when the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 22-shot magazine capacity. *Id.* at 853. Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition. *Id.* One shot from that gun could penetrate a one-inch-thick wood plank or take down an elk. *Id.*

41. Firearm technology progressed rapidly in the 1800s as manufacturers sought to produce reliable firearms with greater ammunition capacities for consumers. *Id.* 1821 saw the introduction of the Jennings multi-shot flintlock rifle, which could fire 12 shots before reloading.

*Id.* "Pepperbox" pistols began to be produced in America in the 1830s. *Id.* at 853-54. These pistols had multiple barrels that would fire sequentially. *Id.* at 854. Although most were produced as five or six shot models, 12 shot, 18 shot and 24 shot models were produced. *Id.* Pepperboxes were eventually supplanted by revolvers. *Id.*

42.     A variety of other firearms having a capacity in excess of 10 rounds were invented in the antebellum years, including the Bennett and Haviland Rifle (12 shot); and rifles invented by Alexander Hall (15 shots) and by Colonel Parry W. Porter (38 shot). *Id.*

43.     Daniel Wesson and Oliver Winchester produced the first metallic cartridges similar to modern ammunition. *Id.* They also invented a lever action firearm that employed these cartridges. *Id.* In 1855, they introduced the Volcanic rifle, with up to a 30-round tubular magazine under the barrel. *Id.* at 855. In 1862, the Volcanic evolved into the 16-round capacity Henry lever action rifle. *Id.* The Henry rifle further evolved into the Winchester repeating rifle, Model 1866. *Id.* According to advertising, the M1866 could be fired 30 times a minute or with 17 rounds in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds." *Id.* Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a 15-round capacity. *Id.* at 856. The Evans Repeating Rifle came on the market in 1873 with a rotary helical magazine in the buttstock that held 34 rounds. *Id.*

44.     Pin-fire revolvers with capacities of up to 20 or 21 rounds entered the market in the 1850s. *Id.* For revolvers with other firing mechanisms, there were some models with more than 17 rounds. *Id.* The 20-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity. *Id.*

45.     The semiautomatic firearm with a detachable magazine was invented before the turn of the 20th century. *Id.* at 857. In 1896, Germany's Mauser introduced the C96 "broomhandle"

pistol, which remained in production until the late 1930s. *Id.* It has capacities ranging from a low of six to a high of 20 rounds. *Id.* The Luger semiautomatic pistol was brought to the market in 1899. *Id.* The most common magazines were seven or eight rounds, but there was also a 32-round drum magazine. *Id*

46.   The 20th Century saw a variety of rifles with magazines capable of holding more than 10 rounds, ranging from various .22 plinking rifles to the M-1 carbine introduced in 1927 to the AR-15 introduced in 1963, followed by such rifles as the Springfield M1A and the Ruger mini-14. *Id.* at 857-60.

47.   Firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. *Id.* at 861. In 1935, Browning introduced the Hi-Power pistol. *Id.* This handgun was sold with a 13-round detachable magazine and is still in production. *Id.* The Beretta model 92, a nine-millimeter pistol with a 16-round magazine, entered the market in 1976. *Id.* Browning introduced another popular handgun in 1977, the 14-round BDA (Browning Double Action). *Id.* Also coming on the market at that time were European handguns such as Austria's L.E.S. P-18 (18 rounds) and Germany's Heckler & Koch VP 70Z (also 18 rounds). *Id.* at 861-62. And the Austrian manufactured Glock 17 pistol (17 round magazine), now standard issue for a majority of law enforcement agencies in the United States, was introduced into the country in the 1980s. *See* Barrett, Glock: The Rise of America's Gun (2012).

48.   When the Second Amendment was adopted no laws restricted ammunition capacity. Kopel at 864. The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. *Id.* In 1927, Michigan prohibited

firearms which could be fired more than 16 times without reloading. *Id.* That same year Rhode Island banned semi-automatic firearms which could fire more than 12 shots without re-loading. *Id.*

49.     In 1959 Michigan repealed its ban and Rhode Island amended its limit to 14 shots, excluding .22 caliber rimfire guns. *Id.* at 864-65. Rhode Island repealed its limit in 1975. *Id.* at 865. Neither statute covered a bare magazine that was not inserted into a firearm. *Id.*

50.     Ohio enacted a 1933 law requiring a special permit for possession or sale of a semiautomatic firearm with an ammunition capacity of greater than 18 rounds. *Id.* In 1971, the state exempted .22 caliber firearms, and raised the limit for other calibers to 32 or more rounds. *Id.* The Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. *Id.* With or without the permit, one could buy a 60-round magazine in Ohio. *Id.* The licensing law was repealed in 2014. *Id.*

51.     The only statute continuously in effect from the prohibition era limiting magazine capacity is the District's. *Id.* at 866.[4] In 1932, Congress prohibited the possession in the District of a firearm that "shoots automatically or semiautomatically more than 12 shots without reloading." *Id.* Prior to the *Heller* decision, the District interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns. *Id.* The District stands alone in its historical restriction of magazines, and the law in question is not of founding era pedigree. *Id. See Bruen, slip op.* at 57 (finding that a Texas 1873 law and a West Virginia 1900 restricting public carry of handguns were outliers). Moreover, *Bruen, slip op.* at 58 n.28 specifically rejected 20th Century firearm restrictions as historical evidence, stating, "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-

_____

[4] *See* Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.

52.     The only widespread restriction on magazine capacity came in 1994 when Congress banned new magazines holding more 10 ten rounds. *Id.* The law sunset in 2004. *Id.* The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others. *Id.* The final report concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury ...." *Id.* at 866-87[5] Further, "the ban has not yet reduced the use of [such magazines] in crime ...." *Id.* Doctor Koper noted also that state-level firearm bans have not had an impact on crime. *Id.* As discussed above, *Bruen* renders the 1994 Congressional act historically irrelevant.

