## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>     **Plaintiffs,**<br><br>     **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>     **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## APPLICATION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

   I.   The Second Amendment Framework ............................................................... 2

   II.   The Challenged Law ........................................................................................ 4

   III.  Procedural Background ................................................................................... 5

LEGAL STANDARD ........................................................................................................... 7

   I.   Preliminary Injunctive Relief ......................................................................... 7

   II.   Federal Rule of Civil Procedure 65 ................................................................ 7

   III.  Facial And As-Applied Challenges ................................................................ 7

ARGUMENT ....................................................................................................................... 8

   I.   Plaintiffs Are Unlikely To Succeed On The Merits Because They Fail To Show That The Second Amendment Protects Large Capacity Magazines ........................................................ 8

      A.   LCMs are not "Arms" under the Second Amendment. ................................................ 9

      B.   Even if LCMs are "Arms," they are not protected by the Second Amendment because they are not in common use for self-defense. ......................................................... 13

   II.   Plaintiffs Are Unlikely To Succeed On The Merits Because The District's Law Regulates Unusually Dangerous Devices, In Keeping With American Tradition ..................................... 20

      A.   The District need only show that the Law is "relevantly similar" to regulations of dangerous and unusual weapons ..................................................................... 21

      B.   Regulations of dangerous and unusual weapons are ubiquitous in American history. 27

      C.   These historical regulations are relevantly similar to the District's Law. ................. 34

   III.  Plaintiffs Do Not Satisfy The Other Criteria For A Preliminary Injunction. ..................... 39

   IV.  Any Injunction Should Be Limited To Plaintiffs' As-Applied Challenge. ........................ 42

   V.   Defendants Would Be Prejudiced By Consolidation With The Merits ............................. 43

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018)........ 40

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) .................................................................................................................................... 18, 36

*Aymette v. State*, 21 Tenn. 154 (1840) ..................................................................... 32, 35

*Brown v. Maryland*, 25 U.S. 419 (1827)......................................................................... 29, 36

*Burdick v. Takushi*, 504 U.S. 428 (1992)................................................................................ 8

*Caetano v. Massachusetts,* 577 U.S. 411 (2016) .............................................................. 14

*Citizens United v. FEC*, 558 U.S. 310 (2010).................................................................. 42

*Cockrum v. State*, 24 Tex. 394 (1859) ............................................................................ 32

*Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*, 657 F.2d 124 (7th Cir. 1981) ................................................................................................................................ 44

*District of Columbia v. Heller (Heller I)*, 554 U.S. 570 (2008) ........................................... passim

*District of Columbia v. Heller* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ........................ passim

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ............................................... 16, 18, 36, 42

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ....................................... 14, 16

*In re Sealed Case*, 936 F.3d 582 (D.C. Cir. 2019).................................................... 8, 42

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)........................................................... 33

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022)....................................... 8

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ................................................................ passim

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ....................................... 43

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................ 40

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................................ 27

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)............................................... 35, 39

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)..................................... 27

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ....................................................... 3

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .............................. 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)....................... passim

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................ 7

*People v. Persce*, 97 N.E. 877 (N.Y. 1912) ................................................................ 31

ii

*Peruta v. Cnty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) ........................................................ 28

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)........................................................... 7, 40

*State v. Wilburn*, 66 Tenn. 57 (1872)............................................................................... 31

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018).................................................... 12

*United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019).............. 12

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995)........................................ 8, 43

*United States v. Salerno*, 481 U.S. 739 (1987) .................................................... 7, 8, 42

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ............................................................ 7, 44

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)............................. 7, 8

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................................... 7, 40

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ............................................................... 14, 18

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). ................................................ 3, 20

 **Constitutional Provisions**

U.S. Const. amend. II...................................................................................................... 2

**Statutes**

1706-7 Mass. Acts ch. 4, *reprinted in Acts and Resolves Passed by the General Court* 588 (1869), available at https://tinyurl.com/27ubvvvn ................................................................ 29

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10, https://tinyurl.com/2cyczk73 ....................................... 30

1783 Mass. Acts 37, § 2, https://tinyurl.com/nhdsh7w4 .................................................... 29

1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844 .............................................. 29

42 U.S.C. § 1983............................................................................................................... 6

A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57........................................................................................ 29

An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191, https://tinyurl.com/mtxbn4nd........................................................................................ 31

D.C. Code § 7-2506.01(b)................................................................................................. passim

**Rules**

Federal Rule of Civil Procedure 65(a)(2) ................................................................... 6, 7

**Other Authorities**

Bennett & Haviland Many Chambered Revolving Rifle, NRA Museums, http://tinyurl.com/mdejetmd ................................................................................... 23

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021* 16 (2021), https://tinyurl.com/3aff4bft ................................. 14

Christopher S. Koper et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* (2004) (Koper 2004), http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf ......................................................... 37

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Criminology & Pub. Pol'y 147, 151 (2020) (Koper 2020) .................................................. 37

Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj ........................................... 24

Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," November 25, 2008 (Comm. Rep.), https://tinyurl.com/mryzvuuc ..................................................................................................... 5

Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495 (2022) ...................................................................................................................... 24

David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ...................................................................................................................................... 23

Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 Am. J. Pub. Health 1754 (2019), https://tinyurl.com/4hmw3szk ..... ............................................................................................................................................. 38, 41

Matthew Green, Gun Groups: *More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, https://tinyurl.com/586mj8fa 41

Michael Siegel et al., *The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018*, 44 L. & Human Behavior 347 (2020), https://psycnet.apa.org/fulltext/2020-78672-001.html ............................................................ 38

Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J. L. & Contemp. Probs. 331 (2020). ..................................................................................................................................... 18

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017) ...................................................................................................... 34

S. Rep. No. 72-575 (1932) ....................................................................................................... 34

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016) ................................................................................. 21

Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Magazines*, http://vpc.org/fact_sht/VPCshootinglist.pdf. .......................................................................... 38

William R. Williamson, *Bowie Knife*, Texas State Historical Association (Jul. 6, 2017), https://tinyurl.com/mpjzkfsj ..................................................................................................... 32

# INTRODUCTION

In an emergency posture, Plaintiffs ask this Court to break new ground as the first to declare a constitutional right to possess large capacity magazines (LCMs), a gun accessory responsible for the deadliest mass shootings in history.  As concealed carry licensees who already publicly carry semi-automatic pistols for their personal protection, Plaintiffs now wish to enhance their firing capacity with LCMs.  The Court should reject Plaintiffs' novel assertion of a constitutional right to continually fire their semi-automatic pistols more than ten times without reloading, and instead heed the Supreme Court's repeated instruction that the Second Amendment's right to armed self-defense is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 626 (2008)).  Particularly at this early stage of the case, the Court should resist Plaintiffs' invitation to unleash dramatically augmented firing capacity on the public through the extraordinary remedy of a preliminary injunction.  Such a ruling would be premature, endanger residents and law enforcement officers, and imperil public safety—all contrary to the legislature's considered judgment, as well as history and tradition.

First, Plaintiffs have demonstrated no likelihood of success on their Second Amendment claim under the test recently articulated in *Bruen*.  To start, Plaintiffs have failed to show that LCMs are "arms" within the Second Amendment's text.  LCMs are firearm *accessories*, which, since the Founding, have always been considered outside the scope of the Second Amendment. The military-style enhancement that they provide—allowing continual fire of large amounts of ammunition without reloading—is not integral to the operation of a firearm and is neither necessary nor commonly used for self-defense.

Even if LCMs did fall within the scope of the Second Amendment's text, Plaintiffs would not demonstrate a likelihood of success because the District's prohibition on LCMs is entirely consistent with the Nation's tradition of regulating dangerous and unusual weapons.  Even in this preliminary posture, the historical record establishes that the District's law is one in a long line of government restrictions on weapons and enhancements that endanger the public.  As such, it constitutes a permissible legislative response both to dramatic technological developments in firing capacity and to the devastating societal consequences of those technological advances, neither of which existed at the adoption of the Second or Fourteenth Amendments.

Even if this case were a closer call on the merits, Plaintiffs would still not be entitled to a preliminary injunction.  They have failed to show that such an injunction is necessary to save them from irreparable injury, let alone that the balance of equities and public interest favor immediate relief.  Indeed, those factors weigh strongly *against* issuing an injunction at this early stage, as Plaintiffs' desire to possess LCMs pales in comparison to the public interest in preventing violence and mass murder.  Finally, Plaintiffs' premature invitation for the Court to *permanently* enjoin the District's law lacks merit.  Such a move would significantly prejudice Defendants and is an inappropriate way to decide a complicated Second Amendment claim that requires time-intensive historical research.

The Court should thus deny Plaintiffs' requests across the board and allow Defendants to conduct the discovery necessary for this Court to properly resolve the issues in this case.

## BACKGROUND

### I.   The Second Amendment Framework

The Second Amendment ensures that "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  This provision codified the right of "ordinary,

law-abiding," and "responsible" persons to own and carry common firearms for self-defense and other lawful purposes. *See Bruen*, 142 S. Ct. at 2122, 2131, 2135, 2156.  It does not, however, entitle persons "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller I*, 554 U.S. at 626).

In the wake of the Supreme Court's decision in *Heller I*, courts of appeals developed a two-step framework to analyze Second Amendment claims. *See id.* at 2126.  The first step asked whether a challenged law regulated conduct outside the scope of the Amendment, as defined by its "text" and "historical limitations." *District of Columbia v. Heller* (*Heller II*), 670 F.3d 1244, 1252–53 (D.C. Cir. 2011).  A number of Second Amendment challenges failed at this threshold step. *See, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 157–60 (D.C. Cir. 2019) (holding that convicted felons fell outside the category of "law-abiding and responsible" persons protected by the Second Amendment).  For those claims that survived, however, courts typically applied some form of means-end scrutiny at step two, the strictness of which depended on how onerously the challenged law burdened a "core" Second Amendment right. *Wrenn v. District of Columbia*, 864 F.3d 650, 664–68 (D.C. Cir. 2017).

In *Bruen*, the Supreme Court declined to adopt the courts of appeals' method of analysis and clarified the test laid out in *Heller I*.  142 S. Ct. at 2127.  While the Court rejected means-ends scrutiny, it endorsed the first step of the above framework, noting that it is "rooted in the Second Amendment's text" and "history." *Id*. at 2125–27.  To satisfy their initial burden, plaintiffs must show that the challenged restriction regulates conduct covered by "the Second Amendment's plain text." *Id.* at 2129.  The Court indicated that the plaintiffs' threshold burden would entail both a textual and historical showing, given that "the right secured by the Second

Amendment is not unlimited" and "the historical understanding of the Amendment" serves "to demark the limits on the exercise of that right."  *Id.* at 2128 (quoting *Heller I*, 554 U.S. at 626).[1]

Even when plaintiffs fit their claim within the Second Amendment's text, however, the government can still prevail by showing that its law "is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.  To satisfy this standard, the challenged regulation need not be "a dead ringer for historical precursors."  *Id*. at 2118.  Rather, where a modern firearm regulation addresses "unprecedented societal concerns or dramatical technological changes," it will pass "constitutional muster" when it is "relevantly similar" to a historical regulation.  *Id*. at 2133.  A "well-established and representative historical *analogue*"—which need not be "a historical *twin*"—is one that "impose[s] a comparable burden on the right of armed self-defense" and is "comparably justified."  *Id.* at 2133.

