# EXHIBIT J

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, <br><br>    **Plaintiffs**, <br><br>    v. <br><br> **DISTRICT OF COLUMBIA**, *et al.*, <br><br>    **Defendants**. | <br><br><br> **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF BRENNAN RIVAS</u>

Pursuant to 28 U.S.C. § 1746, I, Brennan Rivas, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.  The views I state herein are drawn from my professional experience.

2.      I have been asked by the District of Columbia to render an opinion on the history of firearms restrictions enacted in the mid- and late nineteenth century, especially as it relates to large-capacity magazines (LCMs) as defined in D.C. Code § 7-2506.01(b).  I have also been asked when ammunition feeding devices capable of holding more than 10 rounds first became commercially available in the United States, widely or at all.

3.      I have been retained by the District of Columbia to render expert opinions in this case.  I am being compensated at a rate of $175 per hour for research and $200 per hour for my work on this declaration.

## BACKGROUND AND QUALIFICATIONS

4.      I am an Historian and Independent Scholar. From 2021 until earlier this year, I was the Lloyd Lewis Fellow in American History at The Newberry Library.  From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University.  From 2019 to 2020, I was a Lecturer in American History at Texas Christian University.  Before that, I was a graduate student in history who conducted research and administrative tasks on behalf of my professors, taught undergraduate survey courses, and worked at my university library.  My educational background includes a Ph.D. in History from TCU, where my Thesis was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

5.      My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; earlier this year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.  I am currently completing a book manuscript, based upon my dissertation research.

6.      I have provided expert witness testimony in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 22-cv-03093 (E.D. Wash.); and *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.).

7.      A true and correct copy of my current curriculum vitae is attached as Exhibit A.

## OPINIONS

8.      The field of gun law history is a relatively young and obscure one, though it will undoubtedly continue to grow as Second Amendment jurisprudence generates a need for more

and better scholarship on the subject.  My research, which represents some of the most in-depth work on nineteenth-century gun regulations, shows that there are historical firearm regulations similar to the District of Columbia's restrictions on large-capacity magazines.  Notably, during this period, several states prohibited the sale, gift, transfer, or importation of certain types of multi-shot revolvers and other pistols which people of the time associated with criminal activity.

9.      My research as an historian began with an exploration of a public carry law enacted in Texas in 1871; I examined its legislative history, socio-political context, and the ways in which it was amended over the ensuing decades.  For my dissertation, I expanded upon that project, tracing the weapon-related laws and bills debated in the Texas legislature from 1836 to the 1930s.  Even though my work has focused on a state-level case study (a methodological approach that is needed within this historical subfield), I placed Texas within the larger context of national and regional regulatory traditions.  Along the way I conducted additional research on late-nineteenth-century public carry and sales restrictions from Arkansas and Tennessee—two states whose gun laws Texan policymakers had clearly followed and considered emulating.  The years-long endeavor of uncovering the history of weapon regulations in Texas and the greater southwest forms the basis of my expertise in historical gun regulations.  This is a relatively young and small field for historians, and much work remains to be done to bring the landscape of nineteenth-century weapon regulations into a clearer view.

10.      My research into the history of nineteenth- and early twentieth-century gun laws demonstrates that the proliferation of public carry laws and sales regulations during that time grew out of Americans' concerns about rising levels of gun crime.  Technological developments in the design and production of firearms made them more lethal and more widely available in the decades following the Civil War, which led to the country's first encounter with rampant gun violence.  The first impulse of the American people, from the purported "wild west" to the seemingly refined metropolitan centers was to reduce the number of guns circulating in public by restricting access to them.  Importantly, these restrictions did not flatly ban the carry or

possession of all arms, and instead targeted only those weapons that posed significant risk to public safety at that time.

11.    In addition to the research I have conducted on gun laws, I have examined the availability of certain types of firearm magazines in the early twentieth century.  The core of this project has been a research trip to the McCracken Research Library[1] and access to significant firearm publications from the twentieth century, particularly *Gun Digest*.  Though it is still a work in progress, the research conducted so far indicates that semi-automatic firearms available for civilian purchase in the United States generally did not feature detachable clip magazines with a capacity of more than ten rounds until the late twentieth century; even through the mid-twentieth century, such firearms remained the rarity within a sizable market of semi-automatic weapons.

