**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**ANDREW HANSON, ET AL.**                              )
                                                                          )
                    Plaintiffs,                                  )
                                                                          )
v.                                                                        )   Civil Action No. 22-cv-2256 RC
                                                                          )
**DISTRICT OF COLUMBIA, ET AL.**                 )
                                                                          )
                    Defendants.                               )
_____ )


**MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO
OPPOSITIONS TO APPLICATION FOR PRELIMINARY INJUNCTION**


**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   January 23, 2022

# TABLE OF CONTENTS

I.      Introduction and summary of argument ……………………………………………….. 1

II.     Prevalence of firearms and magazines holding more than ten rounds of ammunition ……... 2

III.    The history of magazine capacity restrictions …………………………………………… 3

IV.     DC's magazine ban violates the Second Amendment …………………………………… 4

        A.      The proper standard for analyzing Second Amendment claims …………………… 4

        B.      DC's magazine ban restricts conduct protected by the Second Amendment ……….. 6

                1.  Magazines are "arms" within the scope of the Second Amendment …………… 6

                2.  Magazines over ten rounds are commonly used for lawful purposes ………….. 11

        C.      DC cannot show that relevant historical tradition justifies its magazine ban ……… 16

                1.  None of DC's historical evidence establishes a relevant and enduring
                    historical tradition of firearm capacity regulation ……………………………... 17

                    a. Medieval and pre-Founding English history ………………………………... 17

                    b. Colonial America and the Founding era …………………………………… 19

                    c. Antebellum America and Reconstruction …………………………………… 21

                    d. Twentieth century regulations …………………………………………… 24

                2.  DC's unmoored use of analogical reasoning that defies Bruen ………………… 27

                    a.  DC's modern magazine ban does not address an unprecedented
                        societal concern nor a dramatic technological change …………………… 27

                    b.  DC has failed to present relevantly similar historical analogues that
                        impose comparable burdens on Second Amendment rights to justify
                        its magazine ban ………………………………………………………... 30

V.      Plaintiffs have shown irreparable injury ………………………………………………… 32

VI.     The balance of equities and the public interest favor grant of the injunction ……………… 33

VII.    The Court should issue a permanent injunction ………………………………………… 34

VIII.   Conclusion ………………………………………………………………………… 35

# TABLE OF AUTHORITIES

*Cases*          **Page**

*Antonyuk v. Hochul,*
   2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6, 2022) ................................................ 26

*Antonyuk v. Hochul,*
   2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022) ........................................ 24-25

*Archdiocese of Washington v. WMATA,*
   897 F.3d 314 (D.C. Cir. 2018) .................................................................................... 33, 34

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty Gen. of N.J.,*
   910 F.3d 106 (3d Cir. 2018)........................................................................................... 8, 11

*Bliss v. Commonwealth,*
   12 Ky. 90 (1822) .................................................................................................................. 6

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016).............................................................................................. 7, 14, 17

*CityFed Fin. Corp.,*
   58 F.3d 738 (1995) ............................................................................................................ 33

*\*District of Columbia v. Heller,*
   554 U.S. 570 (2008)................................................................................................... passim

*Drummond v. Robinson Twp.,*
   9 F.4th 217 (3d Cir. 2021).................................................................................................. 7

*\*Duncan v. Becerra,*
   366 F. Supp. 3d 1131 (S.D. Cal. 2019)................................................... 11, 12, 16, 17, 26

*Duncan v. Becerra,*
   742 F. App'x 218 (9th Cir. 2018) ..................................................................................... 8

*Duncan v. Becerra,*
   970 F.3d 1133 (9th Cir. 2020)......................................................................................... 16

*Duncan v. Bonta,*
   19 F.4th 1087 (9th Cir. 2021) .................................................................. 3, 16, 17, 19, 32

*Elrod v. Burns,*
   427 U.S. 347 (1976) ......................................................................................................... 33

Authorities denominated with an * are primarily relied upon

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ...........................................................7, 8, 15, 33

*Firearms Pol'y Coal., Inc. v. McCraw,*
    2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022) ........................... 25

*Fisher v. Kealoha,*
    2012 U.S. Dist. LEXIS 90734 (D. Haw. June 29, 2012) ................................. 33

*Friedman v. City of Highland Park,*
    784 F.3d 406, 415 (7th Cir. 2015) ................................................................11

*Funk v. United States,*
    290 U.S. 371 (1933)........................................................................................ 18

*Fyock v. City of Sunnyvale,*
    25 F. Supp. 3d. 1267 (N.D. Cal. 2014) .................................................... 8, 13

*Fyock v. Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ................................................................. 7, 8, 11

*Gamble v. United States,*
    587 U.S. __, 139 S. Ct. 1960 (2019 ............................................................... 23

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs,*
    788 F.3d 1318 (11th Cir. 2015) ..................................................................... 15

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ....................................................................... 34

*Grace v. District of Columbia,*
    187 F. Supp. 3d 124 (D.D.C. 2016.) .............................................................. 33

*Hardaway v. Nigrelli,*
    2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3, 2022) ........................... 25

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ..................................................................... 11

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016)..................................................................... 15, 17

*Hurtado v. California,*
    110 U.S. 516 (1884)........................................................................................ 15

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) .................................................................. 7, 15

*Jones v. Bonta,*
    34 F.4th 704 (9th Cir. 2022) .................................................................. 8

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,*
    710 F.3d 99 (3d Cir. 2013) .................................................................. 33, 34

*Kolbe v. Hogan,*
    813 F.3d 160 (4th Cir. 2016) .................................................................. 8

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) .................................................................. 11

*Luis v. United States,*
    578 U.S. 5 (2016) .................................................................. 7, 10

*Miller v. Bonta,*
    542 F. Supp. 3d 1009 (S.D. Cal. 2021) .................................................................. 24

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009) .................................................................. 33

*Morris v. United States Army Corps of Eng'rs,*
    990 F. Supp. 2d 1082 (D. Idaho 2014) .................................................................. 33

*New York Times Co. v. United States,*
    403 U.S. 713(1971) .................................................................. 33

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S. Ct. 2111 (2022) .................................................................. passim

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) .................................................................. 8, 11, 12

*Ocean State Tactical, LLC v. Rhodes Island,*
    22-cv-246 (D. R.I. Dec. 14, 2022) .................................................................. 10

*Oregon Firearms Federation v. Brown,*
    22-cv-1815 (D. Ore. Dec. 6, 2022) .................................................................. 10

*\*Parker v. District of Columbia,*
    478 F.3d 370 (D.C. Cir. 2007) .................................................................. 17

*Peterson v. Martinez,*
    707 F.3d 1197 (10th Cir. 2013) ............................................................. 15

*Rhode v. Becerra,*
    445 F. Supp. 3d 902 (S.D. Cal. 2020) ..................................................... 33

*Staples v. United States,*
    511 U.S. 600, 612 (1994) ....................................................................... 25

*State v. Reid,*
    1 Ala. 612 (1840) ..................................................................................... 6

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) (en banc) .................................................... 8

*United States v. Decastro,*
    682 F.3d 160 (2d Cir. 2012) ................................................................... 15

*United States v. Miller,*
    307 U.S. 174 (1939) .......................................................................... 7, 10

*United States v. Nutter,*
    2022 U.S. Dist. LEXIS 155038 (S.D. W. Va. Aug.29, 2022) .................... 25

*Wilson v. Cook Cty.,*
    937 F.3d 1028 (7th Cir. 2019) ................................................................ 15

**Statutes**

1 Stat. 271 (1792) (Militia Act) ..................................................................... 19

18 U.S.C. § 922(w) ......................................................................................... 4

33 Hen. 8 c. 6, §1 ........................................................................................ 18

1785 Va. Statutes at Large 12 (12 Hening c. 1) ............................................ 19

1784 Mass. Acts 142 .................................................................................... 19

1786 N. Y. Laws 228 .................................................................................... 19

Cal. Penal Code § 16740 ................................................................................ 4

Cal. Penal Code § 32310 ................................................................................ 4

Colo. Rev. Stat. §§ 18-12-301–302 ................................................................ 4

Conn. Gen. Stat. § 53-202w ................................................................................. 4

D.C. Code § 7-2506.01(b) ................................................................................... 4

Del. Code Ann. tit. 11, § 1469(a) ....................................................................... 4

Haw. Rev. Stat. § 134-8(c) ................................................................................. 4

Mass. Gen. Laws ch. 140, § 121 ........................................................................ 4

Mass. Gen. Laws ch. 140, § 131 ........................................................................ 4

Md. Code, Crim. Law § 4-305(b) ....................................................................... 4

N.J. Stat. § 2C:39-1y, -3j, -9h ........................................................................... 4

N.Y. Penal Law § 265.00 .................................................................................... 4

N.Y. Penal Law § 265.36 .................................................................................... 4

Oregon Ballot Measure 114, Sec. 11 ................................................................. 4

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322,
      108 Stat. 1999 (1994) ................................................................................... 4

Vt. Stat. Ann. tit. 13, § 4021 .............................................................................. 4

### *Other Authorities*

Brennan Gardner Rivas, *The Problem with Assumptions: Reassessing the Historical
      Gun Policies of Arkansas and Tennessee," Second Thoughts,*
      Duke Center for Firearms Law (Jan. 2022) ....................................................... 35

Christopher S. Koper, et al., *An Updated Assessment of the Federal
      Assault Weapons Ban: Impacts on Gun Markets and Gun Violence,*
      *1994-2003*(Nat'l Instit. Just. June 2004) ......................................................... 3

*David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions,*
      78 Alb. L. Rev. 849, 851-64, 871-72 (2015) ............................................ passim

David B. Kopel, *What Should America Do About Gun Violence?:*
      Hearing Before U.S. S. Comm. on Judiciary, 113th Cong. 11 (2013) ............................. 4

Declaration of Michael Vorenberg, *Duncan v. Bonta,*
      17-cv-1017 (S.D. Cal. Nov. 11, 2022) .................................................... 23, 24

Herbert L. Osgood, The American Colonies in the Seventeenth Century 499-500 (1904) ......... 19