53.     Professor Kopel observes that of the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being "longstanding" or part of American history and tradition. *Id.* at 883-84. The opinion in *Bruen* requires a historical analogue to have been well-established. *Bruen, slip op.* at 21 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.") *Bruen* in fact found insufficient New York's reliance on the laws of  "a handful of late-19th-century jurisdictions" to justify its restrictive firearm carry regime. *Bruen, slip op.* at 29. It is clear from the discussion above that Ammunition capacity limits are far outside the norm of the traditional exercise and regulation of Second Amendment rights. Kopel at 884.

---

[5] Quoting Koper, et al., An Updated Assessment Of The Federal Assault Weapons Ban: Impacts On Gun Markets And Gun Violence, 1994–2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

54.     In sum, no regulations from around the time of the adoption of the Second or 14th

Amendments limited the ammunition capacity of a firearm. Firearms with ammunition capacity in

excess of 10 rounds have been available since well before the Second Amendment was adopted.

Restrictions on ammunition capacity being  of only recent vintage are not supported by reference

to the nation's historical regulation of firearms.

55.     Certain 20th Century hunting regulations generally do restrict the number of

shotgun shells or rifle rounds allowable in a hunting weapon. However, these are conservation

regulations designed to prevent overhunting and are obviously not of founding era pedigree as

*Bruen* requires. As one commentator has explained it,

> At the behest of […] hunters, laws were passed to better regulate hunting in the
> United States. Laws created bag limits, possession limits, sectioned off certain plots
> of land as refuges for birds. This is also where we got laws banning the sale of wild
> game meat (if you have a source of venison that you purchase, it is from a farm).
>
> One set of game laws that rose out of that early movement was magazine capacity
> limits. The idea was that a recreational hunter would only kill one or two birds out
> of a flock, it wasn't considered sporting to blast dozens of ducks out of the water.
> Limiting shotguns to 10 gauge and smaller with only few shells played a big part
> in ending market hunting for birds.
>
> Many laws and hunting etiquette from those early days has carried over into the
> 21st Century. One such law is shotgun magazine capacity. In 1935 the first federal
> law restricting waterfowl hunters to three shots was enacted. As it happened,
> waterfowl populations began to rebound after an all-time low in the mid-30's.

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3,

2021),                   available                   at                   https://backfire.tv/why-shotguns-have-

plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depe

nding%20on%20the%20gauge%20and%20magazine%20length.

56.     Plainly, these types of modern hunting regulations have no nexus to the Second

Amendment's core protection of armed self-defense; nor are they of founding era vintage as *Bruen*

requires. *See Bruen, slip op.* at 30 ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' *Heller*, 554 U.S., at 634-635 (emphasis added).") Since no historical analog for limiting the capacity of firearm magazines exists, the District's limitation as set forth in DC Code Section 7-25506.01(b) fails Second Amendment scrutiny. *See Bruen, slip op.* at 67.

57.     In *Heller,* the Supreme Court eschewed balancing tests for evaluating the Constitutionality of regulations burdening the Second Amendment. *Heller,* 554 U.S. at 576-627. The just recently released *Bruen* decision makes it abundantly clear as to the Constitutional test for governmental restrictions on Second Amendment conduct, and the District cannot meet this test with respect to the regulation here at issue:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg [v. State Bar of California]*, 366 U.S., [36,] 50, n. 10 [(1961)].

*Bruen, slip op.* at 20 (2022).

58.     Accordingly, it would be error for the Court to evaluate the regulation at issue under some type of the means-end tiers of scrutiny approach *Bruen* specifically rejects. *Id.* at 15. The appropriate test is the text of the Second Amendment and the nation's historical tradition of firearms regulation. The D.C. magazine ban fails this test. Because there is no historic tradition in this nation of limiting firearm magazine capacity, the District's prohibition on possession of

magazines having a capacity in excess of 10 rounds is unconstitutional as violative of the Second Amendment.

**FIRST CLAIM FOR RELIEF: U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS.**

59.     DC Code Section 7-2506.01(b)'s prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds is not supported by the nation's historical tradition of firearms regulation. As such the law violates Plaintiffs' Second Amendment rights.

60.     DC Code Section 7-2506.01(b) prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds violates the Second Amendment to the United States Constitution, facially and as applied against the individual Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against DC Code Section 7-206.01(B), and damages for the violation of their Second Amendment rights.

**SECOND CLAIM FOR RELIEF:**

**U.S. CONSTITUTION, AMEND. V, 42 U.S.C. § 1983.**

61.     DC Code Section 7-2506.01(b) prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds is arbitrary and irrational and thus violates the due process clause of the Fifth Amendment to the United States Constitution in light of the Plaintiffs' Second Amendment rights to keep and bear arms for self-defense.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgement be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgement that the DC Code Section 7-2506.01(b) is arbitrary and unreasonable under the Second and Fifth Amendments to the United States Constitution;

2. Enter a declaratory judgement that DC Code Section 7-2506.01(b) violates the Second Amendment to the United States Constitution;

3. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing DC Code Section 7-2506.01(b) within the District of Columbia;

4. Enter an order awarding Plaintiffs damages in an amount to be determined at trial;

5. Enter an order awarding Plaintiffs their costs of suit, including attorneys fees and costs pursuant to 42 U.S.C. §1988; and

6. Enter an order providing any other and further relief that the court deems just and appropriate.

Respectfully submitted,

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

By:      /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   August 1, 2022