## II.   <u>The Challenged Law</u>

The challenged regulation (the "Law"), D.C. Code § 7-2506.01(b), bars the possession, sale, or transfer of devices that feed ammunition into firearms if they have a capacity larger than ten rounds of ammunition.  These devices are commonly called "large capacity magazines," or LCMs.  Borrowing language from other state and federal laws, the Law was intended "to prevent the ability of an individual to fire a large quantity of ammunition without having to pause to reload."  Council of the District of Columbia, Committee on Public Safety and the Judiciary,

---

[1]      The Court's reasoning in *Bruen* abrogated holdings that relied on means-end scrutiny, including the D.C. Circuit's decision in *Heller II* affirming that the District's prohibition on LCMs was constitutional.  Still, these courts' surveys of the historical record are consistent with the *Bruen* framework and remain good law.  Moreover, their factual findings, based on voluminous records, remain relevant, and this brief cites their decisions for that limited purpose.

Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," November 25, 2008

(Comm. Rep.) at 2, https://tinyurl.com/mryzvuuc.[2]  It provides as follows:

> No person in the District shall possess, sell, or transfer any large capacity
> ammunition feeding device regardless of whether the device is attached to a
> firearm.  For the purposes of this subsection, the term "large capacity ammunition
> feeding device" means a magazine, belt, drum, feed strip, or similar device that has
> a capacity of, or that can be readily restored or converted to accept, more than 10
> rounds of ammunition.  The term "large capacity ammunition feeding device" shall
> not include an attached tubular device designed to accept, and capable of operating
> only with, .22 caliber rimfire ammunition.

D.C. Code § 7-2506.01(b).  In recommending the Law, the Committee explained that

"magazines holdings over 10 rounds are more about firepower than self-defense" and that

"[l]imiting fire power" was warranted "especially given homeland security issues in the

District."  Comm. Rep. at 9.  In 2011, the D.C. Circuit upheld the prohibition on LCMs, finding

it "does not effectively disarm individuals or substantially affect their ability to defend

themselves."  *Heller II*, 670 F.3d at 1247–48, 1260–64 (surviving intermediate scrutiny).

### III.  <u>Procedural Background</u>

Plaintiffs are residents of the Washington, D.C.-metropolitan area who have licenses to

carry concealed handguns and who want to "possess and use" LCMs "within the District of

Columbia."  Compl. [2] ¶¶ 1–4.  Each Plaintiff regularly carries a concealed pistol in the District

of Columbia and possesses, outside of the District, magazines capable of holding more than ten

rounds.  Decl. of Andrew Hanson [8-2] ¶¶ 2–3; Decl. of Tyler Yzaguirre ¶¶ [8-3] 2–3; Decl. of

Nathan Chaney [8-4] ¶¶ 2–3; Decl. of Eric Klun [8-5] ¶¶ 2–3.  Plaintiffs do not seek to possess

LCMs for use with firearms other than pistols.  *Id.* at ¶¶ 2–4 (same in each); Ex. A, Pls.'

---

[2]     All cited electronic materials were last accessed on November 22, 2022.  All citations are
to ECF or .pdf pagination.

Answers and Objections to Defs.' First Set of Interrogs. at 7–10.  Each Plaintiff contends that, but for the Law, they would carry firearms equipped with LCMs in the District of Columbia; Plaintiffs Hanson and Yzaguirre would also use firearms equipped with those magazines for protection inside their residences.  Hanson Decl. ¶ 4; Yzaguirre Decl. ¶ 4; Chaney Decl. ¶ 4; Klun Decl. ¶ 4.  On October 18, 2022, Plaintiff Yzaguirre applied to register a Sig Sauer P365 with a 12-round magazine with the District of Columbia Metropolitan Police Department (MPD), but his application was refused.  Declaration of Tyler Yzaguirre [16-1] ¶¶ 2, 6.

Plaintiffs filed this suit on August 3, 2022.  They bring two claims under 42 U.S.C. § 1983, alleging that D.C. Code § 7-2506.01(b) violates both the Second Amendment and the Fifth Amendment Due Process Clause.  Compl. ¶¶ 59–61.  On August 19, 2022, Plaintiffs filed their Application for a Preliminary Injunction (the "Motion"), seeking to enjoin enforcement of the Law, facially or as-applied, based on their Second Amendment claim alone.[3]  *See* Pls.' Mem. at 8, 10, 14.  Plaintiffs also requested that the Court consolidate consideration of their Motion with a trial on the merits and grant permanent relief under Fed. R. Civ. P. 65(a)(2).  *Id.* at 33.

---

[3]     Although Plaintiffs purport to bring both a facial and an as-applied challenge to Section 7-2506.01(b), Pls.' Mem. at 7; Compl. ¶ 22, Plaintiffs make no attempt to establish standing for or support any argument related to the District's prohibition on the "sell[ing]" or "transfer" of LCMs.  D.C. Code § 7-2506.01(b).  Accordingly, the District understands Plaintiffs' challenge to refer only to the prohibition on "possess[ion]."  *Id.*; *see Heller II*, 670 F.3d at 1249 (similarly limiting plaintiffs' challenge and citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), for the proposition that "standing doctrine 'requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction,' and the plaintiff 'bears the burden of showing that he has standing for each type of relief sought'").

**LEGAL STANDARD**

### I.   Preliminary Injunctive Relief

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Plaintiffs must prove that they are "likely to succeed on the merits," that they are "likely to suffer irreparable harm," that "the balance of equities" favors such extraordinary relief, and "that an injunction is in the public interest."  *Winter*, 555 U.S. at 20; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the last two factors merge when the government opposes an injunction).

### II.   Federal Rule of Civil Procedure 65

Under Rule 65(a)(2), upon hearing a motion for preliminary injunction, "the [C]ourt may advance the trial on the merits and consolidate it with the hearing."  But this practice is disfavored:  "[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

### III.   Facial And As-Applied Challenges

Litigants may attack the constitutionality of a law in two ways:  A facial challenge, which alleges that the law is unconstitutional in all its applications, and an as-applied challenge, which alleges that the law is unconstitutional as applied to the particular facts of their case.  Plaintiffs bear a "heavy burden" in bringing a facial challenge.  *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (explaining why facial challenges are "disfavored").  They cannot merely suggest that constitutional problems may arise when the law is applied to some "conceivable set of circumstances."  *Salerno*, 481 U.S. at 745.  Rather, they must affirmatively "establish that *no* set

of circumstances exists under which the Act would be valid." *Id*. (emphasis added).  Where a

statute has a "plainly legitimate sweep," a facial challenge must fail.  *Wash. State Grange*, 552

U.S. at 449; *see In re Sealed Case*, 936 F.3d 582, 588–89 (D.C. Cir. 2019).  And, although the

"occasional case" may require a court to entertain a facial challenge, the court should "neither

want nor need to provide relief to nonparties when a narrower remedy will fully protect the

litigants."  *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (citing

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989)).

## ARGUMENT

### I.  <u>Plaintiffs Are Unlikely To Succeed on the Merits Because They Fail To Show that the Second Amendment Protects Large Capacity Magazines.</u>

Plaintiffs have failed to carry their burden of demonstrating that "the Second

Amendment's plain text" protects their possession of LCMs.  *Bruen*, 142 S. Ct. at 2129–30.

"Under [the Supreme] Court's precedents, a plaintiff bears certain burdens to demonstrate an

infringement of his rights under the [Constitution]," and only "[i]f the plaintiff carries these

burdens" does "the focus then shift[ ] to the defendant to show that its actions were nonetheless

justified."  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (emphasizing

plaintiffs' threshold burden in the First Amendment context); *Burdick v. Takushi*, 504 U.S. 428,

434 (1992) (same in the election law context); *see also Bruen*, 142 S. Ct. at 2130 ("This Second

Amendment standard accords with how we protect other constitutional rights.").

To make this showing under the Second Amendment, a plaintiff must demonstrate that

the "textual elements" of the Second Amendment's operative clause are applicable to the

conduct being restricted.  *Bruen*, 142 S. Ct. at 2134 (quoting *Heller I*, 554 U.S. at 592).  Thus, in

*Bruen*, before turning to whether New York's restriction was "consistent with the Nation's

historical tradition of firearm regulation," *id*. at 2135, the Court confirmed that the plaintiffs

were "part of 'the People' whom the Second Amendment protects" and that "handguns are weapons 'in common use' today for self-defense," *id.* at 2134 (quoting *Heller I*, 554 U.S. at 627, and citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016)).  A plaintiff must therefore prove both that the regulated instrument, device, or weapon fits within the category of "bearable arms," *id.* at 2132, and that it is "commonly used" for self-defense purposes, *id.* at 2128.

Plaintiffs do not dispute that they bear this textual burden.  But their efforts to meet it consist of only a threadbare claim that LCMs are "instruments that constitute bearable arms" and evidence that LCMs are a "commonly *owned* weapons component[ ]."  *See* Pls.' Mem. at 3, 5 (emphasis added).  Plaintiffs' arguments are insufficient and, ultimately, incorrect.  The Second Amendment only reaches "Arms," and only those "Arms" that are not just commonly owned, but "in 'common *use*' for self-defense."  *Bruen*, 142 S. Ct. at 2143 (quoting *Heller I*, 554 U.S. at 627) (emphasis added).  LCMs are neither.

### A.  LCMs Are Not "Arms" Under the Second Amendment.

"Like most rights, the right secured by the Second Amendment is not unlimited" and it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller I*, 554 U.S. at 636).  Although not cabined to the types of arms "in existence at the time of the founding," the right extends only to "arms" as that term was historically understood.  *Id.* at 2132 (quoting *Heller I*, 554 U.S. at 582) (internal quotation marks omitted).  LCMs do not fall within this scope.  Rather, since the Founding, bullet storage containers—whether Founding-era cartridge boxes or modern detachable magazines—have been recognized as accessories or "accoutrements," a category distinct from "arms."  And while some accessories may be so integral to the operation of a

firearm that the Second Amendment might be read to extend to them, LCMs, a capacity-based subset of ammunition magazines, are not among them.