I.    **Brief History of the Colt Revolver and the Spread of Handgun Violence in the Nineteenth Century**

12.    The revolver design that came to dominate American markets during the mid- and late nineteenth century was patented by Samuel Colt in 1836.  He was not the first inventor to produce a multi-shot pistol, but he was the first whose creation became technologically and socially significant.  Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

13.    The Colt revolver diverged from pistols then widely available in two critical ways.  First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.  The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process.  By about the 1870s, technological developments in the design and

---

[1]    The McCracken Research Library houses the archives of the Winchester Repeating Arms Company in addition to numerous other gun-related materials; its collection of firearm history books is unparalleled.  The library is affiliated with the Buffalo Bill Center of the West in Cody, Wyoming.

functionality of ammunition meant that later models of Colt's could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more swift—a boon on the battlefield, but a new danger in other contexts.

14.     Though Colt's revolver was a revolutionary device that represented a paradigmatic shift in firearm technology, his company struggled to reach its potential.  The expiration of Colt's patent in 1857 opened the door for other manufacturers to enter the market without having to endure the same decades-long startup cost.  Meanwhile, the growing crisis over slavery and its looming prospect of war gave Colt what he had always wanted—substantial government patronage.  Southern states ordered as many revolvers as they could in the lead-up to Fort Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than willing to deliver.  But the far more important contracts came from the United States military, whose orders for pistols like Colt's revolver skyrocketed during the course of the Civil War.[2]  Wartime production by Colt, in addition to the new entrants into the market (like Smith & Wesson), created an unprecedented infrastructure to manufacture staggeringly large quantities of pistols. As production capacity increased and the U.S. military demobilized, more of these weapons became available to and affordable for American consumers; by the 1870s, the net result was more and cheaper pistols spread throughout the country,[3] introducing the United States to its first experience with rampant gun violence.

15.     The Civil War Era, making up the central three decades of the nineteenth century (1840-1870), marked a sharp departure for the United States in terms of violence and homicide

---

[2]     On the life of Samuel Colt and the history of his firearm manufacturing companies, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

[3]     Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online, see https://bit.ly/3VeUhHo.

in comparison to other Western nations.  Distrust in governing institutions and tremendous economic change wrought by industrialization primed Americans for homicidal violence to a degree that was unprecedented in American history.  In northern cities, rising population levels accompanied urbanization, labor agitation, and poverty, which caused an increase in homicide and crime.  Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s in the north remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s northern homicide rates began ratcheting upward yet again.[4]  Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined.  That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past.  In the southern states, the revolutionary consequences of emancipation and Reconstruction created an atmosphere of distrust of government and one's neighbor, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching violence suffered primarily by Black Americans and their political allies.  The disruption of war, occupation, and frequent changes in state government and constitutional structure bred attitudes of vigilantism and disregard for the judicial process.  Rates of violence and homicide remained quite high in the southern states across the nineteenth century.[5]  The proliferation of deadly weapons, and especially easily concealable pistols, to a point of near ubiquity in American

---

[4]      On homicide in American history, particularly as broken down into northern and southern regions, see Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[5]      Roth, *American Homicide*, 411-434.

communities rendered the interpersonal conflicts that erupted as a result of urbanization, Reconstruction, economic hardship, and social dislocation all the more deadly.

## II.    <u>Governmental Responses to the Rise in Handgun Violence</u>

16.    The response to this gun violence varied across the United States.  The most popular approach was the enactment or strengthening of public carry laws.  Jurisdictions that did not already have such laws were likely to enact them, and those using the older mechanism of sureties to keep the peace were likely to transition toward the implementation of criminal statutes mandating fines and/or jail time for violators.[6]  These public carry regulations targeted concealable items like pistols, sword canes, and daggers that were used in the commission of crimes and generally referred to as deadly weapons.  The closing third of the nineteenth century saw a flurry of this activity as states and municipalities tried new penalties, added new weapons to the lists of prohibited weapons, and generally attempted to eliminate small, easily concealable weapons from the public sphere.[7]

17.    Another strategy employed by state governments to reduce gun violence and gun crime was to tax certain types of firearms.  In 1894, Georgia enacted a new occupation tax law that applied to "dealers in pistols and other weapons."  A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five dollars per place of business.[8]  In 1907, the Texas legislature placed a fifty-percent sales tax upon pistols; dealers had to report their sales and pay the required tax to the state comptroller's

---

[6]    The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[7]    In the second half of the nineteenth century, items like metal knuckles and razor blades became targets for proscription alongside bowie knives, pistols, and sword canes.