Joel Tiffany, A Treatise on the Unconstitutionality of American Slavery 117-18 (1849) ........ 6, 7

Thomas Wetmore, Commissioner, *The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City at 142-143 (1834)*, available at *Modern Law of Modern Law: Primary Sources* .................................... 19, 20

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (Bombardier Books 2022). M1 ...................................................................................... 12

*The Federalist No. 44* (James Madison) (Charles R. Kesler ed., 2003) ............................................ 7

Thomas M. Cooley, *General Principles of Constitutional Law* 271 (1880) ................................ 7

Transcript Hearing, *Duncan v Bonta, et al.,* 17-cv-1017 (Dec. 12, 2022) ................................... 23

*U.S. Const., amend. II ......................................................................................................... passim

U.S. Const., amend. XIV ...................................................................................................... passim

## I.    Introduction and summary of argument.

DC has failed to rebut Plaintiffs' showing they are likely to prevail on the merits. No tradition exists in America of banning commonly owned arms like the magazines at issue. And that should be the end of the analysis. DC, however, refuses to respect the fundamental right to keep and bear arms, and rebels against the confines of the text-and-history test. DC knows no "well-established and representative analogues" exist for banning magazines commonly owned by millions of Americans for lawful purposes, including self-defense, training, hunting, target shooting, and competition. Certainly, historical predecessors to modern firearms equipped with magazines able to hold more than ten rounds existed. We can debate their popularity. What is not open for serious debate is no longstanding American tradition of banning such arms existed. Regular Americans could—and did—lawfully own these arms in the 19th century. Since Plaintiffs are likely to prevail on the merits on their constitutional claim, the remaining preliminary injunction factors necessarily fall in their favor because loss of constitutional rights for even minimal periods is an irreparable injury and the balance of equities and public interest favor vindication of constitutional rights.

DC's defense of its ban on commonly possessed firearm magazines presents a host of specious arguments in some 600 pages exhibits and "expert" declarations. But its attempt to elevate the opinions of modern academics into equivalence with historical laws fails. Few of the voluminous pages contain any "relevantly similar" analogues, much less the "distinctly similar" analogues *Bruen* requires to support DC's ban on magazines of more than ten rounds. DC focuses on immaterial pre-Founding and 20th century history, but as to the most relevant time period—the Founding—it presents nothing remotely analogous to a ban on commonly possessed arms. As to the Reconstruction era, the best DC offers are laws restricting carry (but not possession) of concealed pistols and certain other weapons like Bowie knives. A ban on concealed carry does not approach the burden on Second Amendment rights that DC's ban on possession, even in the home, entails.

All the while, its experts admit no state laws regulated the repeating rifles that paved the way for today's semiautomatic firearms equipped with detachable magazines holding more than ten rounds.

DC instead seeks to revive the interest-balancing test *Bruen* expressly rejects, mentioning mass shootings and presenting expert declarations with little bearing on the merits. Although we do not need to, we respond to DC's experts, establishing: (1) mass murder is not a new societal problem; (2) repeating arms able to fire more than ten shots before reloading were common in the 19th century and not regulated; (3) magazines over ten rounds are commonly owned and used today for lawful purposes, including self-defense, training, target shooting and competitive shooting sports; and (4) DC*'s* evidence has not established such magazines make mass shootings worse, even if that were a valid consideration under *Bruen*. Defendants conclude by demanding more time to conduct discovery. They do not need discovery. They need historic laws that simply do not exist. Plaintiffs (and all DC residents who seeks to obtain and use standard magazines over ten rounds) have waited long enough for their rights to be respected. This Court should promptly rule on the merits.

## II.    *Prevalence of firearms and magazines holding more than ten rounds of ammunition.*

Magazines are necessary to operate most modern firearms, Hanish Decl. ¶¶ 21-25 (Ex. 1, hereto);[1] Helsley Decl. ¶ 9 (Ex. 2, hereto); Hlebinsky Decl. ¶ 12 (Ex. 3, hereto); Givens Decl. ¶¶ 11, 14, 15 & 17 (Ex. 4, hereto). Firearms and magazines able to accept more than ten rounds have been commonly possessed by the American public for generations.  Ex. 1 ¶ 18; Ex. 2 pp. 9-11 (references to pages in Ex. 2 are to the ECF page number); Ex. 3 ¶¶ 22-23, 27. *See also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851- 64, 871-72 (2015) (hereinafter "Kopel"). They have existed since well before the American Revolution. Ex. 2 p. 10; Kopel, at 852-53. *See also* Ex. 2 ¶¶ 7-8 (Washington and Adams were personally involved in

---

[1] Exhibits 1-3, 14 & 15, were filed in the case of *Duncan v. Bonta,* 17-cv-1017 (S.D. Cal.) on December 1, 2022. Inasmuch as the issues in the two cases are identical, these expert declarations are used here with the gracious permission of counsel for the Plaintiffs in that case.

negotiations that would have seen the United States purchase multi-shot muskets). And they "have been very commonly possessed in the United States since 1862." *See* Ex. 2 p. 11. "In terms of large-scale commercial success, rifle magazines over more than ten rounds had become popular by when the Fourteenth Amendment was being ratified. Handgun magazines of more than ten rounds would become popular in the 1930s." Kopel at 851 (footnotes omitted). Their popularity has only steadily increased over time, as technology has improved. *Id.* at 872; Ex. 2 ¶ 11 (between 500 million and 1 billion magazines with a capacity of over ten rounds produced); Harnish Decl. ¶ (Ex. 5, hereto). *See, e.g., Duncan v. Bonta*, 19 F.4th 1087, 1155 (9th Cir. 2021) (Bumatay, J., dissenting) (providing historical precedents for "large capacity magazines" from a 16-shooter developed in 1580 to the Winchester M1873, holding 10 to 11 rounds. More than 720,000 were made from 1873 to 1919).

Between 1990 and 2015 some 115 million magazines able to hold more than ten rounds were in circulation in this Nation. Ex. 1 ¶ 18; Ex. 2 ¶ 11; Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, 1994-2003 at 65 (N.I.J. June 2004). Indeed, magazines of a much larger capacity – up to 30 rounds for rifles and 20 for handguns – are "standard equipment for many popular firearms." Ex. 1 ¶ 27; Ex. 2 p. 9. Such magazines are predominately used for self-defense training and hence for self-defense as well as for other lawful purposes. Ex. 4 ¶¶ 11, 17; Ex. 5 ¶¶ 9-11; Murphy Decl. ¶¶ 7, 8, 13-18 (Ex. 6, hereto); Ellifritz Decl. ¶¶ 17-18 (Ex. 7, hereto); Werner Decl. ¶¶ 11-13 (Ex. 8, hereto).

### III.     *The history of magazine capacity restrictions.*

No relevant evidence supports an "enduring American tradition," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2155-56 (2022), of government restrictions on arms based on their magazine or firing capacity. As our opening submission showed, firearms and magazines holding more than ten rounds have existed since the mid-1500s, yet there were no restrictions on them when the Second Amendment was ratified. Ex. 3 ¶ 47. The first such law appeared "during the prohibition

era, nearly a century and half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment." *Id.* Save for this single law in the District, all of those original laws have since been repealed. *Id.* Today, most states place no restrictions on magazine capacity. The restrictions that are in place are of recent vintage, and they vary as to what constitutes a "large capacity magazine." *See* Kopel at 867-68.[2] Except for one brief period, the federal government did not regulate magazine capacity at all. In 1994, Congress adopted a nationwide prospective ban on certain magazines, which included a grandfather clause. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1999 (1994) (formerly 18 U.S.C. § 922(w)]. Ten years later, Congress vindicated the wisdom of the grandfather clause, but not the efficacy of the ban, allowing the ban to expire after a study commissioned by the DOJ revealed the law made no appreciable impact on crime. David B. Kopel, *What Should America Do About Gun Violence?:* Hearing Before U.S. S. Comm. on Judiciary, 113th Cong. 11 (2013). The possession and acquisition of magazines able to hold more than ten rounds remains legal federally.

## IV.   *DC's magazine ban violates the Second Amendment.*

### A.   *The proper standard for analyzing Second Amendment claims.*

*Bruen*, rejected the "two-step" test the Courts of Appeals applied in Second Amendment challenges. 142 S.Ct. at 2125. The first step asked if the government could justify the regulation by showing "the original scope of the [Second Amendment] based on its historical meaning" allowed

---

[2] Cal. Penal Code §§16740 & 32310 (current 10-round limit on possession originally adopted in 1999 as a limit on sale); Colo. Rev. Stat. §§18-12-301–302 (15-round limit, adopted 2013); Conn. Gen. Stat. §53-202w (10-round limit, adopted 2013); D.C. Code §7- 2506.01(b) (12-round limit adopted in 1932, reduced to 10 in 2009); Haw. Rev. Stat. §134-8(c) (10-round limit, handguns only, adopted in 1992); Md. Code, Crim. Law §4-305(b) (20-round limit on transfer adopted in 1994, reduced to 10 in 2013); Mass. Gen. Laws ch. 140, §§121, 131(a) (10-round limit without permit, adopted 1994); N.J. Stat. §2C:39-1y, -3j, -9h (15-round limit, adopted 1990); N.Y. Penal Law §§265.00, 265.36 (10-round limit, transfer banned in 2000, possession banned in 2013); Vt. Stat. Ann. tit. 13, §4021 (10-round limit for a long gun, 15-round limit for a handgun, adopted 2017); Del. Code Ann. tit. 11, §1469(a) (17-round limit; adopted 2022); *see* 2022 Oregon Ballot Measure 114, Sec. 11 (10-round limit, adopted 2022).

such a restriction on the right to keep and bear arms. *Id.* at 2126. If so, the analysis would "stop there." *Id.* But if history suggested the restriction was not "originally understood" as consistent with the right, or if the historical record was inconclusive, courts moved to a second step at which they typically subjected the regulation to intermediate scrutiny. *Id. Bruen* held that "[d]espite the popularity of this two-step approach, it is one step too many." *Id*. at 2127. The correct analysis starts and stops with consideration of the Amendment's text and historical tradition. *Id.* So, courts must ask whether the conduct in which an individual seeks to engage is within the ambit of the Second Amendment. *Id.* at 2129-30. If so, "the Constitution presumptively protects that conduct," *Id.*, and "the government must affirmatively prove its regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Id.* at 2127. To do so the government must "identify a well-established and representative historical analogue" to the measure. *Id.* at 2133.