### 1.   LCMs Are Accessories, Which Are Distinct from Arms.

The "object" of an individual's Second Amendment right is "Arms." *Heller I*, 554 U.S. at 581. But LCMs are not "Arms" as that term was understood either at the Founding or at the ratification of the Second or Fourteenth Amendments. *See id*. ("The 18th-century meaning is no different from the meaning today."); *Bruen*, 142 S. Ct. at 2132 ("[T]he Second Amendment's definition of 'arms' is fixed according to its historical understanding.").

The term "arms" historically referred *only* to weapons, typically swords, knives, rifles, and pistols. Ex. B, Decl. of Dennis Baron ¶ 10. An analysis of the patterns in the meaning and usage of words from the Founding and Reconstruction Eras confirms as much. *See generally id.* ¶¶ 12–24 (discussing methodology in the field of corpus linguistics). "Arms" did not encompass parts of weapons or weapons accessories, such as ammunition, ammunition containers, flints, scabbards, or holsters. *Id*. ¶ 10. Rather, these items were separately identified as "accoutrements"—"ancillary equipment associated with soldiering, or service in the military," *id*. ¶¶ 10, 28. These terms identified distinct categories and were used in contrast with one another. *See id*. ¶¶ 43, 46 ("arms and accoutrements are separate categories"); *id*. ¶ 64 (finding "no data" that the term "arms" includes "accoutrements").

Cartridge boxes or cartridge cases, in which bullets were historically kept at the Founding, were an "accoutrement." *Id.* ¶¶ 26–27 ("[T]hese bullet storage containers were part of the general category of military accoutrements, not arms."). "[M]agazines," including LCMs, are the descendants of, and thus "analogous" to, cartridge boxes or cartridge cases. *Id*.; *see* D.C. Code § 7-2506.01(b) (defining an LCM as a "belt, drum, feed strip, or similar device . . . t[hat]

accept[s] . . . rounds of ammunition").  They therefore also fall within the category of

"accoutrements."  Baron Decl. ¶¶ 26–27; *id*. ¶ 64 (finding "no data" that the term "arms"

includes "magazines").  Indeed, even today, firearms sellers list magazines under the

"accessories" sections of their websites.  *Compare* Firearms, Guns.com,

https://www.guns.com/firearms (listing handguns, rifles, and shotguns for sale), *with*

Accessories, Guns.com, https://www.guns.com/accessories (listing magazines for sale); *see also*,

*e.g.*, Ex. C, Tom Givens, *Concealed Carry Class: the ABCs of Self-Defense Tools and Tactics*

113 (16 of .pdf) (Gun Digest 2019) ("The magazine is not a part of the pistol, it is a feeding

device for the pistol.").  LCMs are therefore properly categorized as "accoutrements" or

accessories.  They are not "arms," as the term was understood when the Second and Fourteenth

Amendments were ratified.

### 2.  LCMs Are Not Integral to the Operation of a Firearm.

An LCM is also not an "arm" because even if that term included accessories that are

integral to the operation of a firearm, an LCM is not such an accessory.  *Cf. Heller I*, 554 U.S. at

630 (holding that "the District's requirement . . . that firearms in the home be rendered and kept

inoperable at all times . . . makes it impossible for citizens to use them for the core lawful

purpose of self-defense and is hence unconstitutional").  Ammunition magazines, or ammunition

feeding devices, hold ammunition and attach to weapons.  When used, these devices enable a

shooter to fire without reloading until the capacity of the magazine is spent.  Magazines come in

a variety of sizes, and the LCMs barred by the District's regulation are merely a capacity-based

*subset* of these devices.  Magazines holding ten rounds or fewer remain legal in the District, are

widely available, and are compatible with a range of semiautomatic firearms—including

handguns.  *See* Ex. D, Decl. of Stephen Amodeo ¶¶ 4, 12, 14, 16, 18, 19, 23–27.

11

Because the District's regulation limits only the capacity of the magazine that an individual may possess, it has no effect on whether the firearm is operable.  Plaintiffs, for example, can operate all of their registered firearms in the District.  Indeed, Plaintiffs state that the firearms they currently carry are all equipped with magazines that are not LCMs, even those for which the standard magazine is an LCM.  *See* Hanson Decl. [8-2]; Yzaguirre Decl. [8-3]; Chaney Decl. [8-4]; Klun Decl. [8-5]; Ex. A, Pls.' Answers to Interrogs. at 7–10.

Plaintiffs' argument that a magazine of *some* sort is necessary "in order to employ ammunition in a firearm," Pls.' Mem. at 5, is therefore beside the point.  The District's regulation restricts only the use of *large* capacity magazines, leaving gun owners free to use any number of magazines with a capacity of ten rounds or fewer to operate their firearms.  *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) (examining a similar prohibition and noting that "while citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds").

Because LCMs are a firearm enhancement that do not affect the functioning of the firearm, they are most akin to silencers, which federal courts of appeals have held do not fall within the scope of the Second Amendment.  *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')" and thus "can't be a 'bearable arm' protected by the Second Amendment"); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).[4]  Regulation of LCMs is thus "categorically unprotected," and Plaintiffs' challenge to the District's Law fails.  *Bruen*, 142 S. Ct. at 2126.

---

[4]     Although these cases predate *Bruen*, *Bruen* did not abrogate their reasoning about what instruments qualify as protected arms.  *See* 142 S. Ct. at 2157 (Alito, J., concurring) (*Bruen* did not "decide anything about the kinds of weapons [or accessories] that people may possess").

**B.  Even if LCMs Are "Arms," They Are Not Protected by the Second Amendment Because They Are Not in Common Use for Self-Defense.**

Even if the Court determines that LCMs are bearable "arms," they are not the sort of "arms" protected by the Second Amendment because they are not "'in common use' . . . for lawful purposes like self-defense."  *Heller I*, 554 U.S. at 624; *see also Bruen*, 142 S. Ct. at 2134 (discussing whether handguns are "weapons 'in common use' today for self-defense" as part of the test for whether they are protected by the plain text of the Second Amendment).  This "important limitation on the right to keep and carry arms" remains a critical part of the Second Amendment following *Bruen*.  *See id.* at 2162 (Kavanaugh, J., concurring).

As the phrase "in common *use* . . . for self-defense" suggests, the Second Amendment does not protect a weapon merely because it is commonly bought or sold—though, of course, to be commonly used the weapon must also be commonly possessed.  Rather, in determining whether a weapon is commonly *used* for self-defense, both the Supreme Court and the D.C. Circuit consider the suitability of the weapon for self-defense and the frequency with which it is actually used for that purpose.  In *Heller I*, for example, the Supreme Court specifically examined the "*reasons* that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand "while the other hand dials the police."  554 U.S. at 629 (emphasis added).  And in *Bruen*, the Court reiterated that the weapon must be both suitable for use in self-defense and in practice be "commonly used" for that purpose.  142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense" (emphasis added)).

Conversely, the Court made clear that there is no Second Amendment protection for weapons that are "most useful in military service," even if they are sufficiently popular.  *Heller I*

at 627; *see also Kolbe v. Hogan*, 849 F.3d 114, 142 (4th Cir. 2017).  For example, there are more

than 700,000 machine guns registered in the United States.  *See* Bureau of Alcohol, Tobacco,

Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update*

*2021* 16 (2021), https://tinyurl.com/3aff4bft.  But even though there are more registered machine

guns than, for example, the number of stun guns discussed in Justice Alito's concurrence in

*Caetano*, 577 U.S. at 420, the Court in *Heller I* explained that the Second Amendment does not

protect such weapons because they are "not typically possessed by law-abiding citizens for

lawful purposes," 554 U.S. at 625.  The Court labelled "startling" the idea that "restrictions on

machine guns . . . might be unconstitutional."  *Id*. at 624; *see Friedman v. City of Highland Park*,

784 F.3d 406, 408 (7th Cir. 2015) (noting Tommy guns were "all too common" before being

federally prohibited and that the "popularity" of such dangerous military weapons doesn't mean

they have "constitutional immunity").

     Similarly, in *Heller II*, the D.C. Circuit expressly rejected the idea that common

ownership of LCMs is sufficient to establish that they are protected by the Second Amendment.

After crediting evidence in the record indicating that magazines with capacities of more than ten

were commonly "owned"—and therefore were "in 'common use'" in that respect—the court

declined to resolve whether the Second Amendment's text encompasses LCMs because, on the

record before it, the court could not "be certain whether [LCMs] are commonly used or are

useful *specifically* for self-defense."  *Heller II*, 670 F.3d at 1261 (emphasis added); *cf. id.*

(acknowledging that there may also "be some capacity above which magazines" are not

commonly owned).  Other federal courts of appeals are in accord.  *See Friedman*, 784 F.3d at

409 ("[R]elying on how common a weapon is at the time of litigation would be circular.");

*Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019) (calling measuring "common use" by the

sheer number of weapons lawfully owned "somewhat illogical"); *cf. Kolbe*, 849 F.3d at 141 (explaining that under a popularity test, manufacturers would need only "flood[ ] . . . the market prior to any governmental prohibition in order to ensure [the weapon] constitutional protection").

Plaintiffs here have likewise built no record that LCMs are "commonly used or are useful specifically for self-defense." *Heller II*, 670 F.3d at 1261.  Although they acknowledge that the Second Amendment protects only their right "to own weapons in common use by law-abiding citizens for lawful purposes," Pls.' Mem. at 5, they point to no evidence showing that LCMs are commonly used for self-defense (or any other lawful purposes).  Instead, they argue that LCMs, in unspecified capacities, are commonly owned and offer a single relevant anecdote about their use, involving a civilian who fired 19 rounds during a gunfight. *See* Pls.' Mem. at 6–7 (citing the statistics recited in *Heller II* and the dissent in *Kolbe* to support the assertion that "[l]aw-abiding citizens own tens of millions of Banned Magazines"), 10 (referring to a store owner who "fir[ed] 19 rounds").  They have thus failed to carry their burden of demonstrating that LCMs fall within the category of arms protected by the Second Amendment and are therefore not entitled to preliminary injunctive relief for that reason alone.[5] *Bruen*, 142 S. Ct. at 2126.  Nor *could* they carry that burden:  Even at this early stage, it is clear that LCMs are not in common use for self-defense, as they are neither suitable for nor actually used for that purpose.

### 1.   LCMs Are Not Suited for Self-Defense.

LCMs are not in common use for self-defense because they are not suitable for that purpose.  Rather, their basic characteristics—the ability to fire without reloading and the

---

[5]      At a minimum, Plaintiffs offer no evidence that 30-, 40-, or 50-round magazines are even commonly *owned*, let alone commonly used for self-defense.  Indeed, none of the Plaintiffs themselves own such devices. Ex. A, Pls.' Answers to Interrogs. at 7–10.  Nor are they used by MPD with pistols, Ex. E, Decl. of Leslie Parsons ¶ 16, even though law enforcement has different, higher capacity needs, *id*. ¶¶ 17–18.

resulting heightened lethality—serve specific combat-oriented purposes.