[8]    Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia; see https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc.  Also, there were likely many more occupation taxes, though they have not been comprehensively indexed as of yet.

office on a quarterly basis.[9]  Sales and occupation taxes like these tended to be less about generating revenue than regulating an activity that was frowned upon by society more generally. Occupation tax laws applied to vendors who appealed to vices like smoking, gambling, and playing games as well as peddlers and itinerant salesmen.  When a Texas appellate court upheld the stringent sales tax (over loud complaints by dealers), the judge described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."  As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[10]

18.    Arkansas and Tennessee, for example, adopted a two-pronged approach that displayed attributes of both public carry laws as well as dealer regulations.  The first prong was to prohibit the public carrying of pistols.[11]  Courts in both states struck down early versions of the laws because they applied to all revolvers, including those being issued to certain classes of soldiers by the United States military.[12]  But they were quickly amended to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand.  By exempting these models, Arkansas and Tennessee lawmakers made their gun policies comport with the reigning Second Amendment jurisprudence of their day, which held that militia arms enjoyed special protection from certain forms of regulation.

---

[9]    An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).  See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, (PhD diss., Texas Christian University, 2019) 161-162.

[10]    *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

[11]    See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

[12]    *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

19.     Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite; case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited.  This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic and select-fire weapons for military use.

20.     When the Tennessee high court struck down the initial statute, which prohibited the carrying of *all* pistols, lawmakers swiftly wrote a replacement statute that, "it shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[13]  It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or hip holster; the only way to carry legally exempted pistols was to hold them in one's hand.  The purpose of this additional phrase was to curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency.  Arkansas's replacement statute was similar to that of Tennessee.[14]  The Tennessee

---

[13]     1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[14]     1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

Supreme Court upheld that state's replacement statute against constitutional challenge.[15]  The revised Arkansas statute received no notable challenge.

21.    The second prong which these states employed was a prohibition on the sale of certain pistols.  Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[16]  Arkansas followed suit but went even further by prohibiting the sale of pistol cartridges as well.  "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[17]

22.    Throughout the nineteenth century, Americans voiced their displeasure with the practice of carrying weapons in public spaces.[18]  Condemnations of such behavior and calls for regulations rang out across the country and became increasingly common during the late nineteenth century when economic and technological developments had made them easier to produce and cheaper to purchase.  Arkansas and Tennessee were no exception to this national rule, and commentators there engaged in the same discourse of their counterparts elsewhere.  The "shocks and violent convulsions which have been so fatal to law and order in the South" were well known, as was the fact that "the pistol, the knife, the shotgun and the bludgeon too often do

---

[15]    *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[16]    1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[17]    Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

[18]    For example, see Patrick Charles, *Armed in America* (New York: Promethus Books, 2018), 152 (noting the Georgia Supreme Court's view that it was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874))).

their bloody work."[19]  After the 1875 statute went into effect in Arkansas, news editors began

praising it as "about the best law that has ever been enacted in this state," and one that, had it

been in effect since statehood in 1836, "would have saved the lives of thousands of good men

who have fallen victim to the vice of carrying deadly weapons, or from the results and natural

consequences thereof."[20]  Some judges in Tennessee began handing down penalties of a fifty-

dollar fine plus sixty days in jail, and "as a result few persons carry deadly weapons in [that]

county."[21]  Reports of this rigid enforcement in Tennessee elicited praise among Arkansans, who

viewed it as a social benefit that in Tennessee "men who for years converted themselves into

walking arsenals discover that they can pursue their ordinary vocations without fear that they

may at any moment be called upon to defend their persons against assault."[22]  From their

perspective, the distrust of one's fellow community members that went along with habitual gun-

toting was a burden of fear that could only be lifted by prohibiting deadly weapons in the public

sphere.  Middle-class Americans, white southerners included, held the view that carrying deadly

weapons was not honorable, and that such behavior should be stopped.[23]

---

[19]    "Crime in the South" *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2.

[20]    *Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2.

[21]    The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee.  Judge Quarles of Nashville declared his intention to follow suit.  *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.  Judge Allen of Davidson County, Tennessee pledged to "impartially enforce the law" regarding weapons and "declared that 'it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them an unfair advantage over other citizens.'"  *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4.