The Court repeatedly emphasized the government's burden to justify a restriction on Second Amendment rights by proving a longstanding American tradition supporting the restriction.[3] The Court further admonished that "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. For example, "[h]istorical evidence that long predates" the Constitution "may not illuminate the scope of the right" if it contradicts American traditions, and courts must "guard against giving post enactment history more weight than it can rightly bear." *Id.* The Court also emphasized that a historical tradition requires "an enduring American tradition of state regulation," and not just a handful of laws in "outlier jurisdictions." *Id.* at 2155-56 (emphasis added). Application of *Bruen's* history-and-tradition test, requires a conclusion that DC's total ban

---

[3] "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126. "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition." *Id.* at 2127. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "[A]nalogical reasoning requires … the government identify a well-established and representative historical analogue." *Id.* at 2133. "[A]gain, the burden rests with the government to establish the relevant tradition of regulation." *Id.* at 2149, n.25.

on magazines over ten rounds is out of step with this country's historic tradition of firearm regulation. It is therefore unconstitutional.

> **B.   DC's magazine ban restricts conduct protected by the Second Amendment.**

The first question under *Bruen* is whether the Second Amendment protects conduct in which a person seeks to engage. 142 S.Ct. at 2129-30. The answer here is plainly yes. Plaintiffs simply want to purchase, possess, and use commonly owned magazines for lawful purposes such as self-defense, training, target practice and competition. That conduct falls comfortably within the Amendment.

> **1.   Magazines are "arms" within the scope of the Second Amendment.**

The Second Amendment guarantees individuals the rights "to keep and bear Arms." U.S. Const. amend. II. That includes the right to use them "for offensive or defensive action." *Bruen*, 142 S.Ct. at 2134, 2127, 2134-35 (Second Amendment protects the right to keep and bear arms in common use in case of confrontation for self-defense). *Id.* at 2158-59, 2161 (Alito, J., concurring) (Second Amendment protects both "possessing … and using a gun"). After all, the Amendment's text must be interpreted as it would have "be[en] understood by the voters" who ratified it. *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008). History shows those who ratified the Amendment understood it to guarantee a right to keep and bear a firearm for a multitude of lawful purposes, including self-defense. Indeed, early state court decisions interpreted analogous state guarantees as protecting the effective use of firearms. *See, e.g., State v. Reid,* 1 Ala. 612, 616-17 (1840) (Alabama's guarantee barred the legislature from adopting rules that "render [firearms] wholly useless"); *Bliss v. Commonwealth*, 12 Ky. 90, 92 (1822) (Kentucky's analogous guarantee "consisted in nothing else but in the liberty of the citizens to bear arms"). Nineteenth century commentators read the Amendment the same way. *See, e.g.,* Joel Tiffany, *A Treatise on the Unconstitutionality of American Slavery* 117-18 (1849) (without "impl[ying] the right to use" firearms the "guarantee would have hardly been worth the paper it consumed"); Thomas M. Cooley,

General Principles of Constitutional Law 271 (1880) ("to bear arms implies something more than the mere keeping; it implies the learning to handle and use them").

Because the Second Amendment right to "keep and bear arms" implies the right to use them, that the challenged law bans magazines, a firearm part and not firearms themselves, changes nothing. "Constitutional rights implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring) (collecting examples). "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen,* 142 S.Ct. at 2132, citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per curiam). "No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized." *The Federalist No. 44*, at 282 (James Madison) (Charles R. Kesler ed., 2003). *United States v. Miller*, 307 U.S. 174, 178 (1939), in considering whether possession of a short barrel shotgun was protected, referred to whether, "this weapon is any part of the ordinary military equipment, *or that its use could contribute to the common defense*," (citation omitted) (emphasis added), and noted Adam Smith's discussion of the militia in Wealth of Nations that "'The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former.'" *Id.* at 180.

Pre-*Bruen* precedent among the various circuits confirms that magazines and ammunition come under the Amendment's protection. *See Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing the "right to possess the magazines necessary to render … firearms operable"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them."); *Drummond v. Robinson Twp.*, 9 F.4th 217, 224, 227-28 (3d Cir. 2021) (zoning rules barring for profit shooting ranges and practice with center-fire ammunition); *Ezell v. City of Chicago*, 651 F.3d

684, 704 (7th Cir. 2011) (access to firing range for training); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016) (possession of "component parts" like detachable magazines), *vacated*, 849 F.3d 114 (4th Cir. 2017) (en banc), abrogated by *Bruen*, 142 S.Ct. at 2126-27; *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), *vacated on reh'g*, 2022 WL 4090307; *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc).

Magazines are essential to the operation of most modern firearms. Ex. 1 ¶¶ 21-25; Ex. 2 ¶ 9; Ex. 3 ¶ 12; Ex. 4 ¶¶ 14-15. They hold and feed individual ammunition cartridges into the chamber for firing. Without the magazine, firearms designed for use with magazines are limited to firing a single round—or none at all. Indeed, for safety reasons, many pistols are designed to fire only when the magazine is in place. In invalidating New York's ban on loading a magazine with more than seven rounds, the court in *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015) implicitly found that magazines are arms within the Second Amendment. That holding is consistent with other circuits. *See Ass'n of N.J. Rifle and Pistol Clubs v. Attorney General*, 910 F.3d 106, 116 (3rd Cir. 201) (hereinafter "*ANJRPC*") ("The law challenged here regulates magazines, and so the question is whether a magazine is an arm under the Second Amendment. The answer is yes."); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d. 1267, 1276 (N.D. Cal. 2014), aff'd, 779 F.3d 991 (9th Cir. 2015) ("[T]he court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as they are integral components to vast categories of guns.").[4]

DC tries to relitigate this well-settled issue, arguing magazines are not "arms" at all because, its linguistics expert opines, they would have been considered "accoutrements," not "arms," during the

---

[4] Only the Fourth Circuit has held that magazines over ten rounds are not protected—though not because they are not arms, but because the court held they are most useful in military service. *Kolbe v. Hogan*, 849 F.3d 114, 137-38 (4th Cir. 2017). Such a holding completely detaches the Amendment's operative clause from its preamble and ignores the underlying rational of the Second Amendment to ensure an armed populace as a prophylactic measure for the prevention of tyranny and to serve as an armed resource in the event of foreign invasion. Moreover, that such magazines are most useful in military service does not mean they are not useful for personal self-defense. *See* Ex. 6 ¶ 9; Ex. 8 ¶ 14.

Founding and Reconstruction Eras. ECF 17 at 16, citing ECF 17-4 ¶ 25). The claim (even if true) does not support DC's position that magazines are not protected by the Amendment. It ignores the long line of precedent discussed above that unquestionably holds items like ammunition and magazines are protected because they are "necessary to render … firearms operable" for their lawful purposes. *Fyock*, 779 F.3d at 998. DC's expert, Baron, says historical evidence "shows that during the Founding Era and the Reconstruction Era, arms [was] used as a general term for weapons," like swords, knives, rifles, and pistols, ECF 17-4 ¶ 10, and claims the term did not include "ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields," which he asserts were often called "accoutrements." *Id.* The logical conclusion from this argument would be the Second Amendment does not protect ammunition. That conclusion is inconsistent with *Heller,* absurd on its face, and sufficient to reject DC's argument altogether. In any event, Baron can only speculate that modern detachable magazines would also fall under that umbrella term in early America because, as he admits, detachable magazines did not appear until 1919 or later. *Id.* ¶ 58. A modern magazine is nothing like an ammunition container of the type Baron references. Those containers did not attach to the firearm. Nor were they necessary for the firearm to function. Magazines, on the other hand, are essential to the firearm that individuals "take into [their] hands," and are thus classified as part of the "arm" itself. *Heller*, 554 U.S. at 581. As Instructor Tom Givens notes, semi-automatic pistols are shipped by the manufacturer with a magazine inserted into the magazine well of the gun. Ex. 4 ¶ 15. Even if magazines are "accoutrements," like ammunition, they must still be protected, like ammunition, because they are essential to the operation of the firearms that use them. Ex. 1 ¶¶ 21-25; Ex. 2 ¶ 9; Ex. 3 ¶ 12.[5] Otherwise, the Second Amendment would only protect an unloaded gun

---

[5] DC cites instructor Givens as stating that the magazine is not part of the gun. ECF 17 at 16. However, Mr. Givens explains the context of that discussion was that magazines are a consumable, non-permanent part of the gun that are subject to wear and may need replacement. *Id.* ¶ 14.

of little use for self-defense other than as a club.[6] We acknowledge the recent decisions in *Oregon Firearms Federation, Inc. v, Brown,* 22-cv-1815 (D. Ore. Dec.6, 2022) and *Ocean State Tactical, LLC v. Rhode Island,* 22-cv-246 (Dec. 14, 2022) holding magazines are not arms and not protected. However, those cases were decided on different records, nor did they discuss the *Luis* or *Miller.*

DC does not dispute magazines are necessary to operate semi-automatic firearms, *see* ECF 17 at 17; nonetheless it argues that, because firearms can accept smaller magazines, magazines over ten rounds are not necessary to the operation of any firearm. *Id.* But that is not an argument magazines over ten rounds are not arms for Second Amendment purposes. If a magazine under ten rounds is an arm, as DC implicitly concedes, it does not magically transform into something else once it meets an arbitrary threshold for being "too large." And DC's claim that a larger capacity magazine is not "necessary" for a firearm to function for self-defense does not change anything other than inviting this court to engage in an interest balancing exercise *Bruen* prohibits. Taken to its logical end, DC's argument would allow banning sights, stocks, weapon mounted lights, and all but one caliber of firearm. No one firearm model would enjoy protection because none is "necessary" for self-defense. To allow the government to whittle down all aspect of arms to those it deems "necessary" would afford it the power to destroy the right. At bottom, DC is arguing the government may ban a subcategory of arms (here, magazines of a certain ammunition limit) as long as others remain available for effective self-defense – a borderline frivolous argument *Heller* soundly rejected. 554 U.S. at 629 ("It is no answer to say … it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.") For these reasons, it is hardly debatable that DC's magazine ban restricts arms under a plain reading of the Second Amendment.