Courts recognize the fact that a weapon is commonly used for military purposes or is designed to be similar to such weapons is a permissible basis for prohibiting that weapon for civilian use.  In *Heller I*, the Court made clear that "M-16 rifles and the like"—that is, "weapons that are most useful in military service"—may be banned.  554 U.S. at 627.  Courts of appeals, in portions of decisions not abrogated by *Bruen*, have applied this reasoning to uphold prohibitions on other weapons and accessories, including LCMs, that are "like" automatic firearms.  *See, e.g.*, *Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (quoting *Heller I*, 554 U.S. at 627)).  The en banc Ninth Circuit, for instance, analogized between LCMs and military weapons, noting that such magazines are likely "most useful in military service" because they "provide significant benefits in a military setting."  *Duncan v. Bonta*, 19 F.4th 1087, 1102 (9th Cir. 2021) (vacated).

Those benefits include the ability to continually fire without reloading—a "uniquely military feature" intended to "enable a shooter to hit multiple human targets very rapidly." *Kolbe*, 849 F.3d at 137; *see Friedman*, 784 F.3d at 409.  Indeed, the first detachable, interchangeable LCMs made available to U.S. civilians were designed during World War I for use with a "one-man, hand held machine gun" (or "trench broom"), later commonly known as a "Tommy gun."  *See* Ex. F, Decl. of Roger Pauly ¶¶ 81–83; Ex. G, Declaration of Brian DeLay ¶ 25; Ex. H, Decl. of Robert Spitzer ¶ 11; Ex. I, Decl. of Randolph Roth ¶¶ 43–46.  LCMs for pistols—including the ones Plaintiffs seek to possess—were also specifically designed for military use.  Ex. J, Decl. of Brennan Rivas ¶ 40; Ex. K, Excerpts of Paul M. Barrett, *Glock: The*

*Rise of America's Gun* 7, 9–11 (2012) (3–5 of .pdf); Ex. L, Excerpt of Jeff Kinard, *Pistols: An Illustrated History of the Their Impact* 270–275 (10–12 of .pdf) (2003).

The ability to continually fire without reloading is valuable in battlefield situations, but it renders LCMs dangerously ill-suited for civilian self-defense. *See, e.g., Heller II*, 670 F.3d at 1263–64 ("[T]he tendency is for defenders [using an LCM] to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders."); Ex. C, Givens at 31, 35 (8, 12 of .pdf) (explaining that shooters who do not have sufficient cool, or practice, "when suddenly confronted with a shooting situation . . . panic, stick the gun out in front of them and empty it as fast as they can"); Ex. E, Decl. of Leslie Parsons ¶¶ 25–27 (stating 16 children killed in District this year alone by gunfire).

This design function results, as intended, in exceptional lethality that is suitable only for military purposes. Outside of the military context, it has been taken advantage of for criminal ends—specifically mass murder. Attacks with LCMs result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks." *Heller II*, 670 F.3d at 1263 (cleaned up). Unsurprisingly, semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history." *Worman*, 922 F.3d at 39; *see* Roth Decl. ¶¶ 53–55 ("[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semi-automatic handguns."). And handguns equipped with LCMs were used in mass shootings at Virginia Tech (32 dead and 17 wounded); Fort Hood, Texas (13 killed and over 30 wounded); Binghamton, New York (13 killed and four wounded); and Tucson, Arizona (six killed and 13 wounded). *Kolbe*, 849 F.3d at 120.

## 2.  LCMs Are Not Commonly Used in Self-Defense.

LCMs are also not in common use for self-defense because they are not in fact used for that purpose. *See Heller II*, 670 F.3d at 1262 (pointing to the lack of evidence that "magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport"). As federal courts of appeals reviewing voluminous records have noted, examples of a civilian firing more than ten rounds in self-defense (let alone needing to do so without pause) are vanishingly rare—if they exist at all. For example, the First Circuit has noted that "not one of the plaintiffs or their six experts could identify . . . even a single example of a self-defense episode in which ten or more shots were fired." *Worman*, 922 F.3d at 37. And recently, the Ninth Circuit has noted that "the record here, as in other cases does not disclose whether" the "benefit" of "being able to fire more than ten bullets in rapid succession . . . has *ever* been realized in self-defense in the home." *Duncan*, 19 F.4th at 1105; *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. N.J.*, 910 F.3d 106, 121 n.25 (3d Cir. 2018) ("The record reflects that most homeowners only use two to three rounds of ammunition in self-defense."); *Kolbe*, 849 F.3d at 127 (explaining that "[n]either the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has . . . needed to fire more than ten rounds[ ] to protect herself" and concluding that such circumstances are "rare"). Indeed, a study of the National Rifle Association's database revealed that between 1997 and 2001, before the federal government's high-capacity magazine ban, the average number of shots fired in self-defense was only 2.2. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J. L. & Contemp. Probs. 331, 244–45 (2020). That number has remained relatively stable since the federal ban was lifted—the average number of shots fired in self-defense from 2011 to 2013 was 2.1. *Id.*

In response, Plaintiffs assert that "[o]ne can never know how many rounds will be sufficient to stop a determined opponent" and "[r]eloading a firearm takes precious seconds that a victim may not have during a criminal attack."  Pls.' Mem. at 11–12.  But those statements have no limiting principle and would require that any conceivable form of self-defense be permitted—an endless arms race, to the detriment of the public.  In any event, missing from Plaintiffs' filing is any support that, in practice, personal self-defense is aided by the ability to "rapidly bring to bear" more than ten rounds of ammunition using an LCM.  Pls.' Mem. at 8. Plaintiffs' Motion mentions a single anecdote of a civilian firing "19 rounds" to protect his business from "armed robbers," Pls.' Mem. at 10, without any suggestion that such circumstances are common or even precedented.[6]  Indeed, Plaintiffs' own evidence suggests that when LCMs *are* used, it is for criminal purposes—several of Plaintiffs' anecdotes illustrate civilian attacks on law enforcement using heightened firing capacity.  *See* Pls.' Mem. at 8 (describing a suspect who "proceeded to fire 11 more rounds" at an officer after the initial shot), 10 (mentioning an officer "shot 15 times by a mass murdering white suprem[ac]ist").

Plaintiffs' handful of anecdotes involving *police* use of LCMs is wholly irrelevant.  There is no constitutional right to be as well-armed as professional peacekeepers.  As the D.C. Circuit has observed, the Second Amendment right applicable to Plaintiffs "enables self-defense at least against the level of threat *generally* faced by those covered by the Amendment: responsible and

---

[6]    It is not clear from the article Plaintiffs cite that an LCM was even used in this incident. A separate article by the same author states that the "19 shots" were fired from three separate firearms.  Massad Ayoob, *The Ayoob Files: An Urban Gunfighter—The Lessons of Lance Thomas* (Mar. 1, 2002), https://tinyurl.com/4t5fb4na.  In their discovery responses, Ex. A, Pls.' Answers to Interrogs. 3–7, Plaintiffs cite two additional anecdotes, one of which has similar deficiencies.  *See* Massad Ayoob, *The Ayoob Files: Lead and Diamonds: The Richmond Jewelry Store Shootout* (May 1, 2003), https://tinyurl.com/u3jz76zc (detailing that the 30 shots came from two defenders and at least six firearms).  The District allows gun owners to possess multiple firearms and multiple magazines.

law-abiding citizens." *Wrenn*, 864 F.3d at 664; *cf. Heller I*, 554 U.S. at 595 (explaining that the Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation"). Those threats are readily distinguishable from the threats faced by professional law enforcement, like SWAT officers and FBI agents, when they are intervening in the commission of violent felonies. *See* Pls.' Mem. at 9–12; Parsons Decl ¶¶ 17–18. And although Plaintiffs express their own concern about being "set upon by multiple assailants," Pls.' Mem. at 12, they make no showing that this is a "level of threat generally faced" by the public or a "common level[ ] of risk." *Wrenn*, 864 F.3d at 664.

Because Plaintiffs have failed to show that LCMs are "in common use" for self-defense, their challenge to the District's Law fails. They are not entitled to preliminary injunctive relief. The analysis may end here.

## II. Plaintiffs Are Unlikely To Succeed on the Merits Because the District's Law Regulates Unusually Dangerous Devices, in Keeping with American Tradition.

Even if LCMs are "arms" within the meaning of the Second Amendment, Plaintiffs have still failed to carry their burden to show that they are likely to succeed on the merits. Plaintiffs rest their argument on the claim that they are "unaware" of any limit on the "ammunition capacity of a firearm at the time of the adoption of the Second or . . . [Fourteenth] Amendments," Pls.' Mem. at 14, 19. But because the Law regulates technology that did not exist, and that would have been "unimaginable at the founding," *Bruen*, 142 S. Ct. at 2132, the District is not required to identify a "historical *twin*," only a "well-established and representative historical *analogue*." *Id*. at 2133 (emphasis in original). Plaintiffs offer neither argument nor evidence to explain why they would prevail under this appropriate framework. Nor could they.

Even at this early stage, the information available shows that the Nation's tradition of regulating dangerous and unusual weapons is "'relevantly similar'" to the District's Law, such

20

that it can act as "a proper analogue." *Id*. at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev, 741, 773 (1993)). The Supreme Court has, of course, not defined the phrase "dangerous and unusual," *id*. at 2128 (quoting *Heller I*, 554 U.S. at 627), and there are some disputes over its origin and meaning.[7] But its substance can be discerned by examining the pattern over time of restrictions on certain weapons (including weapons accessories and configurations) considered to be particularly susceptible to criminal misuse or to pose significant dangers to the public. From the regulation of such weapons in pre-founding England through the founding of the United States and the antebellum and postbellum periods, and continuing into the 20th century, governments have regulated specific weapons, accessories, and associated conduct deemed uniquely dangerous to the public, leaving available other weapons for constitutionally protected use. The District's Law is part of that tradition. *See id*. at 2133 (holding that a regulation is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors and is "comparably justified").

### A. The District Need Only Show that the Law Is "Relevantly Similar" to Regulations of Dangerous and Unusual Weapons.

The District's Law requires the Court to employ the "more nuanced approach" of reasoning by analogy because it implicates both "dramatic technological changes" *and* "unprecedented societal concerns." *Id*. at 2132 (indicating that *either* factor would require this

---

[7]    As the Fourth Circuit has pointed out, the Supreme Court's citation to Blackstone referred to the crime of carrying "dangerous *or* unusual weapons." *Kolbe*, 849 F.3d at 131 n.9 (quoting 4 Blackstone 148–49 (1769)). And the phrase may be better understood as a hendiadys—a figure of speech like "cruel and unusual" and "necessary and proper," which involve "two terms, separated by a conjunction, [that] are melded together to form a single complex expression." Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016). If viewed as a hendiadys, "dangerous and unusual" would be read as "unusually dangerous," which accurately describes LCMs for the reasons discussed *infra*.

mode of analysis).  LCMs would not exist without a dramatic change in firearms technology—

indeed, without *several* dramatic changes—between 1791 and today.  The ability to fire a few

rounds in one *minute* at the founding has become the ability to fire 30 rounds in five *seconds*,

and those rounds go farther, fly straighter, and inflict more damage.  The growing availability of

LCMs has also sparked unprecedented societal concerns, namely, the advent of a lone individual

being able to commit mass murder.  Because the regulation at issue here is the product of these

distinctly modern circumstances, Plaintiffs' reliance on a "straightforward historical inquiry"—

whether an identical regulation existed at the founding—is inapposite.  *Id*. at 2131.