[22]    *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.

[23]    For an example from Arkansas and Tennessee, see *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4 (reporting that a Tennessee district judge stated "that only ruffians carried pistols and it gave them an unfair advantage over other citizens,").  See also Mark Anthony Frassetto, "The Myth of Open Carry," *UC Davis Law Review* 55 (June 2022), 2518-2519.

23.     To fully understand these regulations, it is necessary to understand the different kinds of pistols and revolvers available during this time period.  First, at the larger end of the spectrum was the "army pistol" or "holster pistol," which was originally fashioned after the "horse pistols" that had been adopted by mounted units in Europe and the United States.  Such pistols were typically designed to be carried in a saddle mounted holster and could weigh four pounds or more when loaded.  Though the firearm became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras.[24]  The Arkansas and Tennessee restrictions carved out an exception for these weapons, but only when carried openly in the hand.

24.     Second, "belt pistols" were midsized models and would have been worn in a hip holster attached to the belt.  These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War.  The Colt navy pistol took on that moniker during the antebellum years when that model featured an engraving of a naval battle.  In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened;[25] during the period in which these statutes were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological evolution by referring to the larger, heavier, higher caliber pistols with longer barrels that were then issued by the United States military.  The sales bans under discussion here generally included "belt" pistols, so it remains unclear whether and to what extent the Colt's Navy pistol (which was technically a "belt" model) would have received exemption on the basis of its name and/or its use by the military forces.

---

[24]     On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[25]     See note 24, above.

25.     Finally, the third kind of pistol available was the "pocket pistol."  These were substantially smaller than the holster and belt models.  Pocket pistols ranged from single-shot, muzzle-loading derringers with barrels under two inches to revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel.  After the Civil War, military purchases slowed, which led gun manufacturers to pivot toward civilian sales.  They marketed pocket pistols heavily.  For instance, Colt's produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872.[26]  The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[27]  These cheap revolvers could be had for a few dollars, with used ones selling for even less.[28]

26.     It is in this context that the public carry regulations and associated sales bans and prohibitory taxes mentioned above must be understood.  A confluence of technical advancements and social changes resulted in the widespread adoption of new weapons, causing new societal problems that increased levels of interpersonal violence and ratcheted up public fear.  In response, state legislatures enacted regulations targeting the dangerous weapons that were the source of that problem.  These regulations remained in force well into the twentieth century.

---

[26]     For example, see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[27]     See note 24, above.

[28]     Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online, see https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

27.     Previous scholarship addressing these statutes has cast them as racially motivated.[29]  Those articles did not investigate deeply the primary sources of the time.  My research shows that these accounts have misrepresented the Tennessee and Arkansas statutes, which were enacted as a public safety measure rather than an attempt to disarm Black residents.  The argument made by other scholars, again based on little more than inference, has been that most white men served in the Civil War or had the means to purchase a "army/navy" pistol, and that the army/navy exception was tantamount to a whites-only exception to this policy.[30]  Civil War soldiers on both sides of the conflict were unlikely to be issued a revolver unless they were officers, cavalry, or artillery; a great number of enlisted soldiers who possessed revolvers during the conflict had purchased them on their own, and at times their carrying of the weapons caused sufficient trouble within the ranks that officers confiscated them.  Others discarded heavy and seemingly unnecessary pistols on long, grueling marches.[31]  Confederate service did not automatically correlate to white possession of an exempted pistol.

28.     Rather than impute racism to these laws simply because of their occurrence during Reconstruction, we should embed them within their appropriate political and cultural context.  The fact that Tennessee's legislature amended the public carry law so swiftly to add the army/navy exception could indicate to the casual observer that white residents were dissatisfied with the original statute; however, when the statutes and their constitutional challenges are placed in chronological order and interpreted in light of the other primary sources of the era

---

[29]     For example, Stefan B. Tahmassebi, "Gun Control and Racism," *George Mason University Civil Rights Law Journal* 2, no. 1 (Summer 1991), 74-75; Robert Leider, "Our Non-originalist Right to Bear Arms," *Indiana Law Journal* 89, no. 4, 1619-1620.

[30]     Tahmassebi, "Gun Control and Racism," 74-75.