---

[6] Under *Heller*, anything "a man wears for his defence" or "armour of defence" is considered a protected "arm" as well. *Heller*, 554 U.S. at 581. Thus, a shield and body armor are arms, despite Baron labeling them as "accoutrements." It would be strange indeed if body armor was protected by the Second Amendment, but not a firearm's magazine.

### 2.   Magazines over ten rounds are commonly used for lawful purposes.

The Second Amendment protects arms "typically possessed by law-abiding citizens for lawful purposes," not just for self-defense. *Heller*, 554 U.S. at 624-25. Plaintiffs' experts Givens, (Ex. 4 ¶ 17), Harnish (Ex. 5 ¶ 11), Murphy (Ex. 6 ¶¶ 7-8, 13), Ellifritz (Ex. 7 ¶¶ 17, 18) and Werner (Ex. 8 ¶¶ 9-13), all accomplished firearm instructors, explain that the magazines DC bans are commonly possessed and used for lawful purposes including self-defense, training and competition. And nearly every appellate court that has analyzed this issue has found, or was willing to assume, bans on magazines over ten rounds burden conduct protected by the Second Amendment. *See, e.g., Fyock*, 779 F.3d at 999; *ANJRPC,* 910 F.3d at 116; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d at 255; *Friedman v. City of Highland Park*, 784 F.3d 406, 415 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). *but see Kolbe*, 849 F.3d at 137-38. In short, it is well documented and almost universally accepted that the restricted magazines are commonly possessed in the United States for lawful purposes—including, but not limited to, the core lawful purpose of self-defense. *Bruen* did not alter the common-use analysis, so it is improper for DC to try to relitigate that issue here. Magazines over ten rounds are protected because they "are used for self-defense [and other lawful purposes] by law-abiding citizens. And they are common." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1143 (S.D. Cal. 2019).

Firearms able to discharge more than ten rounds without reloading were common in the Nation by the time of the Second and Fourteenth Amendments. Ex. 2 at p. 10; Ex. 3 ¶¶ 23, 29. *See generally* Kopel at 852-57 (recounting the history of rifles, handguns and magazines with capacities over ten rounds). And that popularity has only solidified as technology has improved and become more affordable. *Id.* at 857-64; Ex. 2 ¶ 11 & p. 11; Ex. 4 ¶ 8; Ex. 5 ¶ 11; Ex. 6 ¶ 7; Ex. 7 ¶ 17; Ex. 8 ¶ 11-13. Indeed, many of the Nation's best-selling firearms – including the ever-popular Glock pistol that Defendant Contee's officers use for self-defense – have for decades come standard with

magazines DC prohibits. Ex. 4 ¶ 8; Ex. 2 pp. 9-10. *See also Duncan v. Becerra*, 366 F. Supp. 3d at 1145 (discussing, among others, the popular "Glock 17, which is designed for, and typically sold with, a 17-round magazine." Today, millions of these magazines are in the hands of law-abiding Americans, and they are lawful in at some 40 states and under federal law. Ex. 1 ¶ 18; Ex. 2 ¶ 11; Under any reasonable measure, they are common. *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d at 255-57 (noting "large-capacity magazines" are "in common use" based on even the most conservative estimates). Moreover, these magazines are overwhelmingly used for lawful purposes. *See* Exs. 4-8. Renowned firearms historian, Stephen Helsley, explains that firearms and magazines over ten rounds were developed for self- and home-defense. Ex. 2, pp. 13-15. Firearm industry senior executive, Mark Hanish, explains firearms that come standard with magazines over 10 rounds have many benefits including "personal defense, target shooting, competition, and hunting," all of these being lawful purposes under *Heller*. Ex. 1 ¶ 11. *See also* Exs. 4-8. They are specifically marketed for those purposes. Ex. 1 ¶¶ 18-20, 26-29. *See* Ex. 9 (advertisements for firearms in Concealed Carry Magazine equipped with magazines holding more than 10 rounds). Civilians overwhelmingly choose them to increase their chances of staying alive in violent confrontations. Ex. 2 ¶ 11, & p. 11; Ex. 4 ¶ 13; Ex. 5 ¶ 8; Ex. 6 ¶¶ 9-12; Ex. 7 ¶ 13.[7] "Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds that has existed since the mid-nineteenth century." Kopel at 871**.** These magazines are overwhelmingly used for example in firearm classes by law-abiding citizens. *See* Exs. 4-8. It is no wonder that few courts have had trouble concluding that these magazines are typically possessed for lawful purposes.

---

[7] The U.S. government played a part in distributing such magazines. The Civilian Marksmanship Program sold some 207,000 M1 Carbines rifles to American citizens. Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* at 198 (Bombardier Books 2022). M1 carbines came standard with 15-round and later 30-round magazines. Id. at 58.

Unable to rebut the overwhelming evidence magazines over ten rounds are typically possessed for lawful purposes, including self-defense, DC retreats to the specious argument that the test for Second Amendment protection of a particular arm is "common use" not common ownership. ECF 17 at 18-25. According to DC, "a firearm being 'commonly owned' 'for lawful purposes," is not enough." *Id.* It must also, apparently, be both suitable for and in actual use for that purpose. *Id.* Moreover, DC employs a crabbed definition of "use," suggesting the magazines are not "used" for self-defense unless citizens actually fire more than 10 rounds in self-defense incidents, ignoring all other lawful uses of such magazines which make them protected under the Second Amendment. Aside from the fact that we showed examples of such incidents, as the district court in *Fyock* held, "Second Amendment rights do not depend on how often the magazines are used. Indeed, the standard is whether the prohibited magazines are 'typically possessed by law-abiding citizens for lawful purposes,' not whether the magazines are often used for self-defense." 25 F. Supp. 3d at 1276 (quoting *Heller*, 554 U.S. at 625). It is enough that they are commonly *possessed* for self-defense and other lawful purposes, not that their actual use in self-defense incidents meets some threshold DC has not identified. Besides, this argument is illogical. When Plaintiff Yzaguirre carries his Sig Sauer P365 with a 12 round magazine in Delaware – where that gun is currently stored – for his personal protection, he is using that gun and its magazine for self-defense. If a citizen fires two rounds out of a 15 round magazine to save his life, he nevertheless uses the 15 round magazine for self-defense. If it were otherwise, DC could justify a ban on all firearms able to fire more than two or three shots since, according to DC on average, only 2.2 shots are fired by defenders. Taken to its natural conclusion, DC's reasoning would justify banning any firearm. Most firearms have never actually been fired in self-defense at all and most defensive gun uses do not require the firing of any shots. *See* Ex. 8 ¶ 10. Surely, that cannot be the right result under *Bruen* or *Heller*. In addition to the examples Plaintiff has already provided of citizens firing more than 10 shots in self-defense,

Heritage Foundation researcher Amy Swearer presents a host of other such examples in her attached declaration, Ex. 10, hereto. *See also* Exs. 7 & 8 (discussing the limits of reported citizen defensive gun uses). That should end DC's crabbed claim that such magazines are not used for self-defense.

DC claims a "mere popularity" test for protection of arms is unworkable. ECF 17 at 19-20. It argues "the phrase 'in common use' as used in *Bruen*, *Heller*, and *McDonald* does not simply refer to a weapon's prevalence in society, or the quantities manufactured or sold." *Id.* Its claim is unsupported, and conflicts with Justice Alito's guidance on what really matters: "[T]he more relevant statistic is that 'hundreds of thousands of tasers and stun guns [the arms at issue] have been sold to private citizens,' who it appears may lawfully possess them in 45 states." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring)). Even if so, the record does not merely establish that magazines over ten rounds are popular for popularity's sake. It shows (1) they are marketed for self-defense, Ex. 1 ¶¶ 18-20, 26-29; Ex. 9; (2) they often come standard with the most popular self-defense firearms, Ex. 2 pp. 9-10; Ex. 4 ¶ 8; and (3) they are overwhelmingly chosen by Americans for self-defense and self-defense training, Ex. 1 ¶ 18; Ex. 2 ¶11; Exs. 4-8. The record also reflects many reasons why citizens prefer them for that purpose. Ex. 1 ¶ 26; Ex. 2 ¶ 11 & p. 11; Ex. 4 ¶¶ 12-14; Ex. 5 ¶ 8; Ex. 6 ¶¶ 10-14; Ex. 7 ¶ 13; Testimony of Massad Ayoob, *Colorado Outfitters Assoc. v. Hickenlopper*, Case No. 13-cv-1300 (D. Colo. April 1, 2014), Ex. 11 hereto (discussing advantage of such magazines for handicapped persons or persons injured in a confrontation and unable to reload their gun). This is  proof magazines over ten rounds are "typically possessed" and used for the core lawful purpose of self-defense. DC′s belief such magazines are "unsuitable" or "unneeded" for self-defense," ECF 17 at 20, lacks record support and is an irrelevant invitation to forbidden interest balancing. The record shows Americans overwhelmingly choose magazines over ten rounds for lawful self-defense *and* other lawful purposes such as training and competition. *See, e.g.,* Exs. 4-8. That choice is entitled to "unqualified deference." *Bruen*, 142 S. Ct. at 2131.

DC also rests much of its argument on the claim these magazines' usefulness for military or law enforcement purposes makes them both "unsuitable" for lawful self-defense and unprotected. ECF 17 at 20-22. But the Supreme Court's precedents do not withhold protection from arms merely because they are useful in militia service. *Heller* explained that machine guns are not protected because they are "not typically possessed by law abiding citizens for lawful purposes." 554 U.S. at 625. So, the test is whether the weapon is typically possessed by law-abiding persons for lawful purposes, not whether the arm is useful or even most useful in a military setting. *Hollis v. Lynch,* 827 F.3d 436, 445-46 (5ᵗʰ Cir. 2016). The 5ᵗʰ Circuit acknowledged there could be overlap between the two categories; they are not mutually exclusive as DC implies. *Id.* at 445.