### 1. "Dramatic Technological Changes"

The particularly lethal LCM technology regulated by the Law simply did not exist when

the Second or Fourteenth Amendments were ratified.  *See* Delay Decl. ¶¶ 13, 19, 25; Ex. M,

Decl. of Kevin M. Sweeney ¶¶ 4, 5, 14, 15, 32.  In the founding era, most arms were flintlock

muzzleloaders capable of firing a single lead ball.  *See* Sweeney Decl. ¶¶ 4, 5, 12, 13; Pauly

Decl. ¶¶ 29, 30, 32; Roth Decl. ¶ 17.  In favorable conditions, such guns could take half a minute

to load (or reload).  *Id.* ¶ 17.[8]  They were the only ones "the vast majority of people ever owned,

used or encountered."  DeLay Decl. ¶ 19.  There is "[no] evidence in primary sources" that guns

with the capacity to fire repeatedly "were anything other than exotic curios in this era."  *Id*. ¶ 19;

*see* Sweeney Decl. ¶15 (based on probate inventories and newspaper references, "repeating

---

[8]      The limits of flintlock technology also made these firearms poor instruments of homicide.
They could not be stored loaded for long periods of time, and because the gun had to be loaded
manually before use, it could not be used impulsively.  *See* Roth Decl. ¶¶ 17–19.

firearms in eighteenth-century America . . . were extraordinarily rare"). They were, to put it simply, "militarily and commercially irrelevant." DeLay Decl. ¶ 19.[9]

By the 1860s, not much had changed for ordinary Americans. The Henry Model 1860 and the Winchester 1866 rifles mentioned by Plaintiffs, *see* Pls.' Mem. at 15–16, were both expensive and rare: They were sold almost exclusively to military buyers through the early 1870s, and "very few" were in the hands of private persons in 1868. *See* DeLay Decl. ¶¶ 22–25 (these firearms were a "tiny percentage," or 0.2%, of those in circulation); Pauly Decl. ¶¶ 57–63 (discussing the firearms' development and use). They were also relatively slow to fire: Users of these "lever-action" weapons were still required to pull a lever between shots, slowing the firing rate to about one shot every three seconds. Pauly Decl. ¶ 61. And unlike modern LCMs, the magazines of the time were a fixed part of the gun. *Id.* To reload, soldiers had to individually insert each new cartridge. Rivas Decl. ¶ 30.[10]

Not until closer to the turn of the 20th century could weapons fire bullets in rapid succession and be efficiently reloaded with interchangeable magazines. These innovations made

---

[9]     The examples Plaintiffs provide circa 1791 (or before), existed only as concept pieces or curiosities. *See* DeLay Decl. ¶¶ 6, 7, 10–19, 21; Sweeney Decl. ¶¶ 15–32; Spitzer Decl. ¶¶ 24–34. Historians widely agree that repeating arms were not practical, functional weapons until at least the 1830s. Before that, they tended to explode at the shooter rather than the target. *See* DeLay Decl. ¶ 11; Sweeney Decl. ¶¶ 16 n.21, 19, 23, 24, 26 (describing some early repeaters as basically "pipe bomb[s]"), 31; Pauly Decl. ¶¶ 27, 28, 42–46.

[10]     Plaintiffs point to several other firearms capable of firing more than 10 rounds without reloading between 1791 and 1868, Pls.' Mem. at 15, but these are inapt comparators. Pepperbox pistols were "heavy, lumpy, and impractical" and "had a nasty habit of discharging all their barrels at once." Spitzer Decl. ¶ 33. Fewer than ten of the Bennett and Haviland, and only around 1,250 of the Porter Rifle, were produced. *See* Bennett & Haviland Many Chambered Revolving Rifle, NRA Museums, http://tinyurl.com/mdejetmd; David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 854 n.42 (2015). Similarly, chain pistols "did not win much market share, perhaps in part because the large dangling chain was such an impediment to carrying the gun." Kopel at 856–57. Volcanic repeaters were "few, flawed, and experimental," Spitzer Decl. ¶ 31, and "suffered from an exceptionally low muzzle velocity," Pauly Decl. ¶ 59, and thus had very little power.

firearms far more deadly.  *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022).  The magnitude of this change is illustrated by an index devised for the U.S. Army, which assessed the relative "lethality" of various weapons (defined as the number of people who could be killed in one hour by a particular weapon, taking into account a weapon's range, accuracy, rate of fire, reliability, and other metrics).  *Id.* at 2597–98.  The lethality of a founding-era flintlock muzzleloader was 43; that of a Civil-War-era rifle capable of firing conoidal bullets was 102; and that of a 1903 bolt-action rifle equipped with a magazine was *495*—"a ten-fold increase over the flintlock musket." *Id*. at 2507–08.  (And that manually re-loaded rifle did *not* even have an LCM—it carried only a five-round clip-magazine.  Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj.)

Interchangeable magazines capable of holding more than ten rounds, closer to the LCMs at issue here, did not appear for civilian use in America until the early 1920s.  They were used with submachine guns, which allowed for the ammunition to be loaded "automatically" into a gun's chamber from a magazine without the manual intervention of the shooter.  DeLay Decl. ¶ 25; Spitzer Decl. ¶ 11; Roth Decl. ¶¶ 43–46; Pauly Decl. ¶¶ 69–74, 83.  Handguns (pistols) using the same automated reloading technology—though called "semi-automatic," because the trigger has to be pulled after each round to reload the chamber —appeared about two decades before that but were not capable of accepting LCMs.  Pauly Decl. ¶¶ 75–78.

Handguns capable of accepting LCMs did not penetrate the U.S. market or society until *the 1980s*.  *See* Spitzer Decl. ¶¶ 61–62; Roth Decl. ¶ 50; Rivas Decl. ¶¶ 41–43; Pauly Decl. ¶ 78. For example, not until 1985 did the U.S. military adopt a 15-round magazine instead of the 7-round magazine chosen in 1911.  Ex. K, Kinard at 263 (7 of .pdf).  Police, too, favored 6- or 7-shot revolvers "well into the second half" of the 20th century.  *Id*. at 256–57 (4 of .pdf).  Only in

24

the 1980s and 90s, when "a new generation of high-powered, high-magazine capacity pistols" made with "advanced construction techniques and materials" became available, did police adopt "military-style automatics." *Id.* at 256–57 (4 of .pdf); Ex. N, Robert Sadowski, *9MM: Guide to America's Most Popular Caliber* 6–8 (Gun Digest 2018). Civilian buyers followed. Ex. K, Barrett at 18–19 (9 of .pdf) (explaining the "American civilian gun-buying population tends to gravitate to what professionals carry" and followed police toward Glocks); Ex. N, Sadowski at 7, 28–29 (9–10 of .pdf) (describing 9MM semiautomatic pistol in 1980s, 90s culture). Today, a Glock 17 handgun can be purchased for less than $200 and is capable of firing 30 rounds in five seconds. Roth Decl. ¶ 49. And such modern firearms are much more deadly than their 1791 or 1868 counterparts, not only because of this increased rate of fire, but also due to increased accuracy and firepower (*i.e.*, bullets that fly faster and straighter and dig deeper). *See* Pauly Decl. ¶¶ 8; 34–40; 64, 65; Ex. R, Graeme Rimer, et al., *Smithsonian Firearms* 302–08 (2014).

### 2. "Unprecedented Societal Concerns"

The District's Law also responds to "unprecedented societal concerns," *Bruen*, 142 S. Ct. at 2132, which similarly did not emerge until the turn of the 20th century and were driven by the technological advances discussed above. From the colonial period into the 1900s, mass murder in the United States was almost always perpetrated by groups of individuals, because technological limitations impaired the ability of a single person to kill multiple individuals at once. Roth Decl. ¶¶ 40–42 (citing examples, including Nat Turner's rebellion). In 1791, for example, firing 30 rounds in five seconds, which a single Glock 17 can accomplish, would have required mustering 15 individuals, each with 2 firearms.

With the development of reliable rapid fire, including detachable magazines and semiautomatic and fully automatic firearms, the "character of mass murder began to change" in

25

the late 19th and early 20th centuries.  These weapons dramatically increased the number of

persons who could be killed or wounded by a lone person during criminal activity.  *See id*. ¶ 43.

Markedly different from the firearms technology in use at the Founding or during the 1860s,

such firearms enabled individuals to wreak havoc on communities.  Spitzer Decl. ¶ 11

(describing the transition of these weapons from military use to civilian circulation and their use

in infrequent but highly publicized killings, such as the St. Valentine's Day massacre); Roth

Decl. ¶ 45 (similar).  The proliferation of modern semiautomatic arms, coupled with the

availability of LCMs, directly correlates with the contemporary problem of mass shootings in

America today.  *See* Roth Decl. ¶¶ 50–55 & figs. 1, 2 (describing how the problem of mass

shootings "is a modern phenomenon" and that "[t]he danger [semiautomatic weapons] pose is

intrinsically different from past weaponry," particularly when paired with LCMs); Spitzer Decl.

¶ 8 (describing contemporary efforts to restrict LCMs as beginning with school shooting in

1989); *cf*. Google, Ngram Viewer, https://books.google.com/ngrams/, Query: "shooting=>mass".

### 3. The Lack of an Express "Founding-Era" Limitation on the Capacity of Firearms Is Irrelevant.

These dramatic technological changes and unprecedented societal concerns readily

explain why Plaintiffs are "unaware" of any limits on the "ammunition capacity of a firearm at

the time of the adoption of the Second or . . . [Fourteenth] Amendments."  Pls.' Mem. at 14, 19;

*see id*. at 21 (citing a lack of "limit[s] [on] firearm magazine capacity").  The District's

prohibition on LCMs, implemented in response to the rise of this dangerous new technology and

its public consequences, is a quintessential "modern regulation[ ] . . . unimaginable at the

founding."  *Bruen*, 142 S. Ct. at 2132.  The failure of the Founders or the ratifiers of the

Fourteenth Amendment to regulate for a degree of firing capacity that *did not exist*, let alone

have any appreciable presence or impact on civil society, is thus easily explained.  "States adopt

laws to address the problems that confront them" at the current moment. *McCullen v. Coakley*, 573 U.S. 464, 481–82 (2014). The Constitution does not "require States to regulate for problems that do not exist." *Id.*; *cf.* DeLay Decl. ¶ 21.