[31]     On pistols and other arms issued during the Civil War, see Katelyn Brown, "Armed to the Teeth," *Military Images* 33, no. 4 (Autumn 2015), 32-36; Joseph G. Bilby, *Civil War Firearms: Their Historical Background and Tactical Use* (Conshohcken, PA: Combined Books, 1996); Graham Smith, *Civil War Weapons* (New York: Chartwell, 2011); Jack Coggins, *Arms and Equipment of the Civil War* (New York: Fairfax Press, 1982); *Arms and Equipment of the Union* (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, *Arming the Suckers: A Compilation of Illinois Civil War Weapons* (Dayton, OH: Morningside House, 1989).

(particularly newspapers and the widespread social contempt for publicly carrying deadly weapons), it is clear that racism was not behind the army/navy exemption. Instead, it represented the best effort of Tennessee lawmakers to emulate the kind of comprehensive public carry prohibition that was in force in Texas[32] while also respecting the parameters set forth by the state supreme court in *Andrews v. State*. The amendatory statute did not simply provide an exemption for army/navy pistols—it specified that even those pistols could not be carried in public unless openly in the hand. Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.

### III.    The Recent Emergence of Large-Capacity Magazines

29.    As explained below, the modern large-capacity magazine as we know it today was not widely distributed in the United States until quite recently. The semi-automatic weapons with which twenty-first century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the twentieth century. Nineteenth-century magazines capable of storing more than ten rounds of ammunition at a time were not usually detachable (which made for slower reloading time) or were designed for large, military-grade firearms that were not capable of being used or carried for personal use.

30.    In the decades following the Civil War, lever-action rifles became commercially available to American consumers for the first time. Lever-action rifles permitted the user to fire

---

[32]    Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *General Laws of Texas*, ch. XXXIV, §1 (1871). The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception. See *English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

multiple shots without reloading.  The lever-action design usually featured a fixed, tubular magazine that was loaded through a loading port on the side of the firearm.  While there are a handful of examples of these fixed tubular magazines capable of holding more than ten cartridges during that time period, such as the famous Winchester Model 1873 Repeating Rifle,[33] between each shot the user had to engage the lever action to discharge the spent shell and load a fresh cartridge from the magazine into the chamber.  And when all rounds had been expended, the user had to individually load cartridges back into the magazine by inserting them through the loading port.

31.    In fact, developments in cartridge design in the second half of the nineteenth century led to a shift toward smaller, not larger, magazine capacities, to accommodate larger and more powerful cartridges. The Winchester 1883 Hotchkiss Repeater was chambered for the newer 45-70 US Government cartridge and featured a magazine in the butt stock that held 6 rounds.[34]  And the Winchester Model 1894 Repeating Rifle was chambered for various center-fire cartridges and its maximum magazine capacity was only 8 rounds.[35]

32.    Around the turn of the twentieth century, John M. Browning began working on the design of a semi-automatic firearm that functioned through a "blowback" method in which "[t]he recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh cartridge into the chamber."[36]  This design was sometimes referred to as "automatic," though its function aligns with our current definition of "semi-automatic;" it was also referred to as "auto-loading" or "self-loading."

---

[33]    Thomas Henshaw, *The History of Winchester Firearms, 1866-1992* (Clinton, NJ: Winchester Press, 1993), 13-19.

[34]    Henshaw, *Winchester Firearms*, 23-24. On cartridges, see Frank C. Barnes and Stan Skinner, *Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges* 11th ed. (Iola, WI: Gun Digest Books, 2009), 96-97.

[35]    Henshaw, *Winchester Firearms*, 41.

[36]    "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

33.    Shortly after Browning's developments, Winchester released its Model 1903 Automatic Rifle, which employed this method, and featured a 10-round, fixed, tubular magazine for .22 caliber cartridges.  According to its product description, "…all that is necessary to do to shoot the ten cartridges that the magazine holds is to pull the trigger for each shot."[37] Winchester did not release a semi-automatic sporting rifle featuring a detachable magazine until its Model 1905 Self-Loading Rifle, and that detachable box magazine held only five cartridges in a single column.[38]  The next semi-automatic model, called the Model 1907 Self-Loading Rifle, featured a 5-round detachable box magazine.