*Bruen* "repeatedly confirms self-defense … is the 'central component' of the Second Amendment right." 142 S.Ct. at 2133. But this was true before *Bruen* as courts all agreed the "core" Second Amendment right was self-defense.[8] But referring to the right's "central component" or "core" does not suggest arms used in "militia service" are without Second Amendment protection. That would be an odd reading of the Amendment. Indeed, it would render its entire prefatory clause meaningless; a result that cannot be. *Hurtado v. State*, 110 U.S. 516, 534 (1884) ("[W]e are forbidden to assume, without clear reason to the contrary, that any part of this most important amendment is superfluous.") In sum, magazines over ten rounds are used by tens of millions of Americans for lawful purposes, with restrictions on such magazines being in effect in only a handful of states. Lawful purposes plainly include self-defense and self-defense training, but also includes hunting,

---

[8] *See, e.g., Wilson v. Cook Cty*., 937 F.3d 1028, 1032 (7th Cir. 2019) (discussing the core right of self-defense); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1323 (11th Cir. 2015) (same); *Peterson v. Martinez*, 707 F.3d 1197,1218-19 (10th Cir. 2013) (same); *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (same); *Ezell v. City of Chicago*, 651 F.3d 684 (same). *See also Fyock*, 779 F.3d at 998 (protection extends to magazines); *Jackson v. City & Cty. of San Francisco*, 746 F.3d at 967-68 (protection extends to ammunition).

target shooting, competition shooting, and as our history teaches us, as a final failsafe against a tyrannical government or foreign attack. The Second Amendment thus protects such magazines.

### C.   DC cannot show that relevant historical tradition justifies its magazine ban.

Under a faithful application of *Bruen*, DC cannot meet its burden to prove its magazine ban is part of the Nation's historical tradition. No "well established and representative" 19th century or prior historical analogues exist. To the contrary, history and tradition show the complete absence of "a well-established and representative historical analogue." *Duncan v. Becerra*, 366 F. Supp. 3d at 1149-53; *Duncan v. Becerra*, 970 F.3d 1133, 1147-51 (9th Cir 2020) (after conducting a "long march through the history of firearms," the panel found no evidence magazine capacity restrictions have any historical pedigree); *Duncan v. Bonta*, 19 F.4th at 1156-59 (Bumatay, J. dissenting) (state "fails to point to a single Founding-era statute that is even remotely analogous to its magazine ban."). DC suggests it is sufficient to show a relevantly similar historical analogue that imposes a comparable burden on Second Amendment rights. ECF 17 at 9. But whether a comparable burden exists on the right of armed self-defense is appropriate only when a challenged regulation seeks to address an "unprecedented societal concern" or "dramatic technological change." *Bruen*, 142 U.S. at 2133. And even then, such reasoning requires DC to first show a "well established and representative," *Id.*, historical analogue. Because no comparable restrictions on possession of common arms, let alone flat bans on firearms based on firing capacity, existed in the 19th century or earlier, DC resorts to arguing *Bruen* allows it to rely on incomparable law that imposed incomparable burdens. This it cannot do.

DC*'s* attempts to point to evidence of a relevant historical tradition, rests on the false premise that DC's modern magazine ban is part of an Anglo-American tradition of "restrictions on 'dangerous' **or** 'unusual' weapons, *Heller*, 554 U.S. at 627, while allowing law-abiding residences to possess and acquire other firearms for self-defense purposes." *See* ECF 17 at 27-34. The argument itself rests on two frivolous premises. First, the idea that the government may ban a class

of commonly possessed arms just because it leaves others untouched was soundly rejected in *Heller*, 554 U.S. at 629.[9] Second, and perhaps most shockingly, DC literally *rewrites* the *Heller* test for what arms are unprotected. Although it may be true that there is some "historical tradition" of excluding "'dangerous *and* unusual' weapons from the Amendment's protection," *Duncan v. Bonta*, 19 F.4th at 1148 (quoting *Heller*, 554 U.S. at 627) (emphasis added), the Supreme Court does not speak in terms of particularly dangerous weapons. As the 5th Circuit made clear in *Hollis,* dangerous and unusual arms can be banned, arms in common use for lawful purposes – like the magazines at issue in this case – cannot be banned. 827 F.3d at 446 ("protected weapons are 'those in common use at the time.' [*Heller*, 554 U.S. at 627]. If a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment.")

> The Second Amendment does not exist to protect the right to down pillows and foam baseball bats. It protects guns and every gun is dangerous. "If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." … "[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."

*Duncan v. Becerra*, 366 F. Supp. 3d at 1146 (*quoting Caetano*, 577 U.S. at 418 (Alito, J., concurring)). The Second Amendment protects arms unless they are both "dangerous and unusual." It "is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). And the magazines in question are not unusual.[10]

---

[9] *See also Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) ("The District contends that since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted."), *aff'd sub nom. Heller*, 554 U.S. 570 (emphasis added)).

[10] DC implies some set of higher capacity magazines, say more than 30 rounds might not be commonly owned, and thus susceptible to ban. ECF 17 at 20 n. 5. The problem is DC bans all magazines with a capacity greater than 10. That particular set of magazines is undoubtedly commonly possessed and used for lawful purposes; so, DC's magazine ban is hopelessly overbroad. Were DC to target only the set of truly high capacity magazines, it might be able to meet its burden under *Bruen.* Because of the overbreath of DC's magazine ban Plaintiffs challenge it both facially and as applied, notwithstanding DC's arguments to the contrary. *See* ECF 17 at 12-13, 47-48.

1. ***None of DC's historical evidence establishes a relevant and enduring historical tradition of firearm capacity regulation.***

   *a. Medieval and pre-Founding English history.*

*Bruen* stated, "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." 142 S.Ct at 2136. *Bruen* also explained the government must prove "an *enduring* American tradition of state regulation." *Id.* at 2155-56 (emphasis added). The Court gave pre-founding and English history little weight because "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136,citing *Heller*, 554 U.S. at 634. English history is ambiguous, and the Court saw "little reason to think that the Framers would have thought it applicable in the New World." *Id.* at 2139.[11]

DC nonetheless relies on  pre-colonial history. ECF 17 at 33. Yet, the history of banning mere possession of commonly owned arms is almost nonexistent. DC cites the very laws *Bruen* itself considered and rejected, including a 1541 Henry VIII law in which the use or keeping of handguns was restricted. The Supreme Court looked at this law and rejected it, explaining: Henry VIII's displeasure with handguns arose not primarily from concerns about their safety but rather their inefficacy. *Bruen*, 142 S. Ct. at 2140. The Court also explained the larger issue with these pre-colonial enactments—they contradict *Heller*'s historical analysis as the 1541 statute not only restricted public carry, but also made it unlawful for those without sufficient means to "kepe in his or their houses" any "handgun." 33 Hen. 8 c. 6, §1. So, even if a severe restriction on keeping firearms in the home may have seemed appropriate in the mid-1500s, it was not incorporated into

---

[11] We do not say pre-founding history is never relevant, but the standard is high. As the Court explained, a "long, unbroken line of common law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice." *Id.* at 2136. "Sometimes, in interpreting our own Constitution, 'it [is] better not to go too far back into antiquity for the best securities of our liberties,' [citation omitted] unless evidence shows that medieval law survived to become our Founders' law." *Id.* (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)).

the Second Amendment. *Bruen,* 142 S.Ct. at 2141, n.10. The Supreme Court has thus already considered—and rejected—the very history DC now relies on. That precedent binds this Court.

### b. Colonial America and the Founding era.

Moving to the Founding Era—the only era *Bruen* makes clear is relevant to the analysis—DC's historical evidence fares no better. DC fails to point to a single Founding-era statute that is even remotely analogous to its magazine ban. *See Duncan v. Bonta*, 19 F.4th at 1159 (Bumatay, J. dissenting). Not one of DC*'s* historians could identify a single Founding era law flatly banning a class of arms commonly possessed by Americans for lawful purposes. Ironically, the closest Founding-era analogues to ammunition [or firing capacity] regulations appear to be laws requiring that citizens arm themselves with particular arms and a specific *minimum* amount of ammunition.[12] The existence of such laws undercuts DC*'s* argument. Turning to DC's claimed founding-era analogues,  to support its claim that "[t]hroughout the colonial and founding eras" governments "imposed regulations on weapons and accessories that posed a heightened threat to public safety," ECF 17 at 34, DC relies on three types of laws: gunpowder storage restrictions, "trap gun," restrictions, and bans on carrying concealed weapons, which DC mischaracterizes as bans on dangerous and unusual weapons. *Id.* at 34-35. None of these laws is remotely similar to DC's flat ban on possessing a class of arms typically possessed for lawful purposes.

*Gunpowder Laws:* DC cites several Colonial Period regulations on gunpowder storage. But those laws were enacted, as DC admits, ECF 17 at 34, to prevent catastrophic explosions and fires in town limits or near a powder house.[13] These laws addressed the highly combustible and unstable

---

[12] *See* 1784 Mass. Acts 142; 1786 N. Y. Laws 228; 1785 Va. Statutes at Large 12 (12 Hening c. 1); 1 Stat. 271 (1792) (Militia Act); Herbert L. Osgood, The American Colonies in the Seventeenth Century 499-500 (1904) (showing that states required citizens to equip themselves with adequate firearms and ammunition—varying between twenty and twenty-four cartridges at minimum)." *Id.*

[13] *See, e.g.,* Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City at 142-143 (1834), available at The

nature of loose gunpowder, which is not a modern concern. They were not enacted to combat crime, in general, or mass killings, more specifically. More importantly, they regulated only the manner of storing gunpowder; they did not prohibit possession or use of any common arm. These distinctions are key because DC's proposed historical analogues must be both similar in type and similar in justification. *Bruen*, 142 S. Ct. at 2133. Dissimilar laws are not legitimate analogues rooted in "an enduring American tradition of state regulation" of arms. *Id.* at 2155-56.