Nor can the fact the Founders did not regulate yet-to-be-invented technologies mean that states are precluded from adopting new laws to address changing circumstances. As Justice Scalia observed in the free speech context, "[q]uite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is ipso facto unconstitutional, or else modern election laws . . . would be prohibited, as would (to mention only a few other categories) modern antinoise regulation . . . and modern parade-permitting regulation." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 372 (1995) (Scalia, J., dissenting). The Court in *Bruen*, too, took care to emphasize that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." 142 S. Ct. at 2132 (citing *United States v. Jones*, 565 U.S. 400, 404–05 (2012)). Because the District's Law addresses a dramatic development in firearms technology and responds to the unprecedented societal consequences of that technology being adopted for crime and mass murder, reasoning by analogy is appropriate and necessary.

## B. Regulations of Dangerous and Unusual Weapons Are Ubiquitous in American History.

Notwithstanding that LCMs are of only recent vintage, their regulation is part of a longstanding tradition whereby governments, from pre-founding English history to the early 20th century, restrict and even prohibit the use of weapons and weapons enhancements that threaten public safety. *See id.* at 2145 (noting a pattern of early state statutes that "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people"). Both the reasoning for and the timing of such restrictions are consistent in each era: Governments adopt restrictions on new firearms technologies not when those technologies are first invented or introduced, but as they begin to

circulate widely in society and present "a safety, violence, or criminological problem or threat." Spitzer Decl. ¶ 23.  Though these restrictions may include different weapons and address different concerns, there is a clear through-line—they target weapons that are susceptible to criminal misuse or that pose special dangers to the public, while leaving available a variety of options for self-defense.

### 1.  Medieval and Pre-Founding English History

The tradition of government regulation of particularly dangerous weapons is deeply rooted, stretching back to pre-founding English history.  *See Bruen*, 142 S. Ct. at 2136 (explaining that such evidence is helpful when it "survived to become our Founders' law"). English monarchs historically had the power to restrict possession of arms that they designated as threats to public safety and order.  *See Peruta v. Cnty. of San Diego*, 824 F.3d 919, 930–32 (9th Cir. 2016) (en banc) (reviewing English prohibitions on the carrying of certain arms in the 16th and 17th centuries), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  For example, Richard II prohibited possession of the launcegay, a 10- to 12-foot-long lightweight lance, because it was "generally worn or carried only when one intended to engage in lawful combat or . . . to breach the peace."  *Bruen*, 142 S. Ct. at 2140.  Similarly, Henry VIII prohibited "little short handguns, and little haquebuts," which he identified as a source of "continual feare [*sic*] and danger of the king[']s loving subjects."  Ex. Q, Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 62 (5 of .pdf) (2018).  Thus, the Second Amendment right "inherited from our English ancestors," *Bruen*, 142 S. Ct. at 2127 (quoting *Heller I*, 554 U.S. at 599), permitted government regulation of weapons that were particularly dangerous or susceptible to criminal misuse.

### 2.  Colonial and Early National history:  Laws Enacted Around the Time of the Ratifications of the Second Amendment.

Throughout the colonial and founding eras, the government acted to protect the public by restricting dangerous types, uses, or configurations of weapons.  Indeed, governments frequently imposed regulations on weapons and accessories that posed a heightened threat to public safety. Gunpowder, for example, was highly regulated throughout the colonies.  Concerned about protecting the public from the threat of fire and explosion, governments frequently set up communal magazines and required that individuals store their gunpowder in those locations. *See*, *e.g.*, 1706-7 Mass. Acts ch. 4, *reprinted in Acts and Resolves Passed by the General Court* 588 (1869), available at https://tinyurl.com/27ubvvvn; A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57; 1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844.  Massachusetts went even further, prohibiting the possession of loaded firearms inside the home in recognition of the serious threat posed by the unintended discharge of such arms.  1783 Mass. Acts 37, § 2, https://tinyurl.com/nhdsh7w4.  Individuals were not free to stockpile as much gunpowder and ammunition as they wished or to store it as they wished; because munitions posed a uniquely dangerous risk to society, the government could lawfully regulate them.  *See Brown v. Maryland*, 25 U.S. 419, 443 (1827) ("The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains … with the States."), *abrogated on other grounds by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995).

Colonial governments also restricted the carrying of particular weapons that would induce "great fear and quarrels" among the public.  Spitzer Decl. ¶ 56; *see also Bruen*, 142 S. Ct. at 2143 (discussing "colonial legislatures['] . . .  prohibit[ion] [on] the carrying of 'dangerous and unusual weapons'").  For example, New Jersey enacted a law against wearing weapons as early as 1686, and Massachusetts, North Carolina, and Virginia followed.  Spitzer Decl. ¶ 56.  These

29

laws generally targeted the carrying of firearms in crowded places and groups of armed people, *id.*, situations in which the danger of firearms possession were particularly heightened.

There were also widespread restrictions on the ownership and use of "trap guns," or firearms that (through the use of string or other devices) were configured to fire remotely when triggered. *Id.* ¶¶ 57, 60. Trap guns were frequently used for lawful purposes, including protection of personal and commercial property. *Id.* ¶ 58. However, governments recognized that these sorts of modifications to firearms were nonetheless "most dangerous," since their uncontrolled lethality raised the risk of harm to innocent bystanders to unacceptable levels. 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10, https://tinyurl.com/2cyczk73. Sixteen states ultimately enacted anti-trap gun laws. Spitzer Decl. ¶ 60, Ex. B (listing years of enactment of trap gun laws); *id.*, Ex. F (providing text of trap gun restrictions).

### 3. Antebellum and Postbellum history: Laws Enacted Around the Time of the Ratification of the Fourteenth Amendment

Regulations from throughout the antebellum and postbellum periods reflect a continuing pattern of state regulation of weapons that were especially dangerous, associated with criminal activity, or both.[11] These laws were passed in response to the most pressing threat to public safety at the time they were enacted: the frequent use of concealable weapons in assaults and homicides. *See* Spitzer Decl. ¶ 44 (quoting a grand jury, "the pistol dirk or club is immediately

---

[11]    The Court in *Bruen* did not have occasion to resolve whether courts should "primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 2138. So too here as to dangerous and unusual weapons. *See id.* at 2136 ("[A] regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." (cleaned up) (quoting James Madison)).

resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens"); *see also People v. Persce*, 97 N.E. 877, 878–79 (N.Y. 1912) (finding specified weapons "are ordinarily used for criminal and improper purposes" and "are not amongst those ordinary legitimate weapons of defense and protection").  Twelve states adopted broad restrictions on any concealed weapon, while dozens of others passed restrictions on specific types, including "bludgeons," "billies," "clubs," "slungshots," and "sandbags."  Spitzer Decl. Ex. C.  Several states also restricted the sales of "pocket pistols," a subclass of the Colt six-shooter designed to be concealed from public view and associated with criminal activity.  Rivas Decl. ¶¶ 21, 25, 44.  These sorts of regulations were designed to address *concealable* arms in particular, leaving other arms available for self-defense—for example, although both Tennessee and Arkansas restricted the sale and public carry of pocket pistols, they continued to allow the carry of larger "army or navy" pistols "in the hand."  *Id.* ¶ 18; *see State v. Wilburn*, 66 Tenn. 57, 61 (1872); An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191, https://tinyurl.com/mtxbn4nd.  By the end of the 19th century, almost every state in the country regulated the concealed carry of guns and other specified weapons in an effort to ensure public safety.  Spitzer Decl. ¶ 38; *cf. Bruen*, 142 S. Ct. at 2147 n.20 (noting that both Arkansas and Tennessee "tolerated the prohibition of all public carry of handguns except for military-style revolvers").

Bowie knives were also considered to be an especially dangerous weapon and prone to criminal misuse.  *See* Spitzer Decl. ¶ 44.  They were equipped with long blades designed for fighting rather than for hunting or general utility, and they included features like crossguards and clip points that were designed to facilitate cutting or stabbing.  *Id.*; *see also* William R. Williamson, *Bowie Knife*, Texas State Historical Association (Jul. 6, 2017),

https://tinyurl.com/mpjzkfsj.  As one court noted, Bowie knives were distinguishable from guns, pistols, or swords, the types of weapons with which "men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill."  *Cockrum v. State*, 24 Tex. 394, 402 (1859).  In contrast, the Bowie knife was, "in its device and design . . . *the instrument of almost certain death*."  *Id*. (emphasis added); *see also Aymette v. State*, 21 Tenn. 154, 158 (1840) (explaining that Bowie knives "are efficient only in the hands of the robber and the assassin").[12]

Noting the unique risk Bowie knives posed to the public, states began to pass targeted laws restricting them.  In the 1830s, six states enacted laws barring the carrying of Bowie knives specifically.  Spitzer Decl. ¶ 47.  In the years that followed, forty-nine states and the District of Columbia enacted similar prohibitions, addressing Bowie knives either by name or as part of a broader restriction on dangerous knives.  *Id.*  As the Tennessee Supreme Court held, these restrictions fell comfortably within the government's historical "right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens."  *Aymette*, 21 Tenn. at 159.  Thus, while antebellum state-court decisions "evidence[d] a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues," *Bruen*, 142 S. Ct. at 2147, states retained broad police powers to regulate particular weapons in the public interest.

### 4.  Twentieth Century

Evidence of similar regulations from the 20th century reaffirm the longstanding tradition

---

[12]    The *Heller I* Court criticized *Aymette*'s narrow reading of the Second Amendment as "odd."  554 U.S. at 613.  Nevertheless, the case remains valuable as an articulation of Tennessee's reasons for prohibiting the carrying of Bowie knives and other dangerous weapons.

of government restriction of particularly dangerous weapons and accessories.[13]  Most notably,

state governments in this period adopted a variety of regulations targeting automatic and

semiautomatic firearms as those weapons came into widespread use for criminal activity.  Spitzer

Decl. ¶¶ 11–14.  An early example of this regulation targeted the Tommy gun, a machine gun

capable of holding up to 100 rounds.  *Id.* ¶ 12.  Guns like the Tommy gun could exact a

devastating toll when used by criminals and garnered extensive national attention.  *Id*. ¶ 11.

Responding to the growing availability and the extreme threat posed by these weapons, 32 states

banned them entirely in the 1920s and 30s.  *Id*. ¶ 12.

Indeed, a number of restrictions on firing capacity—the number of rounds that could be

fired without reloading—were enacted between 1927 and 1934, including the District's.  *See id*.

¶¶ 19–22, tbl. 1 (detailing numerous regulations "adopted by nearly half of all states,

representing approximately 58% of the American population at that time"); Roth Decl. ¶ 46.