34.    A major rival of Winchester at the time was Marlin Firearms, a company that became a highly popular producer of lever-action rifles.  Marlin did not begin manufacturing semi-automatic rifles until 1931 when the company (under new leadership) released the "22 Caliber Autoloading Rifle," also called the Model 50 / 50E.[39]  It came with a six-round detachable clip magazine.[40]

35.    As the twentieth century wore on, both Marlin and Winchester featured semi-automatic rifles as a part of their regular lineup of sporting firearms, though lever-action, pump action, and bolt action designs tended to be more popular.[41]  The magazine capacities of their semi-automatic models with detachable magazines remained at or below 10 rounds with very few exceptions.  In 1948, Marlin released the Model 89C chambered for .22 caliber long rifle rounds, which was sold with a standard 7-shot clip magazine.  Beginning in 1953, new models

---

[37]    "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[38]    Henshaw, *Winchester Firearms*, 61-62.

[39]    William S. Brophy, *Marlin Firearms: A History of the Guns and the Company that Made Them* (Harrisburg, PA: Stackpole Books, 1989), 300-301.

[40]    Brophy, *Marlin Firearms*, 301.

[41]    See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s.  Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

were sold with two 5-shot clip magazines.  In 1957, that changed once again when standard magazines for new manufactures was a 12-shot clip magazine.[42]  The last year in which Marlin featured the Model 89C was 1961; for the next two decades or more, the company's standard magazine sizes tended to max out at 7 rounds.[43]

36.     Even though Winchester produced semi-automatic rifles before Marlin, the company did not sell rifles with a standard clip magazine capacity over 10 rounds to civilians through at least 1996.[44]  For a brief period in the 1970s (1974-1978), the company produced the Model 490 Repeating (Autoloading) 22 Rim Fire Rifle.  These firearms came with a standard 5-round clip magazine and were shown with that magazine in Winchester catalogs; customers who wish to purchase magazines holding 10 or 15 rounds had to do so as accessories.[45]

37.     Records relating to the production and advertisement of rifles manufactured by two of the most popular brands shows that even though detachable clip/box magazines have been in existence since the early twentieth century, they were not generally sold with a capacity of more than 10 rounds until recently.  In fact, these records show that during most of the twentieth century standard clip/box magazine sizes usually ranged from 3 to 7 rounds.[46]

38.     The technological developments that produced automatic and semi-automatic rifles and shotguns also made possible the automatic and semi-automatic pistol.  A German engineer designed the first fully functional semi-automatic pistol, but its unusual size and shape

---

[42]     Brophy, *Marlin Firearms*, 306-307.

[43]     Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[44]     Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[45]     Henshaw, *Winchester Firearms*, 174.  Winchester Catalogs 1970-1975, Folder 1/3, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[46]     See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s.  Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

prevented it from being the financial success its manufacturers wanted.[47] The company commissioned Georg Luger to redesign it, which he did over the course of the 1890s.[48] Meanwhile, the American gun designer, John Moses Browning, developed various semi-automatic pistol designs. One, which promised US military contracts, was purchased by Colt's.[49] The company's developments began with a series of handguns chambered for .38 Auto, then .45 caliber rounds, each of which had a magazine capacity of less than ten rounds.[50] Efforts culminated in the development of the Colt Government Model .45 1911 Automatic—the standard-issue sidearm for American armed forces until the 1980s, which featured a magazine capacity of seven rounds.

39.     Browning's other semi-automatic pistol design was purchased by Fabrique Nationale d'Armes de Guerre (FN), a Belgian arms manufacturer. The FN Browning M1900 was released at the turn of the twentieth century and sold quite successfully in Europe. It was chambered for .32 caliber cartridges and had a magazine in the hand-grip which held seven rounds. These "Browning pistols" were associated with tremendous rises in crimes, accidents, and deaths related to firearms, and particularly the anarchist movement that carried out numerous assassinations on the Continent.[51] Like its closest European competitor, the Luger 9mm handgun, its magazine capacity remained below ten rounds.

40.     FN subsequently approached Browning to design another semi-automatic handgun that might be purchased in large numbers by the French army. One of the requirements for consideration was that the firearm have a magazine capacity greater than ten rounds.

---

[47]     Nathan Gorenstein, *The Guns of John Moses Browning: The Remarkable Story of the Inventor Whose Firearms Changed the World* (New York: Scribner, 2021), 119-120.

[48]     The company was Deutsche Waffen- und Munitionsfabriken (DWM), which owned a controlling interest in the Belgian armsmaker Fabrique Nationale d'Armes de Guerre (FN). See Gorenstein, *The Guns of John Moses Browning*, 128.