*Trap Gun Restrictions:* "Trap guns" were guns set to fire without a person being present. ECF 17 at 35. They could be triggered by any unsuspecting animal or person that happened by. DC explains these laws were passed because their "uncontrolled lethality raised the risk of harm to innocent bystanders." *Id.* But like early gunpowder regulations, these laws did not ban any arms. Rather, they regulated the manner of using them. They banned setting a loaded, unattended gun to prevent unintended discharges. Moreover, DC's characterization of the justification for such laws, risk to innocents, is far too broad. Any gun restriction could be said to promote public safety or protect innocent life. But "trap gun" laws were necessary because setting loaded, unattended guns to discharge automatically entails an incredibly specific risk to life entirely unrelated to violent crime.

*Bans on concealed carry:* Finally, DC turns to Colonial-era restrictions on what it falsely calls carrying "dangerous and unusual" weapons. ECF 17 at 35, citing ECF 17-10 ¶ 56. But DC is relying not on flat bans on possession or carry of any arm, but rather the manner of carrying them in public (i.e., concealed). *See* ECF 17-10 at Appendix I (showing each of these laws to be a concealed carry restriction). Like restrictions on gunpowder storage and setting "trap guns," early restrictions on concealed carry are not remotely analogous to DC's magazine ban which bans possession even in the home. It matters not that, according to DC, some such laws targeted the concealed carry of

---

Making of Modern Law: Primary Sources (An Act ... Prudent Storage of Gun Powder within the Town of Boston. Whereas the depositing of loaded arms in the houses of the town of Boston, . . . is dangerous . . . when a fire happens to break out in said town").

particular types of firearms. *See* ECF 17 at 35. What matters is that, unlike the magazine ban at issue here, such laws did not ban possession of those arms targeted for restriction nor open carry.

### c. Antebellum America and Reconstruction.

Failing to identify a single relevant founding-era law, let alone an "enduring American tradition" of regulation, DC shifts its focus to antebellum America and the Reconstruction Era. DC argues that "during the antebellum and postbellum period, around the time that the Fourteenth Amendment was ratified, numerous states restricted particular weapons deemed to be "especially dangerous or susceptible to criminal misuse." ECF 17 at 35. DC, however, admits that these laws targeted concealed carry of weapons. They were not a complete ban on carry or possession of these arms. So, they are not relevantly similar to DC's magazine ban, much less substantially similar. Thus, these laws are irrelevant to DC's ban on standard magazines over ten rounds—arms that millions of Americans possess and use for lawful purposes, including (but not limited to) self-defense. *Heller* rejected the premise that arms that are otherwise commonly chosen by the law-abiding for lawful purposes can be banned just because criminals might misuse them. 554 U.S. at 628-29. Indeed, *Heller* struck DC's handgun ban even though such weapons made up a significant majority of all stolen guns and are overwhelmingly used in violent crimes. *Id.* at 698 (Breyer, J., dissenting). Beyond these fundamental flaws in DC*'s* reasoning, however, Reconstruction-era history does nothing to justify under *Bruen* DC's modern magazine ban.

DC cites state and some state and municipal laws during this period restricting concealed carry of blunt weapons,[14] including laws restricting "bludgeons," "billies," certain "clubs," "slungshots," "sandbags," as well as concealed firearms, but emphasizes restrictions on 'Bowie Knives' as particularly dangerous weapons. ECF 17 at 36-37 citing ECF 17-10 ¶ 44. DC claims 49 states

---

[14] Certain 19th century laws prohibited slaves from carrying clubs and other weapons. It should go without saying that racist laws enacted to disarm classes of marginalized people provide no legitimate analogue for modern day arms bans. If they did, certainly *Bruen* would have mentioned them.

banned carrying Bowie knives. *Id.* at 37 citing ECF 17-10 ¶ 47. This is simply a falsehood. ECF 17-10 at Appendix 4 provides a compilation of all of these laws on which DC relies. With very few exceptions (generally municipal or territorial regulations, not state laws), none of those laws purport to be a complete ban on *carry or possession* of any weapon, including Bowie Knives. These laws restricted concealed carry, restricted distribution to minors and restricted misuse of weapons. ECF 17-10 Appendix 4. Most of the few exceptions were considered and rejected in *Bruen. See* 142 S.Ct. at 2153-56. With specific respect to Bowie Knives, renowned Second Amendment historian David Kopel, whose work was cited favorably in *Bruen*, recently published a detailed evaluation of Reconstruction-era Bowie knife laws that confirms this analysis. *See* Ex. 12, hereto. He concluded:

> At the end of the 19th century, no state prohibited possession of Bowie knives. Two states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes, such as Alabama's $100 transfer tax from 1837, had been repealed.
>
> Only a very few statutes had ever attempted to regulate the peaceable possession or carrying of Bowie knives more stringently than handguns or other fighting knives, such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on the books by the end of the century…. As with handguns, the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives.… The much more common approach was to legislate against concealed carry, criminal misuse, or sales to minors.

*Id.* Once again, DC relies primarily on historical laws restricting the manner of carrying arms in public, not their possession or even use. At best, it evidences that concealed carry was disfavored in Reconstruction-era America, which we already know from *Heller. See* 554 U.S. 612-14, 626. But such evidence was not enough to justify modern-day bans on all carry in *Bruen*, so it is difficult to see how such laws could support DC's flat ban on possession of commonly possessed magazines.

*Bans on Carrying Revolvers and Pistols:* DC also cites restrictions on carrying certain "pocket pistols," but not all concealable pistols, enacted in Tennessee and Arkansas, ECF 17 at 36; but that again, misses the mark because restrictions on the manner of carrying arms in public do not impose a burden on the Second Amendment that is in any way comparable to the burden imposed by a ban

on their acquisition and possession. They are not "relevantly similar" as *Bruen* requires. 142 S.Ct. at

2122. DC notes these two late 19th century statutes also restricted not just concealed carry, but also

imposed regulations on dealers selling these arms. ECF 17 at 36 (citing ECF 17-12 ¶ 21, 25, 44).

But this is still only two outlier laws of underdetermined duration. And historical concealed carry

bans (especially in just two states) do not justify modern day carry bans, let alone flat bans on the

possession and acquisition of commonly possessed arms as DC imposes here. Moreover, *Bruen*

warned that courts should refrain from "giving post enactment history more weight than it can

rightly bear." 142 S.Ct. at 2136. "[T]o the extent later history contradicts what the text says," as

DC*'s* cited Reconstruction era concealed carry bans do, "the text controls." *Id.* at 2137 (citing

*Gamble v. United States*, 139 S.Ct. 1960, 1987 (2019) (Thomas, J., concurring)).

*Regulation of Repeaters*: Finally, to support DC's unprecedented ban on magazines over ten

rounds, Brady amici claim Henry and Winchester rifles with magazine capacities in excess of 10

rounds were not really popular with civilians when the 14th Amendment was ratified. ECF 18-1 at

23-24. Even if true, and it is not, this claim provides no relevant historical basis for DC's magazine

ban.[15] Professor Vorenberg in a declaration filed in *Duncan v. Bonta,* 17-cv-1017 (S.D. Cal. Nov.

11, 2022) ("Vorenberg"), acknowledged that Americans came to regard self-defense as important in

the western states, and the Winchester Company capitalized on this in their marketing. *Id.* at ¶ 54.

Yet he contended these rifles were not popular and did not sell well. *Id.* at ¶¶ 55-59. However, given

that the military did not adopt Henry-Winchester rifles, and that over 100,000 of them that were

produced in the Reconstruction era stayed in the country, it follows they were commonly owned by

---

[15] Judge Benitez said recently that he conducted his own statistical analysis of civilian repeating-
rifle ownership in the 1800s, consulting the Winchester company website and anecdotal
evidence, and concluded "there was an awful lot of those weapons that wound up in civilian
hands." *Duncan v. Bonta,* Case No. 17-cv-1017, Tr. 21-22 (Dec. 12, 2022). "[I]f you look at Mr.
– Professor Cornell's – if you look at Professor Vorenberg's materials, which I have looked at,
you see that the statement that they were not commonly owned is just not true." *Id.* at 22.

regular citizens. *Id. See also* Kopel at 869 ("The best of these was the sixteen-shot Henry Rifle, introduced in 1861 with a fifteen-round magazine. The Henry Rifle was commercially successful, but Winchester Model 1866, with its seventeen-round magazine, was massively successful.")

In any event, DC fails to identify a single law banning the acquisition and possession of these rifles (or any other firearm) based on their firing capacity in this relevant time period. In his declaration in *Duncan,* Vorenberg candidly admits this fact. *See* Vorenberg ¶ 8 ("[E]xplicit legal text prohibiting civilian possession of the most dangerous weapons of war was not commonly the means by which such weapons were regulated in the United States.") Speculative explanations for why legislative action did not occur cannot justify DC's restriction on standard capacity magazine. To the contrary, *Bruen* demands DC to identify relevant and well-established historical laws evidencing an American tradition of similar regulation.

### d. Twentieth century regulations.

*Bruen* gave little weight to pre-Founding era history. 142 S.Ct at 2136. The Court considered 20th century history even less important. It only referenced it in a footnote, stating it would not even

> address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.

*Id.* at 2154, n.28. [16] DC nevertheless cites several laws adopted in the 20th century it claims banned firearms based on their firing capacity. ECF 17 at 38-39. These laws contradict this country's long

---

[16] Based on *Bruen*'s clear guidance, the first wave of post-*Bruen* decisions rebuked calls to rely on evidence of 20th century regulations. As the Northern District of New York recently observed, "to the extent these laws were from the 17th or 20th centuries, the [c]ourt has trouble finding them to be 'historical analogues' that are able to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868." *Antonyuk v. Hochul,* No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944, at *127 (N.D.N.Y. Nov. 7, 2022). The Western District of New York likewise observed that:

history of not banning classes of arms in common use for lawful purposes. They are thus irrelevant outliers that provide no insight into the original meaning of the Second Amendment. This Court should thus follow *Bruen's* lead and ignore DC*'s* 20th century evidence.