These regulations were "closely tied to the enhanced firing capacity" of widely available

weapons and "the attractiveness (and use) of these weapons by criminals at the time."  Spitzer

Decl. ¶ 18; *see generally* ¶¶ 12–18.[14]  In 1934, the federal government passed the National

Firearms Act, which tightly regulated machine guns (including the Tommy gun) and sharply

---

[13]     Though the Supreme Court cautioned that 20th century evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence," *Bruen*, 142 S. Ct. at 2153 n.28, the consistency of such evidence with earlier regulations can illustrate the continuation of an American tradition.

[14]     Plaintiffs point out that some of these laws were later amended or repealed.  Pls.' Mem. at 17–18.  But where, as here, a regulation is consistent with historical tradition, legislatures are free to experiment to strike the right balance between effective intervention and the preference of the people.  *See Jacobson v. Massachusetts*, 197 U.S. 11, 35 (1905) (explaining that when a regulation is an exercise of the police power, "what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not").  If that preference changes, legislatures should be able to repeal the regulation without fear that such an action would alter the scope of permissible regulation in the future.

limited their availability to the public.  *Id.* ¶ 14 (citing National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236).  And in 1968, Congress banned the transfer or possession of new machine guns altogether.  Pub. L. Nos. 90-618 and 99-308 (1968).  The regulation of dynamite followed this same pattern.  Roth Decl. ¶¶ 44–46.

Early 20th century regulations of semi-automatic weapons were considered "obviously uncontroversial" exercises of states' police powers.  Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 69 (2017).  Indeed, restricting this kind of firepower was so well-accepted that, in 1928, the National Conference on Uniform State Laws promulgated a model law for national use.  *See* Ex. P, Model Law: Report of Firearms Committee, Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting 422, 428 (5, 11 of .pdf) (1928) (prohibiting possession of "any firearm which shoots more than twelve shots semiautomatically without reloading").  And the National Rifle Association endorsed the District of Columbia semiautomatic firing capacity law, stating that "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."  S. Rep. No. 72-575, at 5–6 (1932); *see also* Spitzer Decl. ¶ 13.

### C.  These Historical Regulations Are Relevantly Similar to the District's Law.

The District's Law is "relevantly similar" to the above analogues.  *Bruen*, 142 S. Ct. at 2132–33.  The limited burden it imposes on self-defense is comparable to that imposed by earlier regulations:  It is a narrow restriction targeted at a particularly dangerous weapons enhancement that is susceptible to criminal misuse, leaving available a wide variety of other options for self-defense.  And the justification for this regulation follows the same pattern as in prior eras.  The

District crafted its regulation in response to a particularly dangerous threat to public safety—the growing use of LCMs to facilitate crime and, specifically, to perpetrate mass murder.

### 1. Comparable Burdens

Akin to its historical analogues, the Law restricts only a type of particularly dangerous enhancement that has been widely adopted for criminal activity:  the ability to fire more than 10 rounds continuously, a feature that has facilitated gun violence and mass murder.  This presents a comparably limited burden on the right to keep and bear arms because it preserves the right of individuals to act in self-defense. *See McDonald v. City of Chicago*, 561 U.S. 742, 786–87 (2010) (plurality op.) (noting that the right to keep and bear arms is not an "intrinsic" right, valued for its own sake, but "instrumental"—a means to the end of enabling armed self-defense).

As discussed above, the regulations enacted throughout Anglo-American history targeted certain weapons considered uniquely dangerous and susceptible to criminal use. *See* Section II.B.  The Bowie knife, for example, was designed for maximum lethality and was labeled "efficient only in the hands of the robber and the assassin." *Aymette*, 21 Tenn. at 158.  When states passed regulations to respond to this threat, they did so specifically—indeed, a majority of states passed regulations restricting Bowie knives by name.  Spitzer Decl. ¶ 47.  The District's regulation is similarly targeted.  It does not ban any class of firearms, nor does it ban all magazines.  Instead, it restricts only the particular *subclass* of magazines that is strongly correlated with criminal attacks and mass shootings, and which is unsuited to self-defense.

This pattern of targeted regulation ensures that individuals retain access to firearms for constitutionally protected purposes.  When Tennessee and Arkansas banned the public carrying of a range of knives, blunt weapons, and pistols, for example, they included an explicit exception for large army and navy pistols so long as they were carried openly in the hand. *See* Rivas Decl.

¶ 18.  Despite the limited nature of this exception, courts held that it left the right to self-defense sufficiently intact and upheld the laws.  *See id.* ¶ 20.  The same approach can be seen in other regulations of dangerous gun accessories, particularly ammunition.  While these early laws could be restrictive—some states required that gunpowder be stored in a communal magazine, and at least one state flatly prohibited the possession of loaded firearms in the home, *see* Section II.B.2—they were regarded as appropriate exercises "of the police power" to protect the public from a weapons accessory known to be volatile and dangerous, *Brown*, 25 U.S. at 443.  The District's regulation presents an even lesser burden than these historical analogues.

Indeed, the District's regulation is closer to the prohibitions on trap guns enacted at the Founding, which regulated only the *manner* in which firearms could be configured and did not prevent gun owners from using those firearms for self-defense.  Like trap gun laws, the District's regulation prohibits a particular gun enhancement, one that enables these weapons to fire without pause for more than ten rounds and heightens the risk to innocent bystanders.  Beyond the narrow restriction on magazine capacity, however, gun owners are free to use their weapons and possess lawful ammunition.  *See* Section I.A.2.  The Law requires only that the shooter pause to change magazines every ten rounds, which significantly reduces the risk of injury from violent confrontation and mass murders.  *See, e.g.*, *Duncan*, 19 F.4th at 1109–10 (noting that an expert "described the period after a shooter has exhausted the current magazine as 'precious down-time' that 'affords those in the line of fire with a chance to flee, hide, or fight back'" and citing examples of "people fleeing, hiding, or fighting back during a shooter's pause"); *see ANJRPC*, 910 F.3d at 119 (similar); *Kolbe*, 849 F.3d at 128 (similar).  Nothing suggests that gun owners' ability to defend themselves is, in practice, at all burdened by the regulation.  *See* Section I.B.

### 2.  Comparable Justifications

The District's Law is also justified by the same reasoning that has driven governmental regulation of weapons (including weapons accessories and configurations) throughout history: The state's responsibility to protect the public from the increased danger caused by weapons that pose a particular threat to public safety.  As the historical analogues make clear, governments have long regulated weapons associated with rising crime rates and other salient societal dangers, and these regulations have targeted specific weapons with dangerous attributes, susceptibility to criminal misuse, or both.  The District's Law follows this tradition, addressing a particularly lethal form of firearms technology that has driven the rise of mass murder in this country.

LCMs have been linked to crime and mass shootings since the late 1980s, an association that led to their inclusion in the Federal Assault Weapons Ban in 1994.  "LCMs are used in crime much more often than [assault weapons] and accounted for 14% to 26% of guns used in crime prior to the [federal] ban."  Christopher S. Koper, et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* 2 (2004) (Koper 2004), http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.  Since the sunset of that law, the criminal misuse of LCMs has only increased.  Criminals frequently take advantage of the lethal capacity of LCMs to fire without pause, with devastating results.  Recent studies suggest that firearms equipped with LCMs are involved in somewhere between half and two-thirds of public mass shootings and mass murders that result in six or more fatalities.  Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Criminology & Pub. Pol'y 147, 151 (2020) (Koper 2020); *see* Ex. O, Decl. of Daniel W. Webster ¶¶ 9, 12.

And shootings tend to be more fatal when LCMs are involved:  The total number of victims killed and wounded are two to three times higher when LCMs are used.  *Id*. at 152. Attacks with assault weapons or other semiautomatic guns equipped with LCMs "result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms."  Koper 2004 at 3; *see also* Webster Decl. ¶¶ 10–12.  From Newtown to Las Vegas, Parkland to Tucson, Orlando to Uvalde, LCMs have enabled the most horrific mass shootings of our time.  *See* Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Magazines*, http://vpc.org/fact_sht/VPCshootinglist.pdf.

Contrary to Plaintiffs' assertions, *see* Pls.' Mem. at 19, LCM prohibitions effectively target this threat, reducing the frequency and lethality of mass shootings.  *See* Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 Am. J. Pub. Health 1754, 1754 (2019), https://tinyurl.com/4hmw3szk; *see also* Michael Siegel, et al., *The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018*, 44 L. & Human Behavior 347, 347 (2020), https://psycnet.apa.org/fulltext/2020-78672-001.html (explaining that bans on LCMs are associated with fewer fatalities and nonfatal injuries in mass public shootings).  States that enacted such restrictions experienced fewer mass shootings and, when they occur, fewer deaths and injuries in those shootings.  *See* Webster Decl. ¶ 15 (discussing Klarevas, *supra*, at 1758; Daniel W. Webster, et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Criminology & Pub. Policy 171, 188 (2020), https://tinyurl.com/y64ebzxd).

As discussed above, a similar rationale has justified firearms regulations throughout Anglo-American history.  Governments have always used their police powers to protect their

populations, particularly from weapons linked with crime or with especially dangerous features. In the colonial period, governments strictly controlled the storage of gunpowder because of the extraordinary risk of fire or explosions.  And as the homicide rate began to rise in the antebellum period, states adopted restrictions on the type of concealable weapons most frequently used in assaults.  Weapons like pocket pistols and Bowie knives, which were designed to be highly lethal and were often put to criminal misuse, were specifically targeted for regulation.  This pattern was repeated in the 20th century, when automatic and semiautomatic firearms proliferated.  The reason for these laws mirrors the reasoning behind the District's Law.[15]

\* \* \*

Governments have long exercised their powers to regulate the possession, use, and storage of unusually dangerous weapons and accessories in order to protect their residents.  And even at this early stage, the uniformity of the available historical evidence makes clear that the District's prohibition on LCMs is part of this unbroken tradition and therefore constitutional under the Second Amendment.  Plaintiffs are thus unlikely to succeed on the merits.

## III.    Plaintiffs Do Not Satisfy the Other Criteria for a Preliminary Injunction.

Plaintiffs' claims of injury are based on the alleged denial of their constitutional rights. But because their claims fail on the merits, Plaintiffs are not entitled to preliminary injunctive

---

[15]     Plaintiffs' exclusive focus on an alleged insufficient "handful" of regulations that "limit[ ] firearm magazine capacity" is doubly mistaken.  *See* Pls.' Mem. at 19, 21.  *First*, this is the wrong metric, as the District's prohibition on LCMs is a quintessential "modern regulation[ ] . . . unimaginable at the founding."  *Bruen*, 142 S. Ct. at 2132; *see* Section II.A.  *Second*, the number of states that restrict LCMs today is not a historically grounded approach for determining what laws are consistent with the Second Amendment.  Laws satisfy *Bruen*'s standard where they are "consistent with this Nation's *historical tradition* of firearm regulation."  *Id*. at 2126 (emphasis added).  The right to keep and bear arms accommodates state and local variation in "devis[ing] solutions to social problems that suit local needs and values."  *McDonald*, 561 U.S. at 784 (plurality opinion).  "[A]nalogical reasoning under the Second Amendment" is not a "regulatory straightjacket."  *Bruen*, 142 S. Ct. at 2133.

relief.[16]  Nor have Plaintiffs met the remaining factors necessary for a preliminary injunction.