[49]     Gorenstein, *The Guns of John Moses Browning*, 123-125.

[50]     Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver, and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 205-207, 209, 210-213.

[51]     Gorenstein, *The Guns of John Moses Browning*, 130-133.

Browning was initially reluctant to participate in the endeavor but soon changed his mind.  An engineer from FN, Dieudonne Saive, developed a functional "double-stacked" magazine prototype, which offset cartridges in two separate columns to double the capacity.[52]  The resulting hand-grip was significantly wider than those of previous models, but it held thirteen 9mm cartridges.[53]  The FN Browning M35 Hi-Power pistol went into production after John M. Browning passed away in the 1930s, but FN produced the weapon (even though it was not initially selected by the French military) until 2018.  When the Nazis occupied Belgium, they took over the FN factory and produced some of these pistols for their own use during World War II.[54]

41.    Even though American companies and designers proved to be trailblazers in the development of semi-automatic handguns, American consumers were not quickly won over by them.  Through at least the World War II era, Americans seem to have preferred revolvers to semi-automatic designs; this was in sharp contrast to Europe, where semi-automatic pistols were favored over revolvers.[55]  Browning M35 Hi-Power pistols were sold in the United States and some Americans purchased them with magazine capacities greater than ten rounds, but by far most semi-automatic firearms on the American market maxed out at ten.  Brands like Colt's and Smith & Wesson produced several semi-automatic models for target shooting, police, military, and personal defense, and these firearms generally had a capacity of six to ten rounds.

42.    By 1940, Colt's still had not produced a handgun with a magazine capacity greater than ten,[56] and by 1944 the inaugural issue of Gun Digest (which published advertisements for the best-selling American handguns) did not feature one.[57]  By 1951, Gun

---

[52]    Gorenstein, *The Guns of John Moses Browning*, 209-210.

[53]    Henry M. Stebbins, Albert J. E. Shay, and Oscar R. Hammond, *Pistols: A Modern Encyclopedia* (Harrisburg, PA: The Stackpole Company, 1961), 140.

[54]    Stebbins, Shay, and Hammond, *Pistols*, 139-140.

[55]    Gorenstein, *The Guns of John Moses Browning*, 130-133.

[56]    Haven and Belden, *A History of the Colt Revolver*, 219-225.

[57]    *The Gun Digest: Complete Guide to American Rifles, Shotguns, Handguns and Accessories, The Encyclopedia for Shooters, 1944 First Annual Edition* (Chicago: Follett

Digest included the Browning Hi-Power in its lineup of "military small arms," but it was an outlier among the other sixteen semi-automatic handguns with magazine capacities of ten or less.[58]  The section featuring foreign handguns included two models with magazine capacities over ten out of a total of nine semi-automatic models.[59]  By 1969, the selection of handguns featured in Gun Digest had grown substantially, but only two models had a capacity of more than ten rounds.[60]

43.    The production history of mainstream American companies (like Colt's and Smith & Wesson) in addition to the enthusiasts' literature of the time shows that most semi-automatic handguns from the late-nineteenth and early twentieth centuries did not typically have magazine capacities larger than ten.  Even though the technology existed, American producers did not manufacture them in significant numbers until the post-World War II period.  And even then, the vast majority of handguns available for purchase (including semi-automatic pistols) had a magazine capacity of less than ten rounds.

## CONCLUSIONS

44.    An important lesson that the study of history shows us is that nineteenth-century Americans confronted a gun violence problem, and their solution was the enactment of state and local regulations that might limit the number of pistols in circulation.  These took the form of

---

Publishing Company, 1944, repr. 1963), 155-127.

[58]    John T. Amber, ed., *The Gun Digest: 5th Edition—1951* (Northfield, IL: DBI Books, Inc., 1950, repr. 1977), 131-132.

[59]    These were the Ranger 22 Automatic with a magazine capacity of 11 shots and the Starr Automatic Target Pistol with a magazine capacity of 11 shots.  See Amber, ed., *The Gun Digest: 5th Edition*, 146-147.