Although such evidence is irrelevant to the issue before this Court, we address DC's claimed 20th century "analogues." To begin with, DC has pointed to no restrictions on magazines over ten rounds enacted before 1990. DC does reference several laws dating to the 1930s. ECF 17 at 38, citing ECF 17-10 ¶¶ 19-22. But as DC admits, the laws it cites largely pertained to restrictions on machine guns. *Id.*[17] Nonetheless, relying on ECF 17-10 ¶ 19, DC claims nearly half the states adopted capacity restrictions; but ECF 17-10 actually claims only 12 applied to machine guns *and* semi-automatic firearms, while nine applied only to machine guns. *Id.* If we look at the actual laws involved, however, it tells an entirely different story. Of the 12 states ECF 17-10 claims adopted capacity restrictions that applied to semi-auto firearms, the New Jersey and North Carolina statutes actually limited the amount of ammunition in a gun only while hunting, plainly inapposite. *Id.* at n.28. Louisiana's law plainly applied only to actual machine guns (*see Id.* at 60) ("automatically discharging") and did not prohibit possession. *Id.* Likewise, Section 6 of the Virginia law, a section

---

> *Bruen* itself invalidated a century-old New York proper cause requirement similarly in effect in five other states as well as the District of Columbia. That seven jurisdictions enacted similar restrictions was insufficient in the face of a much broader and much older public-carry tradition. If such was a failure of analogs or tradition in *Bruen*, the State's argument must also fail here.

*Hardaway v. Nigrelli*, No. 2022 U.S. Dist. LEXIS 200813, at *37, n.16 (W.D.N.Y. Nov. 3, 2022) *See also United States v. Nutter*, 2022 U.S. Dist. LEXIS 155038, at *9 (S.D.W.Va. Aug. 29, 2022) (holding that laws originating in the 20th century alone cannot uphold a law unless similar laws existed in the Founding era); *Firearms Pol'y Coal., Inc. v. McCraw*, 2022 U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (holding that 22 state laws adopted in the 20th century were insufficient historical justification for a ban on firearms purchases for those under the age of 21). DC discusses none of these cases.

[17] What makes a machine gun "dangerous and unusual" is its ability to fire automatically, not to accept detachable magazines of more than 10 rounds. *See Staples v. U.S.*, 511 U.S. 600, 612 (1994) (difference between lawfully possessed AR-15s and unlawfully possessed M-16 machine guns, both capable of accepting "large capacity magazines," is the latter's ability to fire automatically).

omitted from ECF 17-10's recitation of the Virginia law, shows that the Virginia did not prohibit possession of all guns it defined as machine guns and allowed such guns to be used for self-defense. *See* Ex. 13, hereto. The Massachusetts law plainly referred to fully automatic weapons ("operates automatically"), as did the laws of South Carolina ("automatically discharging") and South Dakota ("single function of the firing device"), ECF 17-10 at 61, 74-77, which in any event did not ban all machine guns (ECF 17-10 at 77). Finally, the Minnesota statute applied to semi-auto firearms *only* if they were altered to increase the firing capacity beyond their original design. ECF 17-10 at 62. California's law is admittedly ambiguous, yet it is plainly directed to restricting machine guns. *See* ECF 17-10 at 49-50. We are thus left with the handful of laws we addressed in our opening submission: Michigan (16 rounds), Ohio (18 rounds) (a licensing law, not a prohibition on possession or use), Rhode Island (12 rounds) and the District's (12 rounds). DC *'s* brief attempts to mislead this Court, grouping all of these unrelated restrictions together as if they all pertained to blanket magazine capacity restrictions on semi-automatic firearms in common use for lawful purposes. That is not the case. Moreover, as *Duncan* found, all of these laws except the District's were repealed within decades. *See Duncan*, 366 F. Supp. 3d at 1150. *See also* Kopel at 874.

So, of the few states that actually had capacity limits that applied to semi-auto firearms, all had limits of more than ten rounds. Only the District itself has had a capacity restriction in place since the 1930s, and even there the limit was 12, not 10, until 2009. DC submits these laws even though *Bruen* weakens their persuasive value by clearly stating 20th century laws are of little use to the Second Amendment analysis. To be clear, 20th century laws do not establish a historical tradition; they can only confirm what came before. And as already discussed, there is no relevant Founding-era or Reconstruction-era tradition of banning a class of arms commonly possessed for lawful purposes. The 20th century laws DC cites thus contradict the relevant historical tradition instead of reaffirming it. Under *Bruen*, that makes them irrelevant to the analysis.

## 2.  *DC's unmoored use of analogical reasoning that defies* **Bruen**.

DC argues its magazine ban is relevantly similar to its proffered historical analogues while imposing a limited comparable burden. ECF 17 at 39, citing *Bruen*, 142 S. Ct. at 2132-33. Not even close. DC's law is a ban on a class of arms commonly possessed for lawful purposes. DC has not shown an established tradition of banning any commonly possessed arms, nor even banning the carrying of such arms. At best DC's historical analogues support a tradition of regulating how such arms are carried, e.g., prohibiting concealed carry of such arms as long as open carry is allowed. Plainly, a ban on possession of an arm, even in the home, imposes a far greater burden than a regulation on how such arm is carried. *See Heller,* 554 U.S. at  628-30. To be sure, *Bruen* did note that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to determining whether a law is consistent with historical tradition. 142 S. Ct. at 2132 (emphasis added). But it cautioned that reasoning by analogy in such cases must be carefully constrained by an inquiry into both "whether modern and historical regulations impose a comparable burden on the right of armed self-defense – here it does not – and whether that burden is comparably justified." *Id.* at 2133. It did not suggest, as does DC, that such changes give it a blank check to rely on any historical practice no matter how far removed from *Bruen*'s clear dictate that burdens on the Second Amendment must be rooted in "an enduring American tradition of state regulation," *Id.* at 2155-56 (emphasis added). Even if it did, DC's magazine ban addresses neither an "unprecedented societal concern" nor a "dramatic technological change" in firearms.

### a.  *DC's modern magazine ban does not address an unprecedented societal concern nor a dramatic technological change.*

"[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."

*Bruen*, 142 S. Ct. at n. 2131. DC contends its magazine ban addresses the supposedly unprecedented social problem of mass killings, arguing modern guns equipped with magazines over ten rounds have empowered individuals, acting alone, to commit such atrocities. ECF 17 at 42. But, tragically, mass murder is not a new phenomenon in America. It has plagued the world for centuries, as DC's own expert concedes (though claiming early mass murders were a "group activity"): "[M]ass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and non lethal violence of all kinds became more common." ECF 17-11 ¶ 40. "[F]rom the 1830s into the early twentieth century, mass killings were common." *Id.* "Mass murder is not particularly new…. Almost everything can be, and has been, used to commit mass murder in America." Cramer Decl. ¶ 46 (Ex. 14 hereto). *See also Id.* ¶ 24 (confirming more than 1,600 known mass murders by 1960). Such killings committed by a single person acting alone are not a new development either; They have persisted since at least the end of the 18th century. Professor Vorenberg tells of an 1869 mass shooting in Florida. Vorenberg ¶ 97. A single shooter "fired 'thirteen or fourteen shots in rapid succession,' killing and wounding many of the party." *Id.* "Because of the speed and volume of the shots fired," the assailant reportedly had likely used a Henry rifle. *Id.*

 Historian Clayton Cramer has been researching the history of mass murder since 2019. Ex. 14 ¶ 3 hereto. He has painstakingly examined archived articles to identify thousands of mass murders in American history. *Id.* ¶¶ 12-17. Although there are competing definitions of "mass murder," he has synthesized the FBI and Secret Service definitions for his project, defining a mass murder to include at least two murder victims within 24 hours. *Id.* ¶ 4. Further, he excludes mass murders committed during riots, gang disputes, mutual combat, acts of war or other government-backed mass killings, and most mass murders of Native Americans by other Native Americans. *Id.* ¶¶ 5-11.

Cramer finds "individual mass murder is neither particularly modern nor dependent on technological advances." *Id.* ¶ 19. And he found that firearms were used to commit several mass

murders in the 19th century. *Id.* ¶ 24 (detailing firearm-related mass murders that occurred in 1860, 1865, 1870, and 1889). Some of the mass murders described had horrific numbers of victims, such as the 1955 dynamite bombing of an airliner that killed 44 people, an arsonist killing 27 people in 1913, or another arsonist killing 95 in 1958. *Id.* All three of these were acts of lone individuals. *Id.* Mass killings are simply not a new problem in our history.

DC is engaging in a forbidden interest-balancing and legislative-deference argument, essentially telling this Court that because, it claims, our mass shooting (but not mass killing) problem is worse now, DC should be given more room to rely on stretched analogies to uphold its otherwise unprecedented law. This Court should reject that invitation. *Bruen* tells us that its examination of analogues is not meant to be a way to sneak back in the abrogated interest-balancing tests: "This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry.... Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances.... It is not an invitation to revise that balance through means-end scrutiny." *Bruen*, 142 S. Ct. at 2133, n.7.

Moreover, DC*'s* premise that mass shootings, specifically, are so common today that they rise to the level of an "unprecedented societal concern" justifying resort to a "more nuanced approach," does not comport with findings that (even today) such crimes, though horrific, really are relatively rare. *See Miller v. Bonta*, 542 F. Supp. 3d 1009, 1018 (S.D. Cal. 2021) (a mass shooting "fortunately is a rare event"). *See also* Kleck Decl. ¶ 40, Ex. 15 hereto ("[T]he risk of an American being killed in a 'gun massacre' is less than 1/14th of the risk of being killed by a bolt of lightning – itself a freakishly rare event.") Nor has there been a dramatic change in firearm technology that would not in any event justify DC's use of overextended analogies to support its magazine ban. Semiautomatic firearms with detachable magazines are a technological improvement over what came before; that much is clear. But the more significant shift occurred between the American

Revolution and the ratification of the 14th Amendment. In 1791, most firearms were single-shot weapons requiring time to reload between shots. But see Ex. 3 ¶¶ 21-23 (commenting on various multi-shot firearms that existed during or before the founding era). But by 1868, and over the decades that followed, revolvers gave Americans five or six shots in a single compact firearm, while repeating rifles like the Henry Rifle allowed the bearer to fire up to 16 shots before reloading, with only a quick operation of the lever action between each shot. Ex. 3 ¶¶ 30, n.43. The Model 1866 Winchester Rifle similarly had a capacity over ten rounds, and of the 164,466 combined Henry and Winchester Rifles that were made between 1861 and 1877, two-thirds were sold to civilians. *Id.* ¶ 31. Going from single-shot firearms to repeating rifles and revolvers is a far more significant technological leap than going from repeating rifles and revolvers to modern-day semiautomatics with detachable magazines. Yet, as Plaintiffs established above, not one law banned possession of repeating rifles, nor limited civilians to repeating rifles with capacities of 10 rounds or less.