Contrary to Plaintiffs' assertions, Pls.' Mem. at 22, the mere "allegation" of a Second

Amendment violation it is not enough to show irreparable injury.  *See Winter*, 555 U.S. at 21–22.

Instead, Plaintiffs must demonstrate that such a deprivation is actually "likely."  *Archdiocese of*

*Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (emphasis added).

Otherwise, anyone fearing a perceived rights-infringement would enjoy a presumption of

irreparable injury when seeking equitable relief.  That is not the law.  *See Winter*, 555 U.S. at 22

(rejecting the "possibility" of irreparable harm).  Because Plaintiffs' constitutional claims fail,

*see* Sections I and II, they cannot demonstrate that they will be injured, let alone irreparably so,

in the absence of an injunction.

Moreover, when "balanc[ing] the competing claims of injury," the Court must "consider

the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S.

at 24.  "Any time [the District] is enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S.

1301, 1303 (2012) (cleaned up)).   Furthermore, "[t]he equities and public interest . . . generally

weigh in favor of enforcing duly enacted state laws."  *Strange v. Searcy*, 135 S. Ct. 940, 940

(Feb. 9, 2015) (Thomas, J., dissenting).

These principles hold extra force here given the public's paramount interest in restricting

the use of deadly firearm accessories.  Plaintiffs' interest in possessing LCMs in anticipation of

---

[16]     The D.C. Circuit has not yet decided whether the "sliding-scale approach" remains valid
after *Winter*, *see Sherley*, 644 F.3d at 393, and Plaintiffs do not argue that that approach should
apply here.  However, the D.C. Circuit *has* made clear that it reads *Winter* to "suggest if not to
hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary
injunction.'"  *Id*. (citing *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir.
2009) (Kavanaugh, J., concurring)).

needing to fire more than 10 rounds without reloading—a circumstance so rare that Plaintiffs

offer only stray or irrelevant anecdotes in support of it—pales in comparison to the District's

interest.  Large-capacity magazines have been illegal in the District of Columbia since 2009.  If

the Court were to enter Plaintiffs' requested injunction, individuals who have been prevented

from acquiring large-capacity magazines for nearly 15 years will be able to lawfully possess

them.  Significant numbers of large-capacity magazines could flood into the District, hobbling

enforcement even if the prohibition is later upheld on appeal.  That risk is tangible.  *See* Matthew

Green, Gun Groups: *More Than a Million High-Capacity Magazines Flooded California During*

*Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, https://tinyurl.com/586mj8fa; Parsons

Delc. ¶¶ 10–13.  Such an influx could also have devastating consequences for the public, as

"LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality

mass shootings."  Klarevas, *supra*, at 1758; *see* Section II.C.2.

       The societal interest in preventing grievous injuries to and deaths of innocent civilians

and law enforcement caused by the use of LCMs is paramount.  Use of LCMs increases the

likelihood of indiscriminate fire that can strike a home, storefront, or bystander, especially in

urban environments like the District.  Parsons Decl. ¶ 25.  These bullets can and do travel

through walls and car doors.  *Id.*  Stray (and spray) gunfire is already a very real danger in the

District; in July 2022, for example, MPD recording devices documented discharge of 50 rounds

in 5.5 seconds.  *Id.* ¶ 23.  And allowing the use of LCMs risks multiplying the already tragic

number of deaths—including deaths of children—caused by errant bullets.  *Id.* ¶¶ 25–27.

Plaintiffs cannot demonstrate that it is in the public interest to enjoin a duly enacted law designed

to protect public safety and reduce gun violence and gun-related crime.  Indeed, invalidating the

District's prohibition on LCMs would remove a valuable tool from the hands of law

enforcement, making it more difficult to ensure the security of the Nation's Capital and to protect the safety of officers and members of the public. *Id.* ¶ 29.

## IV. <u>Any Injunction Should Be Limited to Plaintiffs' As-Applied Challenge.</u>

Even were the Court to find that Plaintiffs have established some entitlement to injunctive relief, Plaintiffs have not met the "heavy burden" to show that the District's prohibition on LCMs violates the Second Amendment's guarantee under *every* circumstance—the requirement for any facial challenge. *Salerno*, 481 U.S. at 745; *see Duncan*, 19 F.4th at 1101 (explaining that, to succeed on a facial challenge to an LCM prohibition, plaintiffs "must show that no set of circumstances exists under which [it] would be valid."). The District's prohibition applies to a wide variety of LCMs—stick magazines, drum magazines, 30-round versions, and even 100-round versions. *See* D.C. Code § 7-2506.01(b). Yet Plaintiffs make no effort to show that a 30-, 50-, or 100-round magazine is in common use for self-defense—nor could they. *See supra* Section I.B; *cf. Heller II*, 670 F.3d at 1261 (even assuming magazines holding 10 rounds are commonly owned, "[t]here may well be some capacity above which" they are not).[17]

Thus, any injunctive relief should redress *only* the injuries alleged (1) by Plaintiffs, and (2) as to the magazines they have offered evidence that they would use. The Supreme Court has recognized the "general rule"—rooted in traditional equitable principles—that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the

---

[17]     Nor do Plaintiffs make any argument with respect to the Law's prohibition on the "sell[ing]" or "transfer" of LCMs. D.C. Code § 7-2506.01(b). Thus, Plaintiffs' challenge is the "sort of 'separate attack on a defined subset of the statute's applications' [that] is better read as an as-applied challenge." *In re Sealed Case*, 936 F.3d at 588 n.4 (quoting *United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010)); *see also Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (describing the distinction between facial and as-applied challenges as "both instructive and necessary, for it goes to the breadth of the remedy employed by the Court"). And, in any event, Plaintiffs could not bring a facial challenge to the entire law because they lack standing as to the sale and transfer provisions. *Cf. supra* n.3.

plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (internal quotations and citation omitted).  And here, "a narrower remedy [would] fully protect [Plaintiffs]" and avoid prematurely resolving constitutional questions raised by other applications of the Law. *Nat'l Treasury Emps. Union*, 513 U.S. at 477–78.

Plaintiffs have offered no evidence that they currently own magazines with a capacity larger than 21 rounds, would seek to buy or use such magazines, or would be harmed if the injunction did not reach these larger magazines.  Although each Plaintiff filed a declaration in support of the Motion explaining that they seek to possess magazines holding more than 10 rounds while in the District, none mention any interest in possessing magazines with a capacity of more than 21.  *See generally* [8-2]–[8-5].  To the contrary, Plaintiffs aver only that they "would employ" magazines that *they already own* but keep outside the District.  *See id.* at ¶¶ 3, 4 (in each); *see, e.g.*, *id*. [8-3] at ¶¶ 3–4 ("I possess outside the District magazines . . . holding in excess of 10 rounds" and "I would employ these magazines").  None of those magazines have a capacity over 21 bullets.[18]  An injunction limited to the Plaintiffs and to LCMs with a capacity of 21 rounds would thus "fully protect" the Plaintiffs from the injuries they allege as part of their as-applied challenge.  *Nat'l Treasury Emps. Union*, 513 U.S. at 478.

Thus, if the Court finds that Plaintiffs are entitled to some form of preliminary relief— which they are not—the injunction should be limited exclusively to the Plaintiffs and should allow them (and only them) to possess LCMs with no more than 21 rounds of ammunition.

## V.     Defendants Would Be Prejudiced by Consolidation with the Merits.

---

[18]      In response to a discovery request, Plaintiff Yzaguirre stated he possesses a 20-round magazine; Plaintiff Chaney has a 21-round magazine; and Plaintiff Klun has a 15-round magazine.  Ex. A at 7–10.  Plaintiff Hanson has not specified the capacity of magazines he already owns, though he does state that two of the three firearms he normally carries (or would use for home defense) come "standard issue" with magazines of 17 and 15 rounds.  *Id*.

In addition to denying the preliminary injunction, this Court should also decline Plaintiffs' invitation to permanently enjoin the District's Law at this early stage of the case. Such a move under Rule 65 is "generally inappropriate." *Camenisch*, 451 U.S. at 395. And doing so here would "deprive [Defendants] of a full opportunity to discover and present all of their evidence." *Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*, 657 F.2d 124, 126 (7th Cir. 1981).

The law Plaintiffs challenge addresses "unprecedented societal concerns or dramatic technological changes," which demands a "nuanced approach." *Bruen*, 142 S. Ct. at 2132. Specifically, assuming LCMs fall within the Second Amendment's scope, it requires that Defendants and their experts undertake a complex survey of historical state and municipal laws and additional primary-source research on the Nation's tradition of regulation of firearms and other dangerous weapons. Defendants began their research by consulting the text of easily accessible historical state and local laws, but despite working diligently since Plaintiffs' Motion was filed, Defendants have not yet had the opportunity to fully explore all the relevant areas of inquiry. Such an effort would require time-intensive projects, like a deeper canvass compiling these laws, that are voluminous and unfinished. There are also many unexplored primary source materials that contextualize how these laws were understood and enforced, including official reports, manuscripts, newspaper articles, and archival records. *See* Rivas Decl. ¶¶ 9, 46, 47. Analysis of these primary source materials could also help identify historical traditions of restricting the availability and use of dangerous weapons through non-statutory means and could shed light on the historical development of arms designed and intended for civilian self-defense use. Defendants are not aware of existing secondary literature on these topics. Original work will be time-consuming. *See Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C. filed

June 30, 2022), Declaration of Zachary Schrag [18-13].  Defendants should be permitted time to conduct the research—including original archival research—necessary to provide comprehensive insight on these issues before this Court issues a sweeping constitutional ruling.

Not only have Defendants not yet developed a complete account of this American tradition of regulation, given the breadth and complexity of the historical analysis that *Bruen* now requires, but Plaintiffs have not yet even *responded to it*.  And if Plaintiffs *do* respond to the District's extensive survey of historical laws in their reply brief, Defendants will have had no opportunity to address any issues Plaintiffs raise.  Defendants should have the opportunity to fully develop the record on these factors, and to depose the Plaintiffs or to test at all the other evidence on which they rely in their Complaint and Motion, before the Court makes a final determination on the merits.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

Date: November 23, 2022.                              Respectfully Submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Mateya B. Kelley*
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]
HELEN M. RAVE[*]

45

Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 724-7854
Email: mateya.kelley@dc.gov

*Counsel for Defendants*

*Bar number pending