[60]    The two models with magazine capacities greater than ten were the Browning M35 Hi-Power (13 rounds) and the Universal Enforcer Auto Carbine (30 shot magazine).  All other handguns maxed out at 10 round magazine capacities.  See John T. Amber, ed., *Gun Digest: World's Greatest Gun Book, The Shooter's Encyclopedia of Handguns, Rifles, Shotguns and Accessories, Twenty-Third Anniversary DeLuxe Edition, 1969* (Chicago: The Gun Digest Company, 1968), 294-306.  That year's selection of foreign-made handguns featured only two models that could come with a standard magazine capacity greater than ten rounds.  The Luger 22 Auto Pistol had "a 12-shot capacity with one round in the chamber," and the MAB Autoloading Pistol could be purchased with a magazine capacity of either 8 or 15 rounds.  See Amber, ed., *Gun Digest 1969*, 345, 344-351.

public carry laws, prohibitive taxes, and other sales restrictions.  These states targeted pocket pistols and other types of weapons that, due to their concealability, were associated with forms of criminal activity that were threatening the public at that time.

45.    These restrictions on pocket pistols provide historical precedent for the District's restrictions on large-capacity magazines.  As explained above, large-capacity magazines as we understand them today only became commercially available for the first time in the later parts of the twentieth century and earlier parts of the twenty-first.  Sources pertaining to the development of semi-automatic firearms and detachable box magazines also indicate that through much of the twentieth century, most semi-automatics were sold to civilians with magazine capacities at or below ten rounds.  There are a few outliers in the historical record, but most semi-automatic rifles, shotguns, and handguns available in the United States were sold with magazines housing anywhere from three to ten rounds.  Some fixed, tubular magazines for rifles had a magazine capacity greater than ten rounds, but the operation and reloading of these firearms makes them qualitatively different from the detachable box magazines which Americans currently associate with semi-automatic weapons.

46.    As with any historical research project, my work on this subject remains ongoing. There is significant research and analysis to be done on the drafting and enforcement of the pistol sales restrictions in Arkansas and Tennessee, as well as the attitudes of residents toward them as time wore on.  Very little research that is based upon primary sources, other than the review of case law and historical statutes, has yet been conducted into the history of these statutes.

47.     Additional research is also required to develop a complete timetable for the introduction of magazines holding more than ten rounds and evaluate their production numbers, sales, and market penetration.  But this short overview is sufficient to draw a general conclusion that most semi-automatic weapons, at least through the mid-twentieth century, were not designed for or sold to civilians with magazine capacities larger than ten rounds.

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

SIGNED this 22 day of November 2022 at Fort Worth, Texas.

*Brennan Nicole Rivas*
Brennan Nicole Rivas (Nov 22, 2022 13:33 CST)
_____
BRENNAN NICOLE RIVAS, Ph.D.

23

# EXHIBIT A

# Brennan Gardner Rivas
Curriculum Vitae · July 2022

*brennan.rivas.phd@gmail.com*
*Professional Website*
*817.690.3918*

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
    University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
    2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
    Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
    the Lone Star State, 1836-1930"
    Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
    Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
    1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
    on the Place of Guns in American Law and Society* (New York: Oxford University Press,
    forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
    (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
    Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
    Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
    Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
    *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
> ~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
> ~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
> ~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
> ~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
> ~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
> ~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
> ~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
> ~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
> ~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights

Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"

Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West
Status: Research and writing in progress

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University                    2019-2020
  "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
  "American History since 1877: The Quest for Equality" (HIST 10613)
  "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                    2017-2018
  American History to 1877 (HIST 10603)
  American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
  ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
  ~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015
  ~ Informal departmental program designed to ease the transition for incoming graduate
    students

## Professional Memberships
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

## Languages
Spanish (Proficient)
Latin (Proficient)

## References
Gregg Cantrell, Erma and Ralph Lowe Chair in Texas History
Texas Christian University
Fort Worth, TX 76129
g.cantrell@tcu.edu

Saul Cornell, Paul and Diane Guenther Chair in American History
Fordham University
New York, NY
scornell1@fordham.edu

Brian DeLay, Preston Hotchkis Chair in the History of the United States
University of California, Berkeley
Berkeley, California 94720
delay@berkeley.edu

Laura F. Edwards, Class of 1921 Bicentennial Professor in the History of American Law and
  Liberty
Princeton University
Princeton, NJ 08544
laura.edwards@princeton.edu

Patrick J. Charles
Research Division Supervisor
Air Force Historical Research Agency
Maxwell AFB, AL 36112
patrickcharles26@gmail.com

LeAnna Schooley, Executive Director, Center for Texas Studies
Texas Christian University
Fort Worth, TX 76129
l.schooley@tcu.edu