The Civil War and Reconstruction saw a dramatic change in individual firepower, but the government did not respond by banning (or even regulating) firearms based on their capacity. Even if resorting to "analogical reasoning" were appropriate, DC has not established its modern magazine ban imposes a "comparable burden" as any historical analogue or is "comparably justified."

> ### b. DC has failed to present relevantly similar historical analogues that impose comparable burdens on Second Amendment rights to justify its magazine ban.

If this Court concludes DC*'s* modern magazine ban really does address some dramatic technological change or new social issue, the sort of "analogical reasoning" *Bruen* requires demands DC present "well established and representative" historical analogues, 142 S. Ct. at 2133, not just any law or tradition can be plucked from the history books. Although DC need not identify a "historical twin," it must present a genuine analogue—one that is "relevantly similar" to the modern restriction it seeks to defend. *Id.* at 2122. *Bruen* did not establish all the ways analogues may be

relevantly similar, but it explained that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). Speaking very generally, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6, 2022). Dissimilar historical laws cannot meet *Bruen's* standard even if they impose comparable burdens, which the one here at issue does not. And when looking at the question of whether the law imposes a "comparable burden," *Bruen*, 142 S.Ct. at 2133, courts should consider whether the challenged modern law and the proposed historical analogue impose a similar type of burden (not just a similar severity of burden) on the right of armed self-defense.

For example, old laws prohibiting concealed carry of small pistols (but allowing their open carry, or open carry of larger pistols) do not impose a comparable burden as, for example, DC's total handgun ban *Heller* invalidated. *See* 554 U.S. at 573. The former limited only the particular method of carry of some pistols, while the latter restricted even the mere possession of all pistols in the home. The burdens imposed are wildly different – even if it might be said they impose as severe or even a more severe burden on the ability to engage in self-defense at a given moment. So, they cannot meet *Bruen's* test. When looking at the "why," courts consider "whether th[e] burden is comparably justified." *Bruen*, 142 S.Ct. at 2133. This side of the analogical reasoning coin ensures historical laws enacted for one purpose are not used as a pretext to justify a modern law enacted for entirely different reasons. *Id.* This is the sort of strained comparison all of DC's proposed historical analogues rely on. For instance, as discussed above, DC's reliance on Founding-era gunpowder storage laws, ECF 17 at 34, misses the analogical mark because they do not impose "comparable burdens" nor are they "comparably justified." So while some examples of restrictions on keeping loaded guns in the home or storing gunpowder existed, those laws were not enacted to address

crime (let alone mass killings, even though they existed at the time). They were fire prevention laws enacted to prevent explosions and unintended discharges because of the highly combustible nature of gunpowder. *Id.* More importantly, while such laws restricted the manner of storing arms, they did not prohibit possession or acquisition of any arms – the burden DC*'s* magazine ban imposes.

These things are not "relevantly similar" under *Bruen* or any reasonable analysis. Not only is DC's ban not historically longstanding, but it also differs in kind from the regulatory measures *Heller* discusses. Regulations on possession by people dangerous to society, where a firearm may be carried, and how firearms may be exchanged, see *Heller*, 554 U.S. at 626-27, are about the manner or place of use and sale or the condition of the user. DC's ban, on the other hand, is much more like a "prohibition on an entire class of 'arms' that is overwhelmingly chosen by American society" for home defense. *Id.* at 628. Also, like the ban in *Heller*, DC's ban extends "to the home, where the need for defense of self, family, and property is most acute." *Id. Duncan v. Bonta*, 19 F.4th at 1158-59 (Bumatay, J. dissenting). Moreover, DC*'s* reliance on comparable burdens and justifications appears to be just a thinly veiled use of the now-rejected interest-balancing approach.

The Supreme Court did not expressly reject the interest-balancing approach only to readopt it later in the same case. "The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Bruen*, 142 U.S. at 2131 (quoting *Heller*, 554 U.S. at 635). DC seems to want to rid itself of the responsibility of having to establish similar 18th or 19th century laws altogether, but it cannot do so. *Bruen* may not impose a "regulatory straightjacket," but it also forbids the "regulatory blank check" DC is requesting. *Id.* at 2133.

## V.    *Plaintiffs have shown irreparable injury.*

The District denies Plaintiffs suffer an irreparable injury from its magazine ban, but its

argument is particularly weak, simply claiming Plaintiffs' have not shown a likelihood of success on the merits. ECF 17 at 44-45. DC thus impliedly admits that if Plaintiffs show – as they have – that they are likely to succeed on the merits, then irreparable injury is presumed from the Constitutional deprivation. *See Elrod v. Burns,* 427 U.S. 347, 373 (1976). In *Mills v. District of Columbia,* 571 F.3d 1304, 1312 (D.C. Cir. 2009) the D.C. Circuit said:

> We further conclude that appellants have sufficiently demonstrated irreparable injury, particularly in light of their strong likelihood of success on the merits. *See CityFed Fin. Corp.*, 58 F.3d [738,] 747 [(1995)]. . . . It has long been established that the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)).

*See also Archdiocese of Washington v. WMATA,* 897 F.3d 314 (D.C. Cir. 2018). As the 7th Circuit explained:

> The Second Amendment protects similarly intangible and unquantifiable interests [as the First Amendment]. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592-95. Infringements of this right cannot be compensated by damages. In short, for reasons related to the form of the claim and the substance of the Second Amendment right, the plaintiffs' harm is properly regarded as irreparable and having no adequate remedy at law.

*Ezell v. City of Chicago*, 651 F.3d at 699-700 (footnote omitted). *Accord Fisher v. Kealoha,*2012 U.S. Dist. LEXIS 90734, at *40 (D. Haw. June 29, 2012); *Morris v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 1082, 1089 (D. Idaho 2014); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016.) "'The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence and psychic comfort that comes with knowing one could protect oneself if necessary.' *Grace*, 187 F. Supp. 3d at 150." *Rhode v. Becerra*, 445 F. Supp. 3d 902, 954 (S.D. Cal. 2020). Thus, DC's magazine ban imposes irreparable injury on Plaintiffs.

**VI.    *The balance of equities and the public interest favor grant of the injunction.***

As we explained in our opening submission, the D.C. Circuit has acknowledged the "obvious"

fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), as have other circuits. *E.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest.") Those cases are dispositive of the balance of harms factor and the public interest factor despite DC's invitation (ECF 17 at 45-47) for this Court to engage in prohibited interest balancing as to the costs and benefits of magazines holding in excess of 10 rounds. *See also Archdiocese of Washington v. WMATA*, 897 F.3d at 335. In any event, DC has ample alternatives to deal with criminal misuse of such magazine. It could for example prohibit possession by persons lacking a registered firearm or impose enhanced penalties for use of such a magazine in the commission of a crime. It serves no interest outlawing such magazines for law-abiding persons like Plaintiffs.

* * *

Plaintiffs have shown they are likely to succeed on the merits of their claim; that they suffer irreparable injury from DC's magazine ban; that the balance of interests favors them as does the public interest. As such they are entitled to issuance of a preliminary injunction barring enforcement of the public transportation carry ban.

## VII.    *The Court should issue a permanent injunction.*

DC had 90 days to do its historical analogue research to justify their ban on commonly possessed magazines. It submitted some 600 pages of supporting materials and expert declarations. Yet, it failed to point to any established, distinctly similar legislation enacted during the Founding period through the end of the 19th century, nor has DC pointed to relevantly similar laws, even assuming its magazine carry ban qualifies for this more nuanced approach. *See Bruen,* 142 S.Ct. at 2132. And the laws DC does cite as relevantly similar – which they are not – did not impose comparable burdens on Second Amendment conduct, i.e., bans on possession of arms. *See Id.* at 2133.

34

No basis exists for the additional delay DC is requesting. It points only to one of its experts, Ms. Rivas, as stating she needs more time to research the background of the laws of Tennessee and Arkansas discussed in DC's opposition. ECF 17 at 49. But Ms. Rivas has already done extensive research on these two states' laws. *See* Brennan Gardner Rivas, *The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee, Second Thoughts,* Duke Center for Firearms Law (Jan. 2022). And *Bruen* specifically addressed and discounted the Tennessee and Arkansas laws Rivas discusses as outliers. *See* 142 S.Ct. at 2147, 2153 & 2155. DC has provided nothing to justify replowing this same ground.

This Court need not accede to DC's plea for more delay. To the extent the Court might nonetheless afford DC some *brief* additional time to respond to the permanent injunction request, that would be an even more compelling reason to grant Plaintiffs preliminary relief, rather than forcing them to continue to suffer further deprivation of their Second Amendment rights.

## VIII.   Conclusion.

Plaintiffs have met the requirements for grant of a preliminary injunction. They have shown likelihood of success on the merits, that they suffer irreparable injury, that the balance of harms favors an injunction and that an injunction is in the public interest. Plaintiffs request the Court grant the requested preliminary injunction. Moreover, since the District has had sufficient time to proffer support for its ban on commonly possessed firearm magazines and has failed to support it as *Bruen* requires, the Court should declare the ban on magazines capable of holding more than 10 rounds unconstitutional and permanently enjoin its enforcement.

Respectfully Submitted,

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

By: /s/ *George L. Lyon, Jr.*
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

Dated:  January 23, 2023                    *Attorneys for Plaintiffs*

## *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants through the court's ECF system, this 23rd day of January, 2023.

/s/ George L. Lyon, Jr., DC Bar